*Curves for Women* ®

*thirty minute*
*fitness and weight loss centers*

*Franchise Agreement*

Curves International, Inc.
400 Schroeder
Waco, Texas 76710

—

254-399-9285
800-848-1096
facsimile 254-399-9731

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | GRANT OF FRANCHISE | 1 |
| 2. | TERM OF AGREEMENT | 2 |
| 3. | FEES AND PAYMENTS | 3 |
| 4. | FRANCHISOR'S OBLIGATIONS | 5 |
| 5. | FRANCHISEE'S OBLIGATIONS | 6 |
| 6. | TRADEMARKS | 10 |
| 7. | INDEPENDENT CONTRACTOR | 11 |
| 8. | INDEMNIFICATION | 12 |
| 9. | PROPRIETARY INFORMATION AND NONCOMPETITION | 12 |
| 10. | ASSIGNMENT AND TRANSFER | 14 |
| 11. | DEFAULT AND TERMINATION | 17 |
| 12. | FRANCHISEE'S OBLIGATIONS UPON TERMINATION, EXPIRATION OR NON-RENEWAL | 20 |
| 13. | DISPUTE RESOLUTION | 22 |
| 14. | ADMINISTRATIVE PROVISIONS | 24 |
| | SIGNATURE PAGE | 28, 29 |
| | "EXHIBIT A" | 30 |
| | "EXHIBIT B" | 31 |

## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT made this _6th_ day of _July_ , 2000 by and between **CURVES INTERNATIONAL, INC.**, a Texas corporation having its principal place of business at 400 Schroeder, Waco, Texas 76710, hereinafter referred to as the "Franchisor", and **Stephanie O'Callaghan** of **11 Glengary Rd., Croton-on-Hudson, NY 10520** , hereinafter referred to as "Franchisee".

### RECITALS:

WHEREAS, Franchisor has invested considerable time, effort and money to develop a system and method of operating a thirty minute fitness and weight loss center, and has developed public goodwill and certain trade names, service marks and logos including but not limited to the mark *Curves for Women*® ("the Trademark") for its services throughout the United States of America;

WHEREAS, Franchisee recognizes the benefits to be derived from being identified with the Curves International, Inc. system and licensed by Franchisor to use its name and the Trademark;

WHEREAS, Franchisee has studied and fully understands the system of operations, trade names, service marks and logos of Franchisor, the importance of maintaining Franchisor's high standards and the terms and conditions herein, has reviewed Franchisor's Disclosure Statement and a completed copy of this Agreement, and has had the opportunity to visit and examine more than one *Curves for Women*® centers to familiarize itself with Franchisor's program;

WHEREAS, Franchisee desires to establish and operate a thirty minute fitness and weight loss center, to become a franchisee of Curves International, Inc., and to obtain the benefits of being a franchisee thereof pursuant to the provisions of this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants, terms and conditions contained herein and other good and valuable consideration, the parties hereto agree as follows:

### 1.    GRANT OF FRANCHISE

A.    Franchisor hereby grants to Franchisee, and Franchisee accepts, an exclusive franchise to open and operate for the following stated term and on the conditions hereinafter set forth, one (1) *Curves for Women*® center and to use the trademarks, trade names, logo and emblems associated with and developed by Franchisor. The franchise is granted for the area set out in "Exhibit A" herein.

B.     Franchisee shall not move or relocate its place of business without the prior written consent of Franchisor, which consent shall not be unreasonably withheld. Such request for relocation shall be made in writing, stating the new location and received by Franchisor at least sixty (60) days prior to the date of intended relocation. The new location must remain within the area set out in "Exhibit A" herein.

C.     Franchisee shall permit Franchisor to inspect Franchisee's uses of the Trademark at all reasonable times for the purpose of ascertaining compliance with this Agreement. Franchisee shall obtain the approval of Franchisor prior to using the Trademark.

D.     Franchisee shall not do or cause any act to be done to impair Franchisor's exclusive rights, title and interests in and to the Trademark. Franchisee shall not represent that it has any ownership interest in the Trademark. Franchisee shall not adopt or use any words or marks that are similar to, or are likely to be confused with, the Trademark.

E.     Franchisee's business shall be conducted by Franchisee at one location only, located within the limits or boundaries of the exclusive franchise area as described in "Exhibit A", herein. For the purpose of this Agreement, Franchisee's business shall be deemed to include any and all phases of activity in the nature of exercise and weight loss.

F.     In order to adequately respond to changing market conditions, subject to the restrictions described in this Agreement, Franchisor reserves the right to and may use other channels of distribution or license the use of alternative proprietary marks or methods in connection with the operation of businesses which may be similar to or different from the Franchise at any location on any terms and conditions Franchisor deems advisable without granting Franchisee any right thereto.

## 2.    TERM OF AGREEMENT

The term of this Agreement shall be for a period of ten (10) years from the date of this Agreement. Franchisee may, at its option, renew this Agreement for additional periods of five (5) years, provided that:

A.     Franchisee and its owners have complied with this Agreement during its term and are in full compliance upon requesting renewal and continue complying with this Agreement until expiration thereof;

B.     Franchisee shall give to Franchisor written notice of its election to renew not less than six (6) months nor more than twelve (12) months prior to the end of the term of this Agreement;

C.     Franchisee agrees to add or replace equipment, fixtures and signs and modify the *Curves For Women®* franchise and location to bring it into compliance with specifications and standards then-applicable for new *Curves For Women®* franchises;

D.     Franchisee and its owners execute a general release of any and all claims against the Franchisor, its officers, directors, agents, and employees in the form prescribed by Franchisor; and

E.     Franchisee and its owners execute a new Franchise Agreement in the form then being used by Franchisor, which may differ as to fees and services.

If at anytime Franchisee fails to meet any of the above conditions, Franchisor may refuse to grant a renewal of this Agreement to Franchisee and its owners.

## 3.     FEES AND PAYMENTS

A.     **Initial Franchise Fee.** In consideration of the franchise granted in this Agreement by Franchisor to Franchisee, Franchisee shall pay to Franchisor the sum of Nineteen Thousand Nine Hundred Dollars ($19,900.00). The Initial Franchise Fee becomes fully earned at the time the franchise is granted. Franchisee shall pay to Franchisor the sum of Three Thousand Dollars ($3,000.00) upon execution of this Agreement. Franchisee shall further pay to Franchisor the sum of Six Thousand Nine Hundred Dollars ($6,900.00) prior to the training described in Section 4.B. in this Agreement. Franchisee shall also pay to Franchisor the sum of Ten Thousand Dollars ($10,000.00) prior to the delivery of the equipment, described in Exhibit B hereof. In addition Franchisee shall pay to Franchisor the sum of Nine Hundred Fifty Dollars ($950.00) as a Delivery Fee upon delivery of the equipment, described in Exhibit B hereof. Except as provided in this section, the Initial Franchise Fee is non refundable. In the event Franchisee does not open the Franchise within ninety (90) days from the date of execution of this Agreement in accordance with Section 5.B. of this Agreement, Franchisor shall have the right to terminate this Agreement without refunding any part of the Initial Franchise Fee. Franchisee understands that it may be required, under applicable state law, to secure permission from the appropriate government authority to operate a thirty minute fitness and weight loss center. It shall be Franchisee's responsibility to familiarize itself with all applicable laws and regulations, and Franchisor has made no representations as to the nature of such laws or Franchisee's ability to qualify under such laws. If, in Franchisor's sole opinion, Franchisee makes a reasonable effort in good faith to qualify under state law and fails to so qualify, the above-mentioned Initial Franchise Fee shall be refunded to Franchisee, except that Franchisor shall retain the sum of One Thousand Dollars ($1,000.00) to compensate it for expenses incurred in connection with this Agreement. Franchisee shall be responsible for any local or state sales tax or any other tax applicable to the purchase of the franchise and/or the fitness equipment included in the Initial Franchise Fee.

B.     **Monthly Royalty Fee.** Franchisee shall also pay to Franchisor a Monthly Service Fee of Three Hundred Ninety-Five Dollars ($395.00) payable on or before the first day of each month throughout the first twelve (12) months of the term of this Agreement. The Monthly Service Fee shall commence upon the opening of Franchisee's business to the general public, and shall be pro-rated for the first month based on the actual number of days that Franchisee shall be open to the public. Monthly Service Fees after the first month shall be paid by pre-authorized check draft.

After the first twelve (12) months of the term of this Agreement and throughout the remaining term of this Agreement, and any extension thereto, and at the discretion of the Franchisor, the Monthly Royalty Fee shall be determined by multiplying $395.00 by a fraction, the numerator of which is the Consumer Price Index, Urban Wage Earners and Clerical Workers, all items for the metropolitan area geographically nearest to the franchise location, published by the Bureau of Labor Statistics, U.S. Department of Labor, or its successors, or if none, by any other instrumentality of the United States or the state in which the franchise is located for the month of December of each succeeding year during the term of this Agreement, and any extension thereto, and the denominator of which is the Consumer Price Index for the first full calendar month of the first year of this Agreement. Notwithstanding anything to the contrary in this Agreement, in no event shall the Monthly Service Fee be less than $395.00. The Monthly Service Fee is not refundable, with the exception of any fees that may have been overpaid to Franchisor in error by Franchisee.

C.    **Advertising Fee.** Franchisor reserves the right, upon thirty (30) days written notice to Franchisee, to require Franchisee to pay to the Franchisor on or before the first day of each month, during the term of this Agreement and any extension thereof, a continuing Monthly Advertising Fee of $195.00. Monthly Advertising Fees shall be paid by pre-authorized check draft. The Monthly Advertising Fee throughout the remaining term of the Franchise Agreement, and any extension thereto, shall be obtained by multiplying $195.00 by a fraction, the numerator of which is the Consumer Price Index, Urban Wage Earners and Clerical Workers, all items for the metropolitan area geographically nearest to Your franchise location, published by the Bureau of Labor Statistics, U.S. Department of Labor, or its successors, or if none, by any other instrumentality of the United States or the state in which the franchise is located for the month of December of each succeeding year during the term of the Franchise Agreement, and any extension thereto, and the denominator of which is the Consumer Price Index for the first full calendar month of the first year of the Franchise Agreement. With the exception of anything to the contrary in the Franchise Agreement, in no event shall the Monthly Advertising Fee be less than $195.00.

Franchisor will assist in developing all advertising materials and Franchisee must have written approval from the Franchisor of all materials developed or altered by the Franchisee prior to the use of same. All Advertising Fund contributions and interest, dividends and other amounts earned thereon shall be used exclusively for network advertising, advertising in the Franchisee's market area, and for the purposes of marketing and public relations. Franchisor shall be obligated to spend at least fifty percent (50%) of the Advertising Fund contributions on national, regional or local media or other marketing techniques or programs designated to communicate the services of the franchises to the public in the sole discretion of the Franchisor. The remaining fifty percent (50%) of the Advertising Fund contributions, in addition to the above described purposes, may be expended by the Franchisor in its creation and production costs in reimbursement to the Franchisor for reasonable accounting, administrative and legal expenses associated with the Advertising Fund and for other purposes deemed appropriate by the Franchisor to enhance and promote the general recognition of the system and its marks. Franchisor shall not be liable for any act or omission with respect to the Advertising Fund which is consistent with this Agreement or done in good faith.

D.     **Late Payments and Remedies.** Any Monthly Service Fee or Monthly Advertising Fee that is more than five (5) days late shall incur a late fee of Thirty-Five Dollars ($35.00). Franchisee acknowledges and agrees that non-payment of any Monthly Service Fee, Monthly Advertising Fee, or any other fees owed to Franchisor under this Agreement shall be a material breach of this Agreement and entitle Franchisor to claim for general damages for breach of contract. No claim by Franchisee that Franchisor is in default under any provision hereof shall be a defense to a claim by Franchisor for Monthly Service Fees, Monthly Advertising Fees, or other amounts owing hereunder. Franchisee agrees that it will not, on the grounds of the alleged non-performance by Franchisor of any of its obligations hereunder, withhold payment of any amounts due to Franchisor.

## 4.     **FRANCHISOR'S OBLIGATIONS**

A.     **Location of Franchise.** Franchisor, upon request by Franchisee, shall advise Franchisee in selecting a suitable location for Franchisee's business if no address is specified herein at the time of execution. However, Franchisee shall be solely responsible for site selection and securing a lease for the premises. Prior to opening, Franchisee's location must be approved if the monthly rent of Franchisee's location exceeds One Thousand Two Hundred Dollars ($1,200.00). In the event Franchisor does not approve Franchisee's location and Franchisee, after reasonably searching within the territory granted herein, is unable to find a suitable location for Franchisee's business with a monthly rent equal to or less than One Thousand Two Hundred Dollars ($1,200.00) and, as a result of not having a suitable location, Franchisee is unable to open Franchisee's business within ninety (90) days from acceptance of this Agreement by Franchisor, Franchisor, in its discretion or upon written request by Franchisee, may return all moneys paid in accordance with this Agreement to Franchisee, and this Agreement shall be terminated. Franchisee shall have the facility completed and furnished in accordance with Franchisor's specifications within one hundred eighty (180) days of acceptance of this Agreement by Franchisor unless otherwise approved in writing by Franchisor. Franchisor's assistance shall not be considered a guarantee or warranty in any manner whatsoever that the location will be successful.

B.     **Training.** Franchisor shall provide a mandatory four and a half-day training class for Franchisee at a location and time designated by Franchisor. Franchisor shall train Franchisee in exercise physiology, nutritional counseling, marketing, sales, business systems and instructions on use of fitness equipment. There is no additional fee charged for the initial training program for the Franchisee. The Initial Franchise Fee covers the costs of this training. All expenses of Franchisee and its personnel incident to attendance at the training class, including travel, lodging, meals, transportation and other incidental expenses, shall be borne by the Franchisee. This training program must be satisfactorily completed by Franchisee before Franchisee can open its business. Franchisor reserves the right to terminate this Agreement should Franchisee fail, in the opinion of the Franchisor, to satisfactorily complete the initial training program. If Franchisee requests training in addition to that provided for above, Franchisor shall provide such instruction to Franchisee or its employees at such time and place and for such duration as may be mutually convenient; provided,

however, that the costs of such additional training, including transportation, subsistence and a reasonable charge for the services of Franchisor's representative, shall be borne by Franchisee and, if requested by Franchisor, shall be paid in advance.

C.     **Equipment and Manuals.** Franchisor shall furnish Franchisee, for the exclusive use of the Franchisee and its employees, the equipment and manuals listed in Exhibit B herein. Franchisor shall provide these manuals and any other additional manuals at Franchisor's discretion upon written request by Franchisee that Franchisor deems sufficient to commence operations. Franchisee shall provide payment for any printing and/or handling charges resulting from additional manuals not supplied in "Exhibit B" herein. All manuals shall remain the property of Franchisor, and Franchisee shall treat them as confidential and shall not disclose the contents of such manuals to persons other than its employees.

D.     **Initial and On-Going Support.** Franchisor shall provide, at its own expense, a representative at Franchisee's business during the first four (4) days of its operation for assistance, training and advice. Franchisor will provide periodic training seminars for Franchisee at such times and in such locations as selected by Franchisor. Franchisee's attendance at those seminars may be required at the sole discretion of Franchisor. All expenses of Franchisee and its personnel incident to attendance at the training seminars shall be borne by Franchisee. Provided Franchisee complies with all obligations in this Agreement, Franchisor shall periodically analyze Franchisee's sales, promotional efforts and financial status and furnish Franchisee with suggestions as to any improvements which Franchisor believes to be necessary and Franchisor shall provide Franchisee with such on-going advice and assistance as Franchisor deems necessary and appropriate.

E.     **Confidentiality.** Franchisor agrees that financial information submitted by Franchisee is confidential and shall not be disclosed to any third party without protecting Franchisee's identity unless Franchisee consents in advance of the disclosure, except as may be required in response to lawful judicial process or in response to any governmental investigation.

## 5.     **FRANCHISEE'S OBLIGATIONS**

A.     **Training of Personnel.** Franchisee shall train and instruct each person employed in the operation of Franchisee's business, other than those instructed by Franchisor, in the methods and techniques developed by Franchisor. Such training and instruction shall be based upon and given in accordance with Franchisor's training manuals, and shall be provided prior to participation by such employee in Franchisee's business.

B.     **Opening.** Franchisee shall open its business and start paying its Monthly Royalty Fee within ninety (90) days from acceptance of this Agreement by Franchisor, unless prior written consent of Franchisor grants Franchisee an extension for its opening date.

C.     **Manner of Operation.** Franchisees shall keep and maintain a safe, neat, clean and

orderly facility at a location in keeping with the standards established in Franchisor's training manuals. The minimum hours of operation shall be from 9:00 a.m. to 12:00 p.m. and 4:00 p.m. to 7:00 p.m., Monday through Friday, excluding holidays. Franchisees fiscal year shall begin on January 1 and end on December 31 of each year. To maintain uniformity within Franchisor's system and to maintain the standard practices that are necessary to promote the goodwill of Franchisor's system, Franchisee shall use in the operation of its business only the standard form of reports, stationery and printed material uniformly prescribed by Franchisor for use by members of its system. Franchisee may at its discretion purchase all such materials from Franchisor. The charge for such material if ordered from Franchisor, together with all costs for postage and handling, shall be paid in advance by Franchisee. Franchisee shall purchase check drafts for its members through a source approved by Franchisor. Franchisor reserves the right to prohibit Independent Franchisee from using any form of reports, stationery or printed matters purchased from other suppliers that deviate in any way, either in content or in the standards of quality that have been established by Franchisor in the past or may be established by Franchisor in the future. Franchisee shall maintain the highest standards of quality and workmanship in its operation of the Franchise in accordance with the standards established by Franchisor in order to provide the highest quality service to customers of Franchisee and to preserve and enhance the value of the Trademark licensed hereunder. Unless Franchisor consents in writing, Franchisee is required to personally operate and/or exercise personal supervision over the operation of the Franchise. If Franchisee is a corporation, partnership or other legal entity, Franchisee must designate a shareholder, partner or member as the "operating principal", who must be acceptable to Franchisor, and furnish all organizational and other documents regarding Franchisee's creation and structure, together with any and all amendments and modifications thereto, to Franchisor upon request. This Agreement is a personal service contract and is entered into by Franchisor with Franchisee in reliance upon and in consideration of the personal qualifications made with respect to this Agreement, who, it is agreed, will be trained by Franchisor in accordance with Section 4.B. above, and will actively participate in the operation of Franchisee's business. Additional persons may be added from time to time upon Franchisor's written approval and the successful completion of Franchisor's current training program. Franchisee agrees that it will at all times have its business managed by a person who has been trained and approved by Franchisor in accordance with Section 4.B. above.

D.    **Compliance with Laws, Rules and Regulations.** Franchisee shall, at all times, comply with all requirements set forth in this Agreement and in the manuals, and with all laws, rules and regulations of duly-constituted governmental bodies relating to Franchisee's business, and any violation of such requirements, laws, rules and/or regulations may be deemed by Franchisor to be a material breach of this Agreement. To the extent not prohibited by such laws, rules and regulations, Franchisee shall strictly follow and comply with the procedures, methods and standards set forth in Franchisor's training manuals and subsequent revisions of those manuals, and directives that are from time to time issued by Franchisor pertaining to the instruction of employees and to the operation of Franchisee's business.

E.    **Insurance.** Franchisee shall purchase and maintain in effect at all times during the term of this Agreement a policy or policies of insurance, naming Franchisor as an additional insured

on the face of each policy, at Franchisee's sole cost and expense, as follows:

1.    Public liability in no less than the following amounts, which amounts shall be changed from time to time on written notice by Franchisor: Bodily injury-One Million Dollars ($1,000,000) each person, One Million Dollars ($1,000,000) each accident; and, property damage-One Million Dollars ($1,000,000) each accident;

2.    Workers' compensation insurance as required by state law; and,

3.    Automobile liability insurance as provided by state law.

All such policies of insurance shall contain a statement that they cannot be canceled without thirty (30) days' prior written notice to Franchisee and to Franchisor. Franchisee shall provide documentary evidence to Franchisor that such insurance is in full force and effect promptly on request by Franchisor. Franchisee shall promptly notify Franchisor of any and all claims against Franchisee and/or Franchisor.

F.    **Reports.** Franchisee shall furnish to Franchisor monthly reports regarding the operation of Franchisee's business for the preceding month, such reports to be received by Franchisor on or before the fifth day of each month. The reports shall be prepared on forms prescribed by Franchisor for that purpose. Franchisee shall keep true and correct business records and books of account and shall establish and maintain such records in accordance with methods and procedures recommended by Franchisor.

G.    **Advertising and Promotion.** Franchisee shall place in the yellow pages of the telephone directory serving its market area advertisement(s) as prescribed by Franchisor in the Confidential Master Copies Manual received at the initial training program. Additional yellow page advertisements may be placed by Franchisee, but only in the most recent form prescribed by Franchisor. Franchisee agrees to participate in all non-price related marketing and public relations programs instituted by any future Advertising Funds. Franchisee shall not engage in any deceptive, misleading or unethical advertising which, in the sole discretion of Franchisor, might be injurious or detrimental to Franchisor, Franchisor's trademarks, the system or the public. Franchisee shall use the trademarks of Franchisor only in the forms prescribed by Franchisor. All advertising or promotional materials, signs or other items which Franchisor designates to bear the Franchisor's trademarks shall be in the form, color, location and manner prescribed by Franchisor.

H.    **Trademarks and Trade Names.** In connection with the operation of Franchisee's business, including advertising, Franchisee shall use no name or service mark other than the name *Curves for Women®* or any derivative of such name. Franchisee shall identify itself as a holder of a license from the Curves International, Inc., unless applicable law requires other or additional identification. Franchisee shall use the name and service mark in such format and with such suffix or prefix as Franchisor may from time to time designate. Franchisee shall not register the Trademark with any state authority. Except when necessary to comply with required purchases in accordance

with this Agreement, Franchisee shall not place the Trademark nor give any third party the Trademark for the purpose of placing the Trademark on any products, supplies, or any other item in any form for any purpose unless Franchisee acquires prior written approval by Franchisor.

I. **Financial Inspection.** To assist Franchisor in providing Franchisee with on-going advice and assistance, and to determine whether Franchisee is complying with the terms of this Agreement and with the specifications, standards and procedures established for operation of the Franchise, Franchisor, or its authorized representative, shall have the right, during regular business hours, or at such other times as may be mutually agreed upon, to inspect all records and books of accounts maintained by Franchisee with respect to Franchisee's business. Franchisor shall have the right to examine customer/membership records, both active and inactive, and any other related records. Upon request by Franchisor, Franchisee shall promptly furnish to Franchisor copies of social security reports, state and federal unemployment reports, federal income tax returns, state income, franchise or other tax returns, and such other federal, state, county or city reports as may be requested.

J. **Reimbursement of Legal Fees.** If it becomes necessary for Franchisor to engage the services of an attorney in order to defend any claim made or action brought by any third party as a result of Franchisee's actions or inactions under this Agreement, Franchisor is entitled to indemnification from Franchisee and is entitled to recover reasonable attorney's fees, court costs and expenses from Franchisee. Otherwise, in the unlikely event that a dispute occurs or an action in law or equity arises between Franchisor and Franchisee concerning the operation, enforcement, construction or interpretation of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees, court costs and expenses incurred by the other party in the action.

K. **Prohibition Against Encumbrance.** Without Franchisor's prior written consent, Franchisee shall not grant any security interest in this Agreement, in the Franchise, or in any membership agreements or membership check drafts used in the operation of the Franchise, nor shall any ownership interest in any corporate Franchisee be pledged or encumbered. If Franchisor consents to the grant of a security interest, the secured party must agree that in the event of Franchisee's default under the security interest, Franchisor or its designee shall be notified of the default and shall have the right but not the obligation to be substituted as a obligor to the secured party and/or to cure the default. In no event shall this requirement be construed to make Franchisor liable to Franchisee or to the secured party.

L. **Equipment, Products and Supplies.** In order to provide products and services of the highest quality and in the most expeditious manner, and in order to protect the trade secrets of Franchisor, Franchisee will use and purchase the equipment provided, prescribed and required by Franchisor in operation of Franchisor's system. Franchisee shall offer and sell only the goods and services which conform to Franchisor's standards and specifications. Franchisee shall offer all goods and services that Franchisor designates as required for all franchisees. Franchisor restricts services provided by Franchisee to thirty minute and weight-loss services and to offering for sale weight-loss related products, as specified in the manuals, and in the changes thereto as may be, from time to

time, provided to the Franchisee. Except when necessary to comply with required purchases in accordance with this Agreement, Franchisee shall not place the Trademark nor give any third party the Trademark for the purpose of placing the Trademark on any products, supplies, or any other item in any form for any purpose unless Franchisee acquires prior written approval by Franchisor. Franchisor reserves the right to add additional authorized services that Franchisee is required to offer.

M.     **Franchisee's Signs.** Franchisee shall erect inside and outside of its business such signs as are specifically approved by Franchisor and which conform to Franchisor's specifications. No other sign, regardless of content, sign or construction may be erected or used without Franchisor's prior written approval.

## 6.     TRADEMARKS

A.     **Franchisor's Ownership of the Trademarks.** Franchisee agrees that the trademark *Curves for Women®* (Trademark) is the exclusive property of Franchisor and Franchisee asserts no claim and will hereafter assert no claim to the ownership thereof or to any goodwill attendant thereto. Franchisee further covenants that it will not contest Franchisor's ownership of the Trademark or its validity nor will it do or permit any act or thing to be done in derogation of any of the rights of Franchisor in connection with the Trademark either during the term of this Agreement or thereafter. Nothing in this Agreement shall be construed to give Franchisee any right, title or interest in or to the Trademark except for a revocable privilege and license to display and use the Trademark during the term of and pursuant to the conditions contained in this Agreement. Franchisee expressly understands and agrees that it has not acquired and will not acquire any ownership interests, equitable rights, goodwill or other interests in any Trademark by virtue of this Agreement, its relationship with Franchisor, or Franchisee's use of the Trademark and will not represent that it has. Franchisee also understands and agrees that following the expiration or termination of this Agreement for any reason, it shall not attribute any monetary amount to any goodwill associated with its use of the Trademark or in connection with its operation of the Franchise.

B.     **Modification of Marks.** If Franchisor, in its sole discretion, decides to modify or discontinue use of the Trademark and/or to adopt or use one or more additional or substituted trademarks, Franchisee shall promptly conform its use of the Trademark as directed, in writing, by Franchisor. The sole obligation of Franchisor in any such event shall be to reimburse Franchisee for its documented costs of compliance (such as changing signs, letterhead, etc.), and Franchisee waives any other claim arising from or relating to any such change, modification or substitution of trademarks.

C.     **Franchisee's Use of the Trademark.** Franchisee acknowledges that Franchisor's prior written consent is required for the use of the Trademark, or any other mark Franchisor owns or will own, except as granted herein. Franchisee shall not use the Trademark, or any form of the Trademark, as part of its name if Franchisee is or becomes a corporation or other legal entity.

Franchisee shall use the Trademark and/or any trademark or service mark or trade name adopted by Franchisor, or other written instructions from Franchisor, including the form and manner and appropriate legends as may be prescribed from time to time. Franchisee agrees not to use any other trademark, service mark or trade name in combination with the Trademark without Franchisor's prior written consent. Franchisee shall permit reasonable inspections of the Franchise to monitor with specimens of all uses of the Trademark upon request.

D.      **Defense of the Marks.** If Franchisee learns of any claim, suit or demand against Franchisee or the Trademark on account of any alleged infringement, unfair competition, or similar matter relating to the Trademark, or any unauthorized use of the Trademark, Franchisee shall promptly notify Franchisor, in writing. Franchisor may, but is not obligated to, take such action, if any, as Franchisor, in its sole discretion, deems necessary or appropriate in connection therewith. Franchisor shall have the sole right to defend, compromise or settle any such claim at Franchisor's sole cost and expense, using attorneys of its own choosing. Franchisee agrees to cooperate fully with Franchisor in connection with the defense of any such claim and hereby irrevocably appoints Franchisor to defend or settle all of such claims, demands or suits. Franchisee may participate at its own expense in such defense or settlement, but Franchisor's decisions shall be final and binding upon Franchisee. Franchisee shall not settle or compromise any such claim without the prior written consent of Franchisor. Franchisor agrees to indemnify and hold Franchisee harmless against any claim or demand arising from Franchisee's authorized use of the Trademark provided Franchisee has notified Franchisor of the claim or demand as required by this Section.

## 7.      INDEPENDENT CONTRACTOR

A.      It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between Franchisee and Franchisor, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever. Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name.

B.      During the term of this Agreement, and any extension hereof, Franchisee shall hold itself out to the public as an independent contractor operating the Franchise pursuant to a franchise agreement with Franchisor. Franchisee agrees to conspicuously post notices to that effect in such locations and by such means determined reasonably necessary by Franchisor to inform the public, customers and suppliers. Franchisor reserves the right to specify the content of such notices as well as where and when the notices shall be posted.

C.      Franchisee shall be responsible for, and shall promptly pay when due, all expenses of Franchisee's business, including all taxes and levies of any kind in connection with Franchisee's

business and the income arising from such business. Franchisor shall not be liable for any such expenses, taxes, levies, or disbursements otherwise paid or incurred in connection with the establishment and operation of Franchisee's business.

D.      Franchisor shall not regulate the hiring or discharge of Franchisee's employees, officers or agents, the parties from whom Franchisee may accept business, the working conditions of Franchisee's employees, officers or agents or Franchisee's contracts with customers, suppliers or others, except to the extent necessary to protect Franchisor's system, trade name, trademarks and the goodwill associated therewith.

## 8.    INDEMNIFICATION

**Franchisee agrees to indemnify and hold harmless Franchisor, its officers, agents and employees from any and all liability, loss or damage Franchisor may suffer as a result of claims, demands, costs or judgments against Franchisor arising out of the operation of Franchisee's business or any acts of Franchisee, its officers, agents or employees, whether the liability, loss or damage is caused by or arises out of the negligence of Franchisor, its officers, agents, employees, or otherwise.  The indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.**

## 9.    PROPRIETARY INFORMATION AND NONCOMPETITION

A.      **Manuals and Confidential Information.**  In order to protect the reputation and goodwill of Franchisor, to maintain uniform standards of service and operation under Franchisor's Trademark and system, to promote the goodwill of Franchisor's system, and for the mutual benefit of Franchisor and Franchisee, Franchisor shall provide Franchisee with manuals and Franchisor's system in accordance with this Agreement.  Franchisee acknowledges that all manuals are confidential and Franchisee does not acquire any right, title or interest in the manuals. The manual, and the information contained in them, shall at all times remain the property of Franchisor. Franchisee also acknowledges that Franchisor has developed, and may continue to develop or revise in the future, the system pertaining to the Franchise, and further acknowledges that this system, together with information pertaining to customers of the system, are trade secrets of Franchisor which have been developed through the research of and at the expense of Franchisor. During the term of this Agreement or any time thereafter, Franchisee shall not (except as otherwise contemplated by this Agreement) communicate, divulge or use for itself or for the benefit of any other person, persons, partnership, association, corporation or entity any information, knowledge or know-how concerning Franchisor's manuals and system. Franchisee acknowledges that Franchisor's manuals and system are confidential and will not at any time contest the confidentiality of the information in them or Franchisor's sole ownership of them.  Franchisee shall only divulge information concerning Franchisor's manuals and system to those employees of Franchisee who must have access to it in order to participate in the operation of the Franchise. Franchisee shall also

cause its employees and, if Franchisee is a corporation, partnership or other legal entity, its shareholders, officers, members, directors and partners, to sign an agreement to safeguard all confidential information concerning Franchisor's manuals and system. Franchisor may make additions to, deletions from or revisions of the manuals as Franchisor deems necessary, and such additions, deletions and modifications shall become part of the manuals and shall be binding upon Franchisee, immediately after Franchisee's actual or deemed receipt of such additions, deletions or modifications; provided, however, that such additions to, deletions from or revisions to the manuals shall not alter Franchisee's status and rights under this Agreement. Franchisee shall conduct the operation of the Franchise in accordance with Franchisor's manuals and system. Upon the expiration or other termination of this Agreement for any reason, Franchisee shall return any of Franchisor's manuals and all supplements thereto to Franchisor.

B.      **Covenant Not to Compete.** Franchisee shall not own an interest in, conduct or operate, directly or indirectly, or be employed by or associated in any way with any aerobics, women's fitness and/or weight loss business other than that of Franchisor during the term of this Agreement. Franchisee shall not at any time, directly or indirectly, furnish any information as to Franchisor's methods of operation, advertising, publicity, promotion ideas or any other information relative to Franchisee's business, or to any other business licensed, owned or managed by Franchisor or any subsidiary of Franchisor to anyone except Franchisor. Franchisee acknowledges that the names *Curves for Women®, Quickfit*, and *The Heavin Formula* , the business reputation associated with such names, the methods and techniques employed by Franchisor, the training and instruction to be provided under and pursuant to this Agreement, the knowledge of the services and methods of Franchisor, and the opportunities, associations and experience established and acquired by Franchisee under and pursuant to this Agreement and as a member of the license system, are of considerable value. In consideration thereof, Franchisee therefore covenants and agrees that, except for any interest which Franchisee has in a competitive business on the effective date of this Agreement, by its signature hereinbelow, specifically consents, Franchisee shall not, directly or indirectly, as a proprietor, partner, investor, shareholder, member, director, officer, employer, employee, principal, agent, adviser, franchisor, franchisee, consultant or in any other individual or representative capacity or otherwise for a period of three (3) years immediately following the later of the expiration, termination or non-renewal of this Agreement for any reason or the date on which Franchisee actually ceases operation:

1.      engage in or participate in or derive any benefit from any similar business to that licensed and established under and pursuant to this Agreement within forty (40) miles of the area listed on "Schedule A" herein, without Franchisor's prior written consent. If Franchisor grants permission for Franchisee to engage in the operation of a similar business as set forth above, Franchisee agrees that Franchisee will pay Franchisor a Royalty Fee for a period of twenty-four (24) months in accordance with Section 3.C. herein in addition to any other sums due and owing to Franchisor; or

2.      employ or seek to employ any person who is employed by Franchisor or any other Franchisee, or otherwise induce or seek to induce such person to leave his or her

employment; or

3.      interfere or attempt to interfere with any of the business relationships and/or advantages of Franchisor or any other Franchisee; or

4.      use any confidential information from Franchisor's manuals or system in any manner which would be damaging or derogatory or hinder the relationship of Franchisor with its other Franchisees or the relationship of any other Franchisee with its customers; or

5.      use the Trademark, or any form of the Trademark, any other mark owned by Franchisor at the time of expiration, termination or non-renewal of this Agreement, or any confidential information from Franchisor's manuals or system in any manner to engage in or participate in or derive any benefit from any similar business to that licensed and established under and pursuant to this Agreement; or

6.      divert or attempt to divert any customer or business from Franchisor or any other Franchisee or solicit or endeavor to obtain the business of any person who shall have been a customer of Franchisee's Franchise.

C.      **Injunctive Relief.** Franchisee acknowledges and agrees that the damage caused to Franchisor by Franchisee's violation of any portion of this Section 9 shall constitute irreparable injury for which there is no adequate remedy at law and, accordingly, acknowledges and agrees that Franchisor may seek enforcement of this Section 9 by temporary restraining order, temporary and/or permanent injunction, and such other legal or equitable relief as may be appropriate.

## 10.   ASSIGNMENT AND TRANSFER

A.      As used in this Agreement the term "transfer" shall mean and include the voluntary, involuntary, conditional, direct or indirect assignment, sale, gift or other transfer by Franchisee or any of its owners of any interest in or grant of any security interest in: (a) this Agreement; (b) the Franchise; (c) Franchisee; or (d) some or all of the assets of the Franchise (other than inventory items in the ordinary course of business). As used above, an assignment, sale or other transfer shall include the following events: (1) the transfer of ownership of shares or a partnership interest; (2) merger or consolidation or issuance of additional securities representing an ownership interest; (3) any sale of voting shares of Franchisee or any security convertible to voting shares of Franchisee or any agreement granting the right to exercise or control the exercise of the voting rights of any holder of an ownership interest; or (4) transfer in a divorce, insolvency, corporate or partnership dissolution proceeding or, in the event of the death of Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession or otherwise by operation of law.

B.      **Assignment by Franchisor.** Franchisor may assign this Agreement and all of its rights and privileges hereunder to any other person, firm or corporation; provided, however, that in respect to any assignment resulting in the subsequent performance by the assignee of the functions

of Franchisor, the assignee shall, at the time of such assignment, be economically capable, in Franchisor's reasonable judgment, of performing the obligations of Franchisor hereunder and expressly assume and agree to perform such obligations.

C.    **Notice of Assignment by Franchisee.** Franchisee and its owners may not transfer the Franchise or any interest therein unless Franchisee first notifies Franchisor of such intention by written notice by certified mail setting forth the proposed assignee's name, address, statement of financial qualification and business experience during the previous five (5) years. Within sixty (60) days of receipt, Franchisor must notify Franchisee as to whether or not Franchisor approves the proposed assignee. If Franchisor does not reply within sixty (60) days of the required notification by Franchisee, then Franchisor's approval is deemed granted. No transfer is deemed valid unless the proposed assignee agrees in writing to comply with all the requirements of the Franchise then in effect. Unless approval is granted in writing by Franchisor, no transfer is deemed valid without the proper notification of the transfer by Franchisee as set out herein.

D.    **Franchisor's First Right of Refusal.** If Franchisee or any shareholder thereof has received and desires to accept a *bona fide* offer from a third party to purchase Franchisee's interest in the Franchise, Franchisee or shareholder shall first notify Franchisor of such offer, and Franchisor shall have the right and option, exercisable within twenty (20) days after notification, to purchase Franchisee's Franchise or shareholder's interest as offered by the third party. This right of first refusal shall not be applicable on the part of Franchisor if any partner or shareholder listed in the current Franchise Agreement desires to sell to an existing partner or shareholder. Should Franchisor not exercise this option and the terms of the unaccepted offer be altered, Franchisor must be notified of the altered terms and shall have twenty (20) additional days from the date of notification to purchase on the altered terms. Should Franchisor not exercise this option, Franchisee may transfer its interest in the manner set forth below.

E.    **Assignment by Franchisee.** Franchisee shall not have the right to transfer or assign this Agreement prior to opening the Franchise. Franchisee acknowledges that Franchisor is entering into this Agreement in reliance upon and in consideration of Franchisee's business skill, financial capacity, aptitude and other qualifications. Accordingly, the rights and duties created by this Agreement are personal to Franchisee and neither Franchisee's interest in this Agreement nor any of its rights or privileges hereunder nor the Franchise or any interest therein may be assigned, transferred, shared or divided, voluntarily or involuntarily, directly or indirectly, by operation of law or otherwise, in any manner, without the prior written consent of Franchisor, which consent shall not be unreasonably withheld, provided that Franchisee complies with the provisions of this Section. Any actual or intended assignment, transfer or sale made or accomplished in violation of the terms of this Section shall be null and void and shall constitute a material breach of this Agreement which may give rise to termination of this Agreement. Franchisor's consent to a proposed assignment shall be conditioned upon the following requirements:

1.    the payment of a transfer fee in the amount of Two Thousand Dollars ($2,000.00) to Franchisor by Franchisee or assignee; and

2. Franchisor's receipt of required notification by Franchisee as required herein and any forms required by Franchisor that Franchisor is then using in evaluating prospective purchasers of new franchises; and

3. Franchisor's approval of the proposed assignee and the meeting of minimum financial criteria by the proposed assignee within the standards that Franchisor is then applying in evaluating prospective purchasers of new franchises; and

4. the payment in full to Franchisor of all outstanding debts of Franchisee; and

5. payment of all debts and obligations owed to third parties which were incurred by Franchisee in connection with the Franchise; and

6. the signing of a general release of all claims against Franchisor by Franchisee; and

7. the proposed assignee's execution of the then-current Franchise Agreement; and

8. the delivery of any information required by the rules and regulations of any franchise disclosure legislation to be delivered to the proposed assignee at least ten (10) days prior to any assignment; and

9. the successful completion of the initial training seminar then required of all new franchisees of Franchisor, unless such training is waived by Franchisor in writing by reason of the assignee's prior experience or training; and

10. the delivery by Franchisee or assignee to Franchisor, prior to execution, a copy of the contract conveying the Franchise to the assignee, and Franchisor shall, in its reasonable judgment, not have objected to such contract within fifteen (15) business days after receipt of such contract.

F. **Transfer Due to Death or Incapacity.** The transfer of Franchisee's interest in this Agreement in the event of the death or legal incapacity or permanent disability of Franchisee or the operating principal, if a transfer or assignment is necessary as a result of such an event, shall not constitute an assignment requiring payment of a transfer fee, as set forth herein, so long as the person designated by Franchisee's heirs, legatees, personal representative, conservator or guardian, as applicable:

1. applies in writing to Franchisor within ninety (90) days after death or legal incapacity or permanent disability of Franchisee for Franchisor's approval to transfer the Franchise, or the interest of the deceased or disabled shareholder if Franchise is held by a corporation; and

2. meets Franchisor's standards for new franchisees; and

3. agrees to be bound by the terms and conditions of the Franchise Agreement then in effect between Franchisor and Franchisee; and

4. executes a consent to be so bound; and

5. satisfactorily completes Franchisor's then-current training requirements.

In the event of death or legal incapacity or permanent disability of Franchisee or the operating principal requiring a transfer or assignment of Franchisee's interests in this Agreement or in the Franchise, Franchisor may, at its sole discretion, assume the operation of the Franchise pending the transfer or assignment.

G. **Transfer to Franchisee's Corporation.** If an individual Franchisee desires to assign this Agreement to a corporation formed or controlled by Franchisee, Franchisor will grant its consent, provided:

1. Franchisee is, and covenants to remain, the owner of the majority of the voting stock of the corporation or, if Franchisee is more than one individual, each individual shall have the same proportionate ownership interest in the corporation as that individual had in the Franchise prior to the transfer; and

2. all corporate documents reasonably required by Franchisor are provided to Franchisor prior to the transfer; and

3. Franchisee or another qualified individual is designated "operating principal" in accordance with Section 5.C. hereof; and

4. Franchisee and/or the principal shareholders of the assignee corporation personally guarantee the obligations to be performed under this Agreement by the Franchisee corporation.

## 11. DEFAULT AND TERMINATION

A. **By Franchisor, Without Notice.** Franchisee shall be deemed to be in default of this Agreement, and Franchisor may, at its sole option, terminate the Agreement and all rights hereunder, without affording Franchisee an opportunity to cure the default, effective immediately upon receipt of notice by Franchisee, if:

1. Franchisee becomes insolvent or makes a general assignment for the benefit of creditors; or proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee or a petition in bankruptcy is filed by Franchisee

or such a petition if filed against and not opposed by Franchisee or Franchisee is adjudicated a bankrupt or insolvent or a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee or a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or

2.    a final judgment related to the Franchisee remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed); or the Franchise is dissolved; or execution is levied against the Franchisee; or suit to foreclose any lien or mortgage against the Franchise or its equipment is instituted against Franchisee and not dismissed within thirty (30) days; or the real or personal property of the Franchise must be sold after levy thereupon by any sheriff, marshal or constable; or

3.    Franchisee has made any material misrepresentations or misstatements to Franchisor on the application for the Franchise, or with respect to the ownership of Franchise; or

4.    Franchisee ceases to operate the Franchise one (1) business day (excluding vacations or holidays) when, in Franchisor's opinion, the ability of Franchisee to resume an effective operation has been substantially impaired, or Franchisee otherwise abandons the Franchise at any time, or Franchisee otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located; or

5.    Franchisee is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect upon the Franchise, the Trademark, the goodwill associated therewith, or Franchisor's interest therein; or

6.    Franchisee discloses or divulges the contents of Franchisor's manuals or other confidential information provided to Franchisee by Franchisor, contrary to the terms of the Agreement; or

7.    Franchisee knowingly maintains false books or records, or knowingly submits any false or fraudulent reports, statements or documents to Franchisor; or

8.    Franchisee misuses or makes any unauthorized use of the Trademark or any other identifying characteristics of Franchisor's system, or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein; or

9.    Franchisee fails to maintain insurance at all times in accordance with this Agreement.

B.    **By Franchisor, With Notice.** Except as set forth in Section 11.A. above, Franchisee will have fifteen (15) days after receipt of a written Notice of Default from Franchisor within which to remedy any default under this Agreement and provide evidence thereof to Franchisor; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the fifteen (15) day period (or within such longer period as Franchisor may, at its sole option, grant), and by promptly providing proof thereof to Franchisor. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon the expiration of the fifteen (15) day period or such longer period as applicable law may require. Franchisee shall be in default under this Agreement for failure to comply with any of the requirements imposed by the Agreement, as it may from time to time be reasonably supplemented by Franchisor's manuals, or fails to carry out the terms of this Agreement in good faith. Such defaults include, but are not limited to; if Franchisee:

1.    fails, refuses, or neglects to pay promptly any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit any information required by Franchisor under this Agreement; or

2.    fails to maintain or observe any of these standards, specifications or procedures prescribed by Franchisor in this Agreement, Franchisor's manuals, or otherwise in writing; or

3.    fails, refuses, or neglects to obtain Franchisor's prior written consent as required by this Agreement; or Franchisee or any partner or shareholder in the Franchise purports to sell, transfer or relinquish any rights or obligations under this Agreement or any interest in the Franchise to any third party without Franchisor's prior written consent, contrary to the terms of this Agreement; or

4.    or Franchisee's heirs, legatees, personal representative, conservator or guardian, as applicable, fails to dispose of Franchisee's interest in the Franchise following Franchisee's death or permanent disability or legal incapacity as outlined in this Agreement; or

5.    engages in a similar business to that licensed and established under and pursuant to this Agreement without obtaining Franchisor's prior consent and paying Royalty Fees, or violates the covenant against competition, or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Trademark; or

6.    fails to comply with any of the covenants, provisions, or conditions, or fails to obtain execution of the covenants required by this Agreement or any other agreement executed between Franchisor and Franchisee; or

7.    refuses to permit Franchisor to inspect the Franchise, or the books and records

of the Franchise upon demand; or

8.     allows any dispute, disagreement or controversy between or among partners, managers, officers, directors or stockholders of Franchisee which, in the reasonable opinion of Franchisor, adversely affects the operation of Franchisee, the Franchise, or the interest of Franchisor to continue; or

9.     fails to commence operation of the Franchise within ninety (90) days from acceptance of this Agreement by Franchisor, unless prior written consent of Franchisor grants Franchisee an extension for its opening date; or

10.     receives an excessive amount of customer complaints against the Franchise and/or Franchisee and an investigation by Franchisor determines these complaints to be warranted; or

11.     a threat or danger to public health or safety results from the maintenance or operation of the Franchise; or

12.     Franchisee, upon receiving notice of termination for a default specified under this Agreement, fails to immediately initiate a remedy to cure such default; or

13.     Franchisee, after curing a default pursuant to this Agreement, commits the same default again, whether or not cured after notice; or

14.     Franchisee is repeatedly in default under this Agreement for failure to substantially comply with any of the requirements imposed by this Agreement, whether or not cured after notice; or

15.     Franchisee fails or refuses to conduct and govern its business or the operation of Franchise according to any applicable or governing law, rules or regulations of any governmental or other body, or any other appropriate organization, or any law, ordinance, rule or regulation of the Federal, State, Municipal or City government having jurisdiction.

C.     **By Franchisee.** There are no conditions contained in this Agreement under which Franchisee may terminate this Agreement prior to the expiration of its term except by mutual agreement with Franchisor and execution of a mutual release or by sale of the Franchise to another franchisee in good standing or to a qualified third party.

D.     **Notice As Required by Law.** Notwithstanding anything to the contrary contained in this Section, if applicable law or regulation limits Franchisor's rights to terminate or requires longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods or restrictions upon termination required by such laws and regulations. Franchisor shall not, however, be precluded from contesting the validity, enforceability

or application of such laws or regulations in any action, arbitration, hearing or dispute relating to this Agreement or the termination thereof.

## 12.    FRANCHISEE'S OBLIGATIONS UPON TERMINATION, EXPIRATION OR NON-RENEWAL

A.    **Franchisee's Obligations.** Immediately upon termination, expiration or non-renewal of this Agreement for any reason, all rights granted to Franchisee shall terminate and Franchisee shall thereafter:

1.    cease to use Franchisor's system and methods of operation and comply with the post-term covenants contained in Section 9 herein; and

2.    cease to use the Trademark or any confusingly similar name, device, mark, service mark, trademark, trade name, slogan or symbol used in connection with the Franchise, including any reproduction, counterfeit copy, variation, emulation or colorable imitation thereof which is likely to cause confusion or mistake or deceive the public; and take any steps necessary to change the name of any corporation or entity which Franchisee may have formed, or under which Franchisee trades or does business, so that the name will not likely be confused with Franchisor's Trademark; and

3.    promptly assign to Franchisor any interest that Franchisee may have in the telephone number and telephone listing used by Franchisee in connection with the operation of its business. Franchisee shall promptly transfer all telephone calls by call-forwarding to Franchisor or to such other party or entity as Franchisor shall direct; to execute any such instruments and take such actions as Franchisor may deem necessary to affect such transfer and call-forwarding of telephone calls. Franchisee acknowledges that this Agreement shall be conclusive evidence of Franchisor's rights to such telephone numbers and directory listings and its authority to direct this transfer; and

4.    promptly assign to Franchisor, upon Franchisor's demand, any interest and right that Franchisee may have in the building where the franchise granted herein is located and operates, unless Franchisee owns said building; and

5.    promptly assign and deliver to Franchisor, at Franchisee's expense, any and all check drafts for any and all memberships, any and all membership lists, past and present, and any and all leads for potential members for the business. Franchisee shall not duplicate any membership lists or leads, past or present, used in any manner with the business, and, after deliverance of said materials to Franchisor, Franchisee shall destroy any and all copies of membership lists, leads, and check drafts used in any manner with the business; and

6.    promptly pay all sums and debts owing to all third-party creditors of the

Franchise as well as to Franchisor and its affiliates, whether such sums and debts owing to Franchisor and its affiliates are evidenced by promissory note, invoice, bill or other writing and notwithstanding the fact that such sums and debts owing to Franchisor and its affiliates may not at that time be fully due and payable, such debts being accelerated automatically without further notice to Franchisee. If termination is for any default of Franchisee, sums owing to Franchisor shall include all damages, costs and expenses (including reasonable attorney's fees) incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the vehicles, personal property, furnishings, equipment, signs, inventory, fixtures or other assets owned by Franchisee and used in the Franchise at the time of default; and

7.      return to Franchisor, at Franchisee's expense, all printed material furnished to Franchisee, including, without limitation, all Franchisor's manuals, advertising material, stationery and printed forms and all other matters relating to the operation of the Franchise and/or bearing the Trademark which may be in Franchisee's possession or control at the time of such expiration, termination or non-renewal; and

8.      sell to Franchisor, at Franchisor's sole discretion and upon Franchisor's demand, all Quickfit equipment identified in Exhibit B herein owned by Franchisee. If Franchisee has used the Quickfit equipment identified in Exhibit B herein as collateral for any type of debt, Franchisee shall promptly satisfy whatever amount necessary to release and clear the Quickfit equipment identified in Exhibit B herein. Franchisor shall have the right to purchase the Quickfit equipment identified in Exhibit B herein from Franchisee at a purchase price in accordance with the following payment description; if the Quickfit equipment identified in Exhibit B herein has been used (calculated based on Franchisee's original opening date): less than one (1) year - $7,500; between one (1) year and two (2) years - $5,000; between two (2) years and three (3) years - $3,000; between three (3) years and four (4) years - $2,500; between four (4) years and five (5) years - $2,000; and more than five (5) years - $1,500. Each piece of the Quickfit equipment identified in Exhibit B herein must be in operable condition or Franchisor may attribute a discount for each inoperable piece of equipment in accordance with the above payment description; and

9.      satisfactorily resolve all customer disputes, or reimburse Franchisor or any Franchisee who does so for the reasonable cost of such services; and

10.      refrain from doing anything that would imply or indicate that, or might be anticipated to imply or indicate that, Franchisee is an authorized *Curves for Women®* franchisee.

B.      **Execution of Documents.** Franchisor may, if Franchisee fails or refuses to do so, execute in Franchisee's name and on its behalf, any and all documents necessary to effect the obligations of Franchisee under Sections 12.A.2 and 3 and Franchisee hereby irrevocably appoints Franchisor as Franchisor's attorney-in-fact to do so.

C.    **Franchisor's Rights Not Prejudiced.** The expiration, termination or non-renewal of this Agreement shall be without prejudice to Franchisor's rights against Franchisee and such expiration, termination or non-renewal shall not relieve Franchisee of any of its obligations to Franchisor existing at the time of expiration, termination or non-renewal, nor will it terminate those obligations of Franchisee which by their nature survive the expiration, termination or non-renewal of this Agreement.

## 13.    DISPUTE RESOLUTION

A.    **Agreement to Use Procedure.** Franchisor and Franchisee have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with the same spirit of cooperation that they pledge to attempt to amicably resolve any controversy or claim arising out of or relating to this Agreement or the breach thereof or the transaction embodied therein (a "Dispute"), without the necessity of litigation. If a Dispute arises, the parties agree to utilize the procedures described herein before commencing any legal action. If a party fails to utilize these procedures prior to commencement of any legal action, the other party shall be entitled to a sixty (60) day abatement of the legal action upon filing the appropriate procedural motion in the legal proceeding and bringing this provision to the attention of the court or other legal authority having jurisdiction over the matter.

B.    **Initiation of Procedure.** The initiating party shall give written notice to the other party, describing the nature of the Dispute, its claim for relief and identifying one or more individuals with authority to resolve the Dispute on such party's behalf. The other party shall have ten (10) business days within which to designate in writing one or more individuals with authority to resolve the Dispute on such party's behalf ("Authorized Individuals").

C.    **Direct Negotiations.** Authorized Individuals shall be entitled to investigation of the Dispute as they deem appropriate, but agree to meet promptly, and in no event later than thirty (30) days from the date of the initiating party's written notice, to discuss resolution of the Dispute. Authorized Individuals shall confer in person or by telephone at times, places and frequency as they may agree. However, if the Dispute has not been resolved within thirty (30) days from the date of their initial meeting, the parties shall cease direct negotiations and submit the Dispute to mediation in accordance with the following procedure.

D.    **Selection of Mediator.** Within fifteen (15) business days after the date the parties cease direct negotiations, the parties shall make a good faith effort to select a person to mediate the Dispute. If no mediator has been selected under this procedure, the American Arbitration Association, Two Galleria Tower, Suite 1440, Dallas, TX 75240-6620 at 214-696-5000 or the CPR Legal Program, 366 Madison Avenue, New York, NY 10017 at 212-949-6490 shall be asked to supply a list of five (5) potential qualified attorney-mediators within ten (10) business days. Within ten (10) business days after receipt of the list, the parties shall rank the proposed mediators in numerical order of preference, simultaneously exchange such list, and select the individual receiving the highest combined ranking as the mediator. If such individual is not available to serve, the parties

shall proceed to contact the individual who was the next highest in ranking until a mediator is selected.

E.    **Time and Place for Mediation.**  In consultation with the mediator selected, the parties shall promptly designate a mutually convenient time and place for the mediation, such time to be no later than thirty (30) days after selection of the mediator. If the parties cannot agree, this provision is subject to the jurisdiction specified in Section 14.N. hereof. In the mediation, each party shall be represented by persons with authority and discretion to negotiate a resolution of the Dispute, and may be represented by counsel.

F.    **Exchange of Information; Summary of Views.**  Both parties shall attempt in good faith to agree on procedures for the expeditious exchange of information which is desired for preparation for the mediation. Both parties will deliver a concise summary of its view on the Dispute to the mediator at least seven (7) days before the first scheduled session of the mediation.

G.    **Conduct of Mediation.**  The mediator shall determine the format for the meetings, and the mediation session shall be private. The mediator will keep confidential all information learned in private caucus with any party unless specifically authorized by such party to make disclosure of the information to the other party. The parties agree that the mediation shall be governed by the provisions of Vernon's Texas Code Annotated, Civil Practice & Remedies Code Section 154 and/or such other rules as the mediator shall prescribe.

H.    **Termination of Procedure.**  Both parties agree to participate in the mediation to its conclusion. The mediation shall be terminated by: (1) the execution of a settlement agreement by the parties, or (2) a declaration of the mediator that mediation is terminated, or (3) a written declaration by the parties to the effect that the mediation process is terminated at the conclusion of one full day's mediation session. The parties agree not to terminate negotiations and not to commence any legal action or seek other remedies prior to the expiration of seven (7) days following the mediation; provided, however, any party may commence litigation within such seven (7) day period if litigation could be barred by an applicable statute of limitations or in order to request an injunction to prevent irreparable harm.

I.    **Fees; Disqualification; Confidentiality.**  The fees and expenses of the mediator shall be shared equally by the parties. The mediator shall be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matters. Mediation is a compromise negotiation for purposes of Federal and Texas Rules of Evidence and constitutes privileged communication under Texas law. The entire mediation process is confidential, and such conduct, statements, promises, offers, views and opinions shall not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence which is otherwise discoverable or admissible is not excluded from discovery or admission as a result of its use in the mediation.

## 14.   ADMINISTRATIVE PROVISIONS

A.    **Entire Agreement; Amendments.** This agreement constitutes the entire Agreement between the parties and may not be altered, amended or added to unless such amendment or addition is in writing and signed by both an authorized officer of Franchisor and by Franchisee. This Agreement shall be deemed to cancel and supersede the terms of all prior written or oral agreements and understandings, if any, between Franchisor and Franchisee pertaining to such license.

B.    **Notices.** Any notices required or permitted to be given under this Agreement shall be given by certified or registered United States Mail, return receipt requested, postage prepaid, United Postal Service, or Federal Express directed to Franchisor or Franchisee at their addresses shown herein or at such other address as they may subsequently designate in writing. Notice by mail shall be deemed given upon the depositing thereof in a United States Postal Service facility, a United Postal Service facility, or a Federal Express facility as shown on the receipt therefor.

C.    **Written Consent from Franchisor.** Whenever this Agreement requires Franchisor's consent, Franchisee agrees to make a timely written request for such consent. Franchisor will not unreasonably withhold its consent but its consent must be in writing to be valid.

D.    **Public Representation as Franchisee.** Franchisee shall represent that it is doing business as a Franchisee under the tradename and style of *Curves for Women®*. For this purpose, Franchisee shall publicly display at its business during all times this Agreement is in effect, Franchisor's certificate of good standing. Franchisee shall prominently display a notice or certificate in the public area of its business, as well as a statement on Franchisee's letterhead and on all forms, printed materials, and advertising materials to be distributed to the public, which clearly states that "EACH FACILITY IS INDEPENDENTLY OWNED AND OPERATED". Franchisee shall file for and maintain an "Assumed Name Certificate" in the city, county and/or state where its business is located. Franchisee shall furnish evidence of such filing to Franchisor.

E.    **Reasonableness.** Franchisor and Franchisee both agree to act reasonably in all dealings with one another pursuant to this Agreement.

F.    **Performance.** Any and all payments by Franchisee to Franchisor under this Agreement shall be made at Franchisor's principal place of business in Waco, McLennan County, Texas.

G.    **Severability.** Each provision contained in this Agreement shall for all purposes be construed to be separate and independent. If any provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid and unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement; and the remainder of the Agreement, and the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, it being hereby agreed that such provisions are severable and that this Agreement

shall be construed in all respects as if such invalid or unenforceable provisions were omitted. Each provision of this Agreement shall be valid and shall be enforceable to the fullest extent permitted by law.

H.    **Waiver and Delay.**  The acceptance by Franchisor of any payment specified to be paid by Franchisee hereunder with knowledge of a breach of any covenant or agreement hereof shall not be, nor be construed to be, a waiver of any breach of any term, covenant or condition of this Agreement. The failure or delay to enforce any of the provisions of this Agreement shall not constitute a waiver of rights or a waiver of any subsequent enforcement of the provisions of this Agreement. The waiver or remedy of any default or breach hereunder shall not waive or affect the default remedied or any prior or subsequent default. However, either party may, by written notice, unilaterally waive or reduce any obligation or restriction of the other party. The waiver or reduction may be revoked at any time for any reason on ten (10) days' written notice. All rights and remedies herein enumerated shall be cumulative and none shall exclude any other right or remedy allowed by law, and said rights and remedies may be exercised and enforced concurrently and whenever and as often as the occasion therefore arises.

I.    **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original; and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

J.    **Construction and Interpretation.**  If any provision of this Agreement is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. The paragraph headings used herein are descriptive only and shall have no legal force or effect whatsoever. The term "affiliate" as used in this Agreement is applicable to any company directly or indirectly owned or controlled by Franchisor. The word "corporation(s)" as used in this Agreement shall include Limited Liability Companies and such other similar organizations as are duly formed and existing pursuant to state law. The word "partnership(s)" as used in this Agreement shall include Limited Liability Partnerships and such other similar organizations as are duly formed and existing pursuant to state law. All words in this Agreement shall be deemed to include all genders and the singular as well as the plural, as the context of this Agreement requires.

K.    **Savings Clause.**  If any term hereof may be construed to obligate Franchisee to pay interest in excess of the highest legal amount, it is agreed that such term is a mistake in calculation or wording and, notwithstanding same, it is agreed that neither Franchisee nor any other person or entity obligated for the payment of any sums hereunder shall ever be obligated to pay interest in excess of the highest lawful amount. Franchisor intends to conform strictly to usury laws now and hereafter in effect and in no event shall Franchisor charge or collect, directly or indirectly, an amount for the use, forbearance or detention of money hereunder in excess of the highest lawful rate of interest, any excess of payments to be spread first over the term of the obligation and then, if any excess remains, to be applied next to reduction of the unpaid balance of the principal and then, after such unpaid balance is reduced to zero. any remaining excess shall be rebated to Franchisee. If the

maturity of any indebtedness hereunder is accelerated before the due date, any unearned interest in excess of the maximum permitted by law shall be canceled automatically as of the date of such acceleration and if theretofore paid, shall be refunded or credited against the principal amount of the obligation.

L.       **Modification of Agreement.**  Any modification of this Agreement or additional obligation assumed by either party in connection therewith shall be binding only if placed in writing and signed by all parties hereto.

M.       **Attorney Fees.**  In the event that any legal action is filed in relation to this Agreement, the successful party in the action shall be entitled to recover its costs therein, including reasonable attorneys' fees.

N.       **Governing Law and Jurisdiction.**  Franchisee and each of its owners agree that the relationship, rights, and obligations of the parties of this Franchise Agreement shall be governed by the internal laws of the state of Texas, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1051 et seq.). **FRANCHISEE AND EACH OF ITS OWNERS AGREE THAT ANY ACTION ARISING OUT OF OR RELATING TO THE RELATIONSHIP, RIGHTS, OR OBLIGATIONS OF THE PARTIES HEREIN SHALL BE BROUGHT IN ANY STATE OR FEDERAL COURT OF GENERAL JURISDICTION WHERE FRANCHISOR'S PRINCIPAL BUSINESS ADDRESS IS THEN LOCATED AND FRANCHISEE IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND WAIVES ANY OBJECTION IT MAY HAVE TO EITHER THE JURISDICTION OR VENUE OF SUCH COURT.**

**FRANCHISOR AND FRANCHISEE WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM FOR ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM, EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT. FRANCHISOR AND FRANCHISEE IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM,WHETHER AT LAW OR IN EQUITY, BROUGHT BY ANY OF THEM.**

O.       **Acknowledgments.**  Franchisee acknowledges that Franchisor and its subsidiaries and affiliates have certain rights reserved to them to grant licenses and rights to others, which may or may not be similar to the license and rights conveyed hereunder; to market Franchisor-approved products; and to otherwise use Franchisor's Trademark and system as set forth in this Agreement. Franchisee acknowledges that, prior to the execution of this Agreement, Franchisee has had the opportunity to contact existing Franchisees of Franchisor. Franchisee acknowledges that Franchisee had the opportunity to independently investigate, analyze and construe both the business opportunity being offered hereunder and the terms and provisions of this Agreement itself, utilizing the services of such independent attorneys, accountants, or other advisers as Franchisee so elects. Franchisee acknowledges that no representation or statement has been made by Franchisor or any employee,

agent or salesman thereof and relied upon by Franchisee regarding the future growth of Franchisor's franchise system, the anticipated income, earnings and growth of Franchisee, or the viability of the business opportunity conveyed hereunder. **FRANCHISEE ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT AND ACKNOWLEDGES THAT IT HAS READ ALL OF THE FOREGOING AGREEMENT AND THAT IT HEREBY ACCEPTS AND AGREES TO EACH AND ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS THEREOF.**

P.    **Submission of Agreement.**  Submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon the execution hereof by both Franchisor and Franchisee.

Q.    **Effective Date.**  This Agreement is effective as of the date first above written.

**CURVES INTERNATIONAL, INC.**

By: _____
Gary A. Findley, President and COO

**ATTEST:**

_____

**FRANCHISEE:**

_____
Stephanie O'Callaghan, Individually

**WE THE UNDERSIGNED PRINCIPALS OF THE CORPORATE OR PARTNERSHIP FRANCHISEE, DO AS INDIVIDUALS JOINTLY AND SEVERALLY, WITH THE CORPORATION OR PARTNERSHIP AND AMONGST OURSELVES, ACCEPT AND AGREE TO ALL OF THE PROVISIONS, COVENANTS AND CONDITIONS OF THIS AGREEMENT AS GUARANTORS AND ACKNOWLEDGE RECEIPT THEREOF.**

_____
{NAME}, Individually

_____
{NAME}, Individually

_____
{NAME}, Individually

_____
{NAME}, Individually

# EXHIBIT A

Curves International, Inc. grants an exclusive franchise to operate one (1) *Curves for Women*® thirty minute fitness and weight loss center at the location set out below on the terms and conditions contained in this Agreement executed simultaneously herewith:

## The city limits of Dobbs Ferry, the city limits of Hastings-on-Hudson, and the city limits of Irvington, New York

**Regardless of any rights granted to Franchisee in the area identified herein, Franchisee shall not open a Curves For Women® facility within two (2) miles of an existing Curves For Women® facility.**

**The identified marks representing the boundaries as stated within this Agreement are identified as of the date of this Agreement.    Except when both Franchisor and Franchisee agree in writing, the area, as stated herein as of the date of this Agreement, shall not be altered in any manner in the future as to size or location regardless of any future alterations to the identified marks representing the boundaries herein.**

## EXHIBIT B

Curves International, Inc. provides Franchisees with the following equipment and manuals needed for beginning operations as part of the Initial Franchise Fee:

Equipment

*Quickfit* Thirty Minute Fitness Circuit, including:

Biceps/Triceps
Leg Extension/Leg Curl
Shoulder/Laterals
Chest/Back
Hip AD/AB
Squat
Leg Press
AB/Back
Running Squares (8)

Heart Rate Chart
Stretching Chart
Music and Cue Tape

Manuals

Confidential Training Manual
Confidential Master Copies Manual

_____
(Name of Telephone Company)

_____
(Address)

_____

## TRANSFER OF SERVICE AGREEMENT

In the event my **CURVES FOR WOMEN®** franchise business is discontinued for any reason, I hereby release the use of the following telephone number(s):_____

_____ used in conjunction with said business to **CURVES INTERNATIONAL, INC.**, or its designee.

_____                                                      _____
(Present Customer's Signature)                                                                          (Date)

SWORN AND SUBSCRIBED before me by the said _____
on the _____ day of _____, 200__.

_____
Notary Public, State of _____

I hereby assume all charges outstanding, either billed or unbilled, including White Pages directory charges, on the telephone number(s) listed above.

_____                                                      _____
(New Customer's Signature)                                                                               (Date)

SWORN AND SUBSCRIBED before me by the said _____
on the _____ day of _____, 200__.

_____
Notary Public, State of _____

CURVES INTERNATIONAL, INC.                                                       TRANSFER OF SERVICE AGREEMENT

## RECEIPT

**THIS OFFERING CIRCULAR SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY. IF WE OFFER YOU A FRANCHISE, WE MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIEST OF:**

**(1)    THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE; OR**

**(2)    TEN BUSINESS DAYS BEFORE THE SIGNING OF A BINDING AGREEMENT; OR**

**(3)    TEN BUSINESS DAYS BEFORE A PAYMENT TO US.**

**YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN A FRANCHISE AGREEMENT. IF WE DO NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND TO THE NEW YORK STATE DEPARTMENT OF LAW, 120 BROADWAY, 23RD FLOOR, NEW YORK, N.Y. 10271.**

I have received a Uniform Franchise Offering Circular dated May 19, 2000. This Offering Circular included the following Exhibits and Attachments:

| | |
|---|---|
| Exhibit A: | Financial Statements |
| Exhibit B: | Franchise Agreement |
| Exhibit C: | Promissory Note and Security Agreement |
| Exhibit D: | Transfer of Service Agreement |
| | |
| Attachment A: | List of State Administrators |
| Attachment B: | List of Current Franchise Locations |
| Attachment C: | List of Agents for Service of Process |
| Attachment D: | List of Franchise Brokers |
| Attachment E: | List of Franchisees Who Have Left the System |

X  6/5/00
Date

Stephanie Callaghan
Prospective Franchisee

X Stephanie O'Callaghan
Printed Name

05/30/2000 12:46    7169922202    DAVID MESMER    PAGE 05
04/24/2000 22:21  FROM ( 'LLRGHRN CLAN    TO 17169    202    P.02

## RECEIPT

THIS OFFERING CIRCULAR SUMMARIZES CERTAIN PROVISIONS OF THE
FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN
LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS
CAREFULLY. IF WE OFFER YOU A FRANCHISE, WE MUST PROVIDE THIS
OFFERING CIRCULAR TO YOU BY THE EARLIEST OF:

(1)    THE FIRST PERSONAL MEETING TO DISCUSS OUR FRANCHISE;
OR

(2)    TEN BUSINESS DAYS BEFORE THE SIGNING OF A BINDING
AGREEMENT; OR

(3)    TEN BUSINESS DAYS BEFORE A PAYMENT TO US.

YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL
MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN A
FRANCHISE AGREEMENT. IF WE DO NOT DELIVER THIS OFFERING
CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING
STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND
STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE
FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND TO THE
NEW YORK STATE DEPARTMENT OF LAW, 120 BROADWAY, 23RD FLOOR,
NEW YORK, N.Y. 10271.

I have received a Uniform Franchise Offering Circular dated May 7, 1999. This Offering
Circular included the following Exhibits and Attachments:

| | |
|---|---|
| Exhibit A: | Financial Statements |
| Exhibit B: | Franchise Agreement |
| Exhibit C: | Promissory Note and Security Agreement |
| Exhibit D: | Transfer of Service Agreement |
| Attachment A: | List of State Administrators |
| Attachment B: | List of Current Franchise Locations |
| Attachment C: | List of Agents for Service of Process |
| Attachment D: | List of Franchise Brokers |
| Attachment E: | List of Franchisees Who Have Left the System |

_X_ 4-25-00
Date

Stephanie O'Callaghan
Prospective Franchisee

Stephanie O'Callaghan
Printed Name

CURVES INTERNATIONAL, INC.    RECEIPT PAGE - NY    UFOC0499

TOTAL P.02

## ADDENDUM TO FRANCHISE AGREEMENT

This Addendum to the Franchise Agreement for the geographic area described as **the city limits of Dobbs Ferry, the city limits of Hastings-on-Hudson, and the city limits of Irvington, New York** is agreed to this _27ᵗ_ day of _March_ 200● between Curves International, Inc. and **Stephanie O'Callaghan** to amend and revise said Franchise Agreement as follows:

(1)    Exhibit A. of the Franchise Agreement is amended by the replacement of the original language in full that appears therein by the following language:

### "EXHIBIT A

Curves International, Inc. grants an exclusive franchise to operate one (1) *Curves for Women®* thirty minute fitness and weight loss center at the location set out below on the terms and conditions contained in this Agreement executed simultaneously herewith:

**The city limits of Dobbs Ferry, New York; the city limits of Hastings-on-Hudson, New York; the city limits of Irvington, New York; and the city limits of Ardsley, New York.**

**Regardless of any rights granted to Franchisee in the area identified herein, Franchisee shall not open a Curves For Women® facility within two (2) miles of an existing Curves For Women® facility. The identified marks representing the boundaries as stated within this Agreement are identified as of the date of this Agreement. Except when both Franchisor and Franchisee agree in writing, the area, as stated herein as of the date of this Agreement, shall not be altered in any manner in the future as to size or location regardless of any future alterations to the identified marks representing the boundaries herein.**

To the extent this Addendum shall be deemed to be inconsistent with any terms or conditions of said Franchise Agreement or Exhibits or Attachments thereto, the terms of this Addendum shall govern.

In witness thereof, each of the undersigned hereby acknowledges having read this Addendum, understands and consents to be bound by all of its terms, and agrees it shall become effective the date first above written.

CURVES INTERNATIONAL, INC.

FRANCHISEE:

Stephanie O'Callaghan, Individually