CCH Internet Research NetWork

US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶11,442, Joseph A. Giampapa v. Carvel Corp. (Filed June 18, 1998)

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

The court has designated this opinion as NOT FOR PUBLICATION. Please consult the Rules of the Court before citing this case.

**Joseph A. Giampapa v. Carvel Corp.**

U.S. District Court, District of New Jersey, Civ. No. 96-4758 (WGB), Filed June 18, 1998.

## New Jersey Franchise Practices Act

### Choice of Law --Contractual Stipulation --Public Policy --New Jersey. --

New Jersey law applied to an ice cream franchisee's breach of contract and New Jersey Franchise Practices Act claims against its franchisor, even though the franchise agreement contained a New York choice of law provision. New Jersey's strong public policy in favor of protecting New Jersey franchisees weighed heavily in favor of applying New Jersey law, regardless of the choice of law provision. Moreover, New Jersey had much more substantial contacts with the transactions at issue than New York, whose only link to the suit was that the franchisor had been headquartered in the state until 1991.

Back reference: ¶1830.48.

### Relationship/Termination --Cause for Termination --Termination by Franchisee --Material Breach by Franchisor --Shipment of Substandard Products. --

An ice cream franchisor's alleged shipment of one batch of nonconforming ice cream to a franchisee did not constitute a material breach of the franchise agreement that justified termination by the franchisee. The one alleged breach out of hundreds of shipments was clearly minor in the context of the entire contract. Moreover, the franchisee could have remedied the breach by notifying the franchisor of the problem and demanding a credit or replacement. The one bad shipment did not make the franchisor's remaining performance meaningless or necessarily predict that future shipments also would be bad. Significantly, the franchisee had not reported any other problems regarding product quality during the course of the parties' relationship. In fact, the franchisee had tested the alleged substandard shipment not because he was experiencing problems, but because he wanted to support the claims of other franchisees that the franchisor's system had a quality control problem.

Back references: ¶825, ¶1220.

### Common Law --Breach of Franchise Agreement --Shipment of Substandard Products to Other Franchisees. --

An ice cream franchisor's alleged shipment of substandard ice cream to numerous franchisees did not constitute a material breach of its contract with another franchisee. The franchisor's obligations to each franchisee were separate. The franchisor's alleged breach of the other franchise agreements did not affect its agreement with the complaining franchisee at all. Although a pattern of substandard shipments to other franchisees might indicate a problem with the franchisor's quality control systems, it did not render the franchisor unable to perform under its contract with the complaining franchisee.

Back reference: ¶1220.

### Common Law --Implied Covenant of Good Faith/Fair Dealing --Refusal to Allow Expansion, Co-Branding --Contractual Right. --

An ice cream franchisor did not breach the implied covenant of good faith and fair dealing by refusing to allow a franchisee to open a satellite store or to test the concept of co-branding. The franchisee claimed that the franchisor's stated reason for its refusal --that the franchisee was not in "good standing" -- was a pretext used to punish the franchisee for refusing to release his claims in a class action lawsuit against the franchisor. However, the franchisee did not contend that a new location or co-branding was critical to the financial viability of the franchise, and the franchise agreement did not grant the franchisee the right to open satellite locations or to participate in a co-branding program. Thus, the franchisor's insistence upon a condition in exchange for approval did not transcend community standards of decency, fairness, or reasonableness such that it constituted bad faith. The franchisor was not obliged to ignore the contentious nature of its relationship with the franchisee.

Back reference: ¶1250.

**Relationship/Termination --Release Requirement --Existing Claims in Class Action --Condition for Expansion, Co-Branding. --**

An ice cream shop franchisor's requirement that a franchisee release all claims in class action suit against the franchisor before the franchisor would allow the franchisee to open a satellite store or to test the concept of co-branding did not violate the New Jersey Franchise Practices Act. The parties' franchise agreement did not give the franchisee the right to open a satellite store or to test a co-branding concept. The statute prohibited any requirement that a franchisee execute a release at the time of entering into a franchise agreement, not at the time that an existing agreement was modified. In addition, this prohibition applied only to the release of future claims, not the release of past claims.

Back reference: ¶850.74.

**Relationship/Termination --Release Requirement --Class Action Claims --Condition for Expansion, Co-Branding --Restriction on Right of Free Association. --**

An ice cream franchisor's requirement that a franchisee release all claims in a class action lawsuit against the franchisor before the franchisor would approve the opening of a new satellite store or the franchisee's testing of a co-branding concept did not impinge on franchisees' right of free association in violation of the New Jersey Franchise Practices Act.

Back reference: ¶850.74.

**Relationship/Termination --Release Requirement --"Good Standing" Requirement --Condition for Expansion, Co-Branding --Unreasonable Standard of Performance. --**

An ice cream franchisor's purported requirement that a franchisee be in "good standing" and release all claims in a class action lawsuit against the franchisor before receiving permission to expand or co-brand did not constitute an unreasonable standard of performance that violated the New Jersey Franchise Practices Act. The alleged requirement did not negatively affect the franchisee's rights under the original franchise agreement and did not render him incapable of performing his obligations under the agreement. In addition, the franchisor's actions did not alter the standards that the franchisee was required to meet in order to keep his franchise.

Back references: ¶850, ¶850.74.

**Relationship/Termination --Release Requirement --Existing Class Action Claims --Condition for Expansion, Co-Branding --Illegal Ancillary Agreement. --**

An alleged requirement that an ice cream franchisee release all claims in a class action lawsuit against its franchisor before it would be permitted to open satellite stores did not constitute an ancillary agreement that violated the New Jersey Franchise Practices Act. The statute prohibited waivers or releases of liability at the time of entering into the franchise agreement, not releases executed during the term of the agreement for the purpose of settling disputes between the parties. Thus, the alleged release requirement did not illegally restrict

the franchisee's right to litigate

Back reference: ¶850.74.

Relationship/Termination --Illegal Release Requirement --Remedies Under Statute --Damages, Injunctive Relief --Unilateral Termination of Agreement by Franchisee --Defense to Liability. --

Even if an ice cream franchisor's purported requirement that a franchisee release all claims in a class action suit against the franchisor before receiving permission to expand violated the New Jersey Franchise Practices Act, the franchisor was not liable under the statute because the franchisee had unilaterally terminated the franchise without proper notice prior to bringing an action under the statute. The franchisee's remedy for the franchisor's alleged violations was to bring a suit for damages or injunctive relief, not to terminate the franchise agreement. Not only had the franchisee failed to comply with the franchise requirements by closing his store, but he also had violated the statute by failing to give 15 days' prior written notice. The franchisee's noncompliance was a statutory defense to liability.

Back references: ¶850.74, ¶860.

Relationship/Termination --Covenants Not to Compete --Reasonableness --Two Miles, Three Years --Legitimate Enforcement Interest --Undue Hardship --Public Interest. --

A restrictive covenant that prohibited a former ice cream franchisee from operating within two miles of his former store for a period of three years after termination was reasonable and enforceable under New Jersey law. The franchisor had a legitimate interest in enforcing the covenant to protect its customer goodwill and to prevent the franchisee from using product and business information that had been conveyed to the franchisee. The fact that the franchisor had implemented a "supermarket program" under which it sought to increase sales by selling to grocery stores located in certain franchisees' market areas did not mean that the franchisor had no continuing interest in sales through its franchisees. Moreover, the franchisor's failure to enforce similar covenants against other New Jersey franchisees did not indicate that the franchisor had no legitimate interest in the covenant. Unlike the complaining franchisee, the other franchisees were nearing the end of their agreements and the franchisor had made a business decision not to enforce the covenants in those cases. Enforcement of the covenant would not cause the franchisee undue hardship, since it would not severely restrict him from opening another ice cream store. The geographic and temporal restrictions were reasonable under the circumstances. Finally, enforcement of the covenant would not significantly harm the public interest. The public interest in free and unfettered choice of ice cream shops in the area of the franchisee's former store was not of sufficient weight to preclude enforcement of the covenant.

Back reference: ¶845.72.

Common Law --Breach of Franchise Agreement --Wrongful Termination by Franchisee --Franchisor's Damages --Lost Royalty, Advertising Fees --Liquidated Damages Provision. --

An ice cream franchisor was entitled to $54,474 in lost royalty and advertising fees from a franchisee that had wrongfully terminated the franchise agreement. However, the franchisor was not entitled to an additional $15,000 under the agreement's liquidated damages provision. The provision applied only if the franchisor terminated or canceled the franchise. Moreover, enforcing the liquidated damages provision in addition to awarding regular damages would result in a double recovery by the franchisor.

Back reference: ¶1240.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

[In full text]

BASSLER, D.J.: This matter was tried without a jury before this Court on April 14, 15, 16 and 20, 1998. The Court's jurisdiction in this case is pursuant to 28 U.S.C. §1332 (diversity of citizenship). For the reasons set forth

below, the Court determines that Plaintiff Joseph Giampapa ("Giampapa") is *not entitled to a declaratory judgment* declaring that he did not wrongfully terminate his License Agreement with Defendant Carvel Corporation ("Carvel"); and that the restrictive covenant is unenforceable. Furthermore, the Court finds that Carvel is *not liable* for breach of the franchise agreement between the parties and is *not liable* for violation of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 *et seq*. The Court also concludes that Giampapa *is liable* for breaching the franchise agreement, and Carvel is awarded damages in the amount of $54,474.99.

## I. PROCEDURAL HISTORY

Plaintiff Joseph Giampapa ("Giampapa") is a former franchisee of a Carvel Ice Cream store. Giampapa alleges that Carvel's breaches of the agreement between the parties ("License Agreement") and violations of New Jersey's Franchise Practices Act forced him to terminate the parties' agreement and close his Carvel store.

Giampapa filed a declaratory judgment complaint in the Superior Court of New Jersey, Law Division, Passaic County, on or about September 11, 1996. The Complaint alleged that Carvel breached the License Agreement by supplying nonconforming ice cream mix, that Carvel violated the New Jersey Franchise Practices Act, N.J.S.A 56:10-1 *et seq.*, and that Carvel breached the covenant of good faith and fair dealing. Giampapa sought a declaration that he did not wrongfully terminate the License Agreement, an order declaring the restrictive covenant unenforceable, and an order declaring that Giampapa was under no further obligation to Carvel.

Carvel properly removed the action to this Court on October 9, 1996, based on diversity of citizenship. Carvel filed an answer on November 15, 1996, asserting by way of counterclaim that Giampapa (1) infringed Carvel's trademarks; [1] (2) violated the restrictive covenant by continuing to operate an ice cream store within two miles of his former Carvel store; and (3) breached the License Agreement by failing to pay royalties and other payments in the amount of $46,518.00. Carvel sought damages of several million dollars, punitive damages, and an injunction enforcing the restrictive covenant.

## II. FINDINGS OF FACT

The Court makes these findings of fact pursuant to Fed. R. Civ. P. 52. The Court bases its findings of fact on its careful consideration of the testimony adduced at trial and a review of the documentary evidence submitted, as well as the logical inferences to be drawn from them. In evaluating the evidence of record, the Court undertook an individualized assessment of the credibility of each witness, and assigned the appropriate weight to the testimony based on the Court's conclusions with respect to credibility.

In assessing the credibility of each witness in this case, the Court has taken into consideration how well each witness was able to recall and describe the things testified to, the manner of the witness while testifying, whether the witness had an interest in the outcome of the case or any bias or prejudice concerning any party or matter involved in the case, how reasonable the witness's testimony was considered in light of all the evidence in the case, 9A Wright & Miller, *Federal Practice and Procedure:* Civil 2d §2585 (1995); *see also Miller v. Mercy Hospital, Inc.*, 720 F.2d 356, 365 (4th Cir.), *cert. denied*, 470 U.S. 1083 (1983) ("[c]redibility involves more than a witness's demeanor and comprehends an overall evaluation of testimony in light of its rationality or internal consistency and the manner in which it hangs together with other evidence"), and whether the witness's testimony was contradicted by what that witness had said or done at another time, by the testimony of other witnesses, or by other evidence. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

The Court makes the following findings by a preponderance of the credible evidence:

On June 20, 1988, Giampapa and his former partner, Douglas A. McCaffrey, entered into a Carvel Retail Manufacture License Agreement ("License Agreement") with Carvel, having purchased a retail ice cream store from Giampapa's uncle for $275,000. Giampapa leases the land on which the store is situated from his aunt. On June 30, 1992, when McCaffrey's employer transferred him out of state, Giampapa and Carvel entered into a second License Agreement. The parties agree that this License Agreement is a franchise agreement under which Giampapa operated a retail ice cream store using the Carvel name and products. Giampapa was employed part time as a patent attorney but worked at the store himself on evenings and weekends. In addition to being a member of the U.S. Patent and Trademark Bar, Giampapa, who holds an MBA, is also member of the New Jersey Bar.

CCH Internet Research NetWork

The License Agreement requires that Carvel franchisees purchase an ultra-high temperature, pasteurized liquid ice cream mixture manufactured for Carvel according to its standards from designated independent dairies. As would be expected under a franchise agreement, Carvel licensees may not purchase or sell ice cream mixture not manufactured to Carvel's standards. The License Agreement obligates Giampapa to make royalty and advertising payments to Carvel until July 31, 1998 --the date the License Agreement expires.

From the commencement of the License Agreement, June 30, 1992 until Giampapa's termination on August 31, 1996, Giampapa operated the Carvel retail store at 741 Market Street, Paterson, New Jersey. The License Agreement contained a covenant prohibiting Giampapa from engaging in competition with Carvel for a period of three years and within a two mile radius of his store after termination of the License Agreement.

In the fall of 1992, Carvel began a new business venture by selling its products out of "branded freezers" in Pathmark supermarkets in New Jersey. Although initially Carvel only made its products available to supermarkets in areas where there were no pre-existing Carvel franchise stores, in April 1993, Carvel announced that it would begin selling its products to supermarkets in the same market areas as existing franchisees. The objections by franchisees that this competition subverted their franchisee agreements eventually led to litigation in 1994 between Carvel and its franchisees in the United States District Court for the District of Connecticut. *See Carvel Corporation v. James Baker et als.*, 1997 U.S. Dist. LEXIS 17609 (D.Conn. July 22, 1997). Giampapa was and is a party to that litigation, hereinafter referred to as the "Supermarket Lawsuit."

In the spring of 1994, Carvel conducted a regional seminar for franchisees in Northern New Jersey at a hotel in the Meadowlands. Carvel's entire executive management team was there. Management advised the franchisees that the company was experiencing declining store count and competition from TCBYs and other ice cream vendors. Carvel management represented that in order for Carvel to continue to have a retail presence, Carvel wanted each franchisee to add one location by opening additional, non-traditional distribution outlets in the form of "carts," "kiosks" and "branch unit" stores. Carvel claimed that if each franchisee added one or two branch units, kiosks or vending carts, Carvel could substantially increase the availability of its ice cream. Part of the incentive to the franchisees was that they would not have to pay extra for any gallonage of ice cream mix sold through these alternative distribution forms since it was counted within the required 10,000 gallon minimum. Accordingly, Giampapa, with Carvel's blessing, looked at locations in downtown Paterson and in Hawthorne, New Jersey. These sites did not pan out for one reason or another. However, by late 1994, Giampapa did find two potential business opportunities: a former Dairy Queen in Garfield, and a multiple-site program with McCrory's Five & Dime.

These sites passed the initial screening by Wayne King, the director of Carvel's real estate department, and Giampapa was instructed to submit formal proposals, which he did. In February 1995, Greg DeMadis, Carvel's Vice President for Retail and Business Development, met with Giampapa at the Garfield site and advised him that the sites would be approved only if he signed a release of his claims against Carvel in the Supermarket Lawsuit in Connecticut. DeMadis told Giampapa that Carvel was not inclined to approve any location where the franchisee could potentially gain financially and turn around and use those resources against the company to fund the supermarket litigation.

Tom Kornacky, an associate of Mr. DeMadis, and Vice President of Retail Operations, subsequently told Giampapa that the Garfield site would be approved if he would sign the release. Because Giampapa refused to sign the release, Carvel refused to approve the Garfield site and Giampapa consequently gave up any attempt to explore six or seven other potential sites in McCrory's stores. At the trial Carvel tried to soften its position by testifying that it routinely insisted on a mutual release whenever a new location was being added by a franchisee. At another time DeMadis testified that there were other impediments to signing off on Giampapa's new site, such as getting a release from Dairy Queen and getting rid of the Dairy Queen trade dress to produce a lease satisfactory to Carvel.

The Court does not credit this testimony. It may be true that other things needed to be done but that was plainly not the reason for Carvel's refusal to approve the new location. The Court credits Giampapa's testimony that unless he released Carvel in the Supermarket Lawsuit there was no way Carvel would approve the new site. The other reasons now offered by Carvel for not approving the Garfield location are pretextual.

In addition to using satellite locations to stem declining ice cream sales, another strategy that Carvel and its franchisees discussed was co-branding: the sale of other products at a Carvel store. At the regional seminar held

at the Meadowlands in the spring of 1995, Giampapa was told by Mr. Kornacky that to participate a franchisee had to be "in good standing," which Kornacky explained meant that a franchisee could not be in litigation with the company. Giampapa at that time was a litigant in the Supermarket Lawsuit in Connecticut.

Meanwhile, in the Supermarket Lawsuit, other franchisees were being accused by Carvel of using adulterated mix for the ice cream. At the request of another franchisee and a fellow litigant, Giampapa had samples of the ice cream mix analyzed for butterfat content and total solids by Sani-Pure Laboratories. Sani-Pure Food Laboratories issued a test report dated April 25, 1996 based on three separate samples. The butterfat content was determined to be 6.64%, whereas the federal standard for ice cream is 10%. The percentage of total solids also did not meet federal standards. The laboratory kept the samples for thirty days pursuant to their standard operating procedures. Although Giampapa sent the results of the test to a fellow franchisee who was coordinating various tests being taken by franchisees throughout thirteen states in support of the franchisees accused by Carvel of using adulterated mix, he did not advise Carvel of the results of these tests.

By letter of August 30, 1996, Giampapa notified Carvel that he was terminating the License Agreement. On August 31, 1996 Giampapa ceased operating his store as a Carvel franchise and removed all Carvel signage. Since September 1, 1996, he has operated on the same site as the Paterson Ice Cream Bakery.

### III. CONCLUSIONS OF LAW

#### A. Choice of Law

The License Agreement provides that disputes will be settled by application of New York law. Giampapa, however, argues that despite this provision, New Jersey law should apply. The Court agrees.

A federal court sitting in diversity must apply the conflict of laws principles of the forum state, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1947). In contract actions (and in the absence of a specific contractual choice of law provision), New Jersey follows the Restatement (Second) of Conflict of Laws §188 (1971), which looks to the jurisdiction having the most significant relation and closest contacts with the transaction and the parties. *State Farm Mutual Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34 (1980); *Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F. Supp. 275, 282 n.10 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir. 1993); *Pancza v. Remco Baby, Inc.*, 761 F. Supp. 1164, 1168 (D.N.J. 1991).

Ordinarily, where the parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts uphold the contractual choice. *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 341 (1992). However, under New Jersey law, a choice of law provision will *not* be honored if:

1)

    the state chosen has no substantial relationship to the transaction or the parties, or

2)

    application of the law chosen would conflict with the fundamental public policy of a state having a greater interest in a determination of a particular issue and such state would be applicable in the absence of the choice of law provision under the governmental-interest analysis.

*Stanton v. Rich Baker Berman & Co., P.A.*, 876 F. Supp. 1373, 1381 (D.N.J. 1995).

The New Jersey Supreme Court has recognized that the state's strong public policy in favor of protecting its franchisees under the Franchise Practices Act, N.J.S.A. 56:10-1 *et seq.*, can override a choice of law provision mandating the application of another state's law. *Instructional Systems*, 130 N.J. at 346 (upholding application of New Jersey law despite contractual provision stipulating that California law would apply). The Court noted that the purpose behind franchise legislation is to protect franchisees and to make their bargaining position more equal to manufacturers'. *Id.* at 344-45. The Court further held that the franchise laws would be meaningless if manufacturers' choice of law provisions were routinely upheld:

[W]ere parties free to dispense with the protection afforded by franchise acts, any large franchisor by insertion of a choice of law provision requiring application of the franchisor's home state's law, could with a stroke of a pen remove the beneficial effect of the franchisee's state's remedial legislation.

Id. at 345 (quoting Winer Motors, Inc. v. Jaguar Rover Triumph, Inc., 208 N.J. Super. 666, 671-72 (App. Div. 1986)). In this case, New Jersey's strong public policy in favor of protecting its franchisees weighs heavily in favor of applying New Jersey law, regardless of the choice of law stipulation in the License Agreement.

Even if there were no choice of law provision in the License Agreement, and this case were viewed as a traditional breach of contract action, New Jersey law would apply. New Jersey has the closest contacts with the transactions at issue. Giampapa's ice cream store (and the potential sites for future stores) are located in New Jersey. Carvel's representative met with Giampapa in New Jersey. The restrictive covenant is being enforced against Giampapa in New Jersey.

Carvel argues that the contractual stipulation applying New York law should be enforced, arguing that it has a longstanding history in New York and has many licensees in New York. However, Carvel does not address the public policy considerations in favor of applying New Jersey law, above. Nor does Carvel explain how New York has a substantial interest in this litigation. There is no indication in the record that New York has any contact with this suit, other than the fact that Carvel had its headquarters there until 1991. (Since 1991, its headquarters have been in Connecticut.) This is clearly insufficient to justify applying New York law, especially when New Jersey has a much greater policy interest in, and substantial contacts with, the litigation. The Court concludes that New Jersey law should apply to this case.

### B. *Giampapa's Right to Terminate the Agreement*

Giampapa defends his decision to close his Carvel store because he claims that Carvel once shipped him a batch of ice cream mix that was not up to standards. Giampapa also stated that he knew of other franchisees who had similar problems with quality control. He argues that these were material breaches of the contract by Carvel and justified his own refusal to carry out his contractual obligations.

### 1. *Effect of One Bad Batch of Ice Cream*

Giampapa treated Carvel's ice cream quality control problems as a material breach of the contract. "If ... during the course of performance one party fails to perform essential obligations under the contract, he may be considered to have committed a material breach and the other party may elect to terminate." *Medivox Productions, Inc. v. Hoffman-LaRoche, Inc.*, 107 N.J. Super. 47, 58-59 (Law Div. 1969).

Repeated failure by Carvel to meet quality control standards might amount to a failure of the contract's "essential obligations." Giampapa, however, presented evidence of only one confirmed batch of nonconforming ice cream over the course of the contract.[2] A single breach in the context of a long series of obligations may be material, but only where it ruins the essential purpose of a contract:

Where a contract calls for a series of acts over a long term, a material breach may arise upon a single occurrence or consistent recurrences which "tend to defeat the purpose of the contract."

Id. at 59 (citations omitted). A breach of a promise which is "subordinate and incidental" to the contract's main purpose "does not constitute a breach of the entire contract or warrant its rescission by the injured party." *Oscar Barnett Foundry Co. v. Crowe*, 219 F. 450, 455 (3d Cir. 1915). Although every breach of a contractual obligation theoretically gives rise to a cause of action, to actually discharge the other party from its obligations, the breach "must be of an absolute part of the obligation." Id.

To determine whether a single breach is material in a contract that calls for continuing obligations, the Court must consider its effect on the contract as a whole. In applying the test of materiality to such contracts, a court should evaluate 1) the ratio quantitatively which the breach bears to the contract as a whole, and 2) the degree of probability or improbability that such a breach will be repeated. *Medivox*, 107 N.J. Super. at 59 (citing *Maple Flock Co. v. Universal Future Products*, 1 K.B. 148, 157 (1934)).

Carvel's alleged breach in shipping one substandard batch of ice cream mix is clearly minor in the context of the entire contract, in which the parties performed their obligations for several years. The purpose of the contract was to supply Giampapa with quality ice cream so that he could sell it and pay Carvel royalties. This one incident, out of hundreds of shipments, does not defeat this purpose.

Furthermore, Giampapa could have remedied the breach by notifying Carvel of the problem and demanding a credit or replacement. Although this case is not governed by the Uniform Commercial Code, the policy underlying the UCC's requirement that there be "substantial impairment" caused by a nonconforming shipment applies equally here: "The requirement that there must be substantial impairment of value before the buyer may revoke acceptance precludes revocation for trivial defects or defects which may be easily corrected." *Herbstman v Eastman Kodak Co.*, 68 N.J. 1, 9 (1975). In fact, there was testimony that other nonconforming shipments were remedied by Carvel. Thus one bad shipment, which could have been remedied, did not defeat the whole purpose of the contract, or make Carvel's remaining performance meaningless.

This one shipment did not necessarily predict that future shipments would also be bad. Again, the entire history of the contract is relevant. Although Giampapa recalled a few previous instances in which problems had occurred, he apparently did not find them particularly serious, since he had no recollection of the details. Nor did Carvel give any indication that it would not or could not perform its future obligations under the contract, which is the usual indication of material breach. *See Universal Computer (Systems) Ltd. v. Datamedia Corp.*, 653 F. Supp. 518 (D.N.J. 1987), *aff'd*, 838 F.2d 1208 (3d Cir. 1988).

The Court notes that when Giampapa did have a sample tested, it was not because he was experiencing problems but because he wanted to be able to support the claims of other franchisees that there was a quality control problem in Carvel's system. Significantly, Giampapa never complained to Carvel that he was experiencing any problem with the mix. That is because he had no problems. Even when Carvel reached out to the franchisees in June of 1996 and invited them to corporate headquarters in Connecticut to discuss the entire quality control program, a meeting which included Giampapa and James Stubblefield, Vice President of Manufacturing and Quality, Giampapa never indicated he was having any problem, either with the operation of his franchise or his ice cream mix. Therefore, Giampapa has failed to establish that this one substandard shipment by Carvel, in the context of the entire contract, was a material breach.

### 2. Knowledge of Other Franchisee's Problems

Giampapa states that he knew of other franchisees' similar quality control problems. In fact, he testified that their problems were the reason he tested his own ice cream mix for compliance with standards. Even if Giampapa believed that other franchisees experienced similar problems, however, these problems in other parties' contracts are not a material breach of *Giampapa's* contract with Carvel.

The Court does not consider the other franchisees' experience to be relevant to this contract. Carvel's obligations to each franchisee are separate, and a breach of one franchise agreement does not equal a breach of the other agreement. Although Giampapa argues that the other franchisees' problems created concern that Carvel would breach its obligations to him as well, Giampapa cites no cases, and the Court could find none, in which a plaintiff relied on breaches of other contracts by the defendant to justify termination.

The Court must therefore analyze Giampapa's actions under the same standard as for any material breach case: How serious was this breach, and to what extent did Carvel's actions create a probability that the breach would be repeated? The Court concludes that the effect of a breach of another contract on Giampapa was not "serious"; it did not affect his License Agreement at all. Although a pattern of substandard shipments in other contracts may indicate a problem with Carvel's quality control systems, it is a huge leap to assume from this that Carvel would be unable to perform under the License Agreement with Giampapa. The Court concludes that breaches of other franchisees' agreements are not "material" breaches by Carvel.

### C. Breach of Implied Covenant of Good Faith

Giampapa does not argue that the refusal to allow him to open a satellite store or to test the concept of co-branding constitutes a breach of the License Agreement. Indeed he could not, since the License Agreement

nowhere confers such a right. Rather, Giampapa contends that Carvel's decisions in this regard constitutes a breach of an implied covenant of good faith and fair dealing. Giampapa's good faith claims arise principally out of Carvel's refusal to approve a satellite location for a new store. Carvel informed Giampapa that his proposed site would be approved on one condition: that he execute a release of all claims made against Carvel in the pending lawsuit in Connecticut. When Giampapa refused, Carvel did not allow him to open a new store. Carvel's stated reason for refusing to approve the site was that Giampapa was not in "good standing."

Giampapa asserts that Carvel breached the implied covenant of good faith and fair dealing by unilaterally imposing this "good standing" requirement. Giampapa alleges that this "good standing" requirement was not actually defined, but was instead a pretext used to punish Giampapa's refusal to release his claims in the Connecticut lawsuit. Giampapa also makes a similar argument with respect to the fact that Carvel did not approve Giampapa's location for a test site for co-branding.

Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing prohibiting either party to the contract from "do[ing] anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc.*, 69 N.J. 123 (1976); *Onderdonk v. Presbyterian Homes of N.J.*, 85 N.J. 171 (1981). The good faith performance or enforcement of a contract requires adherence to the agreed common purpose "of the contract and consistency with the justified expectations of the other party." *Riveredge Associates v. Metropolitan Life Insur. Co.*, 774 F. Supp. 897, 899 (D.N.J. 1991).

The covenant of good faith and fair dealing prohibits conduct which, though not addressed explicitly in the contract, should be prohibited to ensure that the contract retains its intended business efficacy. Liability for breach of the covenant of good faith and fair dealing, therefore, does not require proof that the defendant violated the literal terms of the contract. *Association Group Life, Inc. v. Catholic War Veterans of the United States of America*, 61 N.J. 150, 153 (1972); *Riveredge Assocs.*, 774 F. Supp. at 900; *Feldman v. U.S. Sprint Communications Co.*, 714 F. Supp. 727, 731 (D.N.J. 1989).

The duty of good faith and fair dealing does not alter the terms of a written agreement, however. *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 366 (1992), *cert. denied*, 113 S. Ct. 203 (1992); *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 983 (8th Cir. 1991) ("Acting according to the express terms of a contract is not a breach of the good faith and fair dealing.").

Since the License Agreement does not explicitly give Giampapa the right to open new stores, and since Carvel does not contend that a new location was critical to the financial viability of the existing location, it is difficult to see how Carvel's decision about Giampapa's new location can constitute bad faith. That the written terms of the agreement are not altered does not mean, of course that a party to a contract can act in bad faith to thwart his contracting partner's expectation interest and then hide behind the contract's literal terms. A party who transgresses community standards of decency, fairness or reasonableness while adhering to a contract's literal terms has still breached the covenant of good faith and fair dealing when such conduct thwarts a plaintiff's contractual expectation. *See, e.g., National Westminster Bank NJ v. Lomker*, 277 N.J. Super. 491 (App. Div. 1994), *certif. denied*, 142 N.J. 454 (1995) (while the good faith requirement does not impose upon a commercial lender obligations that alter the terms of the deal or preclude it from exercising bargained-for rights, a debtor may defend against enforcement of a lender's rights where the lender has engaged in bad faith, misconduct or the like).

In this case, the License Agreement contained no written provision granting Giampapa a right to satellite locations or to participate in experimental programs such as co-branding. Carvel's insistence upon a condition in exchange for approval of the new location was not bad faith. Although Carvel's refusal to grant the approval can be seen as "playing hardball" with Giampapa, this is not sufficient to establish a breach of good faith and fair dealing. Judge Easterbrook stated the principle well in the commercial lender context:

We do not doubt the force of the proverb that the letter killeth while the spirit giveth life. Literal implementation of unadorned language may destroy the essence of the venture. Few people pass out of childhood without learning fables about genies, whose wickedly literal interpretation of their "masters'" wishes always leads to calamity. Yet knowledge that literal enforcement means some mismatch between the parties' expectation and the outcome does not imply a general duty of "kindness" in performance, or of judicial oversight into whether a party had "good cause" to act as it did. Parties to a contract are not each others' fiduciaries; they are not bound to treat customers with the same consideration reserved for their families.

*Kham & Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351, 1357 (7th Cir. 1990).

Furthermore, a defendant cannot be required to grant concessions to someone who is suing him. Carvel here was not obliged to ignore the larger context of its relationship with Giampapa. Giampapa has not shown by a preponderance of the evidence that Carvel's actions were a "transgress[ion of] community standards of decency, fairness or reasonableness" amounting a breach of good faith. Nor has Giampapa sustained his burden of proving that Carvel's actions frustrated reasonable expectations arising out of the License Agreement.

### D. *Claims Under the Franchise Practices Act*

Giampapa argues that Carvel's refusal to approve his new store without a release of his claims in the Supermarket Lawsuit also violated the New Jersey Franchise Practices Act. Specifically, he argues that the Franchise Practices Act makes it illegal:

a.

    To require a franchisee at the time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by this act.

b.

    To prohibit directly or indirectly the right of free association among franchisees for any lawful purpose.

* * *

e.

    To impose unreasonable standards of performance upon a franchisee.

f.

    To provide any term or condition in any lease or other agreement ancillary or collateral to a franchise, which term or condition directly or indirectly violates this act.

(Plaintiff's Supp. Brief at 2-5.); N.J.S.A. 56:10-7.

### 1. *Requirement of Release*

Giampapa claims that Carvel's demand for a release of the Connecticut lawsuit violates N.J.S.A. 56:10-7(a). The plain language of this provision defeats Giampapa's argument, however. The section specifically prohibits requiring the franchisee to execute a release *at the time of entering into a franchise arrangement.* By its plain language, this section does not apply to modifications of existing franchise agreements.

The one case that cites this provision of the Franchise Practices Act, *Stradling v. Southland Corp.*, BUSINESS FRANCHISE GUIDE (CCH) (New Developments), ¶10,887 (M.D.Pa., Mar. 19, 1996), found that the section only prohibits a franchisor from requiring a release of *future* claims as a condition precedent to the execution of a franchise agreement. A release of liability for *past* claims was held not to violate the Franchise Practices Act.

Although *Stradling* is distinguishable from this case in that a release was contemplated in the franchise agreement, the court's interpretation of N.J.S.A. 56:10-7(a) is equally applicable here. Giampapa here was not asked to release Carvel from future liability, but only from past liability, specifically from the lawsuit already

pending in Connecticut. This was not an attempt by Carvel to immunize itself from the requirements of the Franchise Practices Act with regard to a new franchise agreement.

Giampapa could argue that Carvel's supermarket program violates the implied covenant of good faith and fair dealing because the supermarket program subverts the reasonable expectations of the franchisees that they would not be facing competition from neighboring supermarkets selling Carvel ice cream. He could further argue that by insisting on a release, Carvel is precluding Giampapa from a right to seek a remedy under the Franchise Practices Act. If there is merit to that argument, it strikes this Court that it would service Giampapa only if he were asking for judicial intervention to require Carvel to give him an additional location rather than as a basis for terminating the License Agreement. N.J.S.A. 56:10-10 provides that a violation of the Franchise Practices Act can entitle the franchisee to damages and "where appropriate" to injunctive relief. For the purposes of deciding this lawsuit, it is enough to conclude that since the License Agreement did not give Giampapa the right to open a satellite store or participate in a test of the co-branding concept, Carvel's insistence on a release as the quid pro quo is not a practice prohibited by N.J.S.A. 56:10-7(a).

### 2. *Right to Free Association of Franchisees*

Neither party elaborated on this theory, but Giampapa cites N.J.S.A. 56:10-7(b) in his brief. (Plaintiff's Supp. Brief at 4.) The Court assumes that by citing this section, Giampapa implies that Carvel's attempt to obtain a release from the Supermarket Lawsuit was intended to discourage its franchisees from uniting to challenge Carvel's policies.

The Court is unclear why requiring a release from Giampapa (or any other franchisee) would affect the franchisees' right of association. Here, it is coincidental that Giampapa is involved in a lawsuit with other franchisees and is thus "associating" with others. Carvel would have likely sought the same release even if Giampapa had brought the Connecticut lawsuit on his own. Furthermore, even if Carvel obtained the release from Giampapa, the rest of the Connecticut litigants would be unaffected.

Giampapa's theory is based on speculation that franchisees in a collective suit would feel coerced to release their claims of liability by Carvel. The release requirement does not impinge on any franchisee's right to associate with his other franchisees, however; it merely affects the individual franchisee's ability to gain concessions from Carvel. In any case, Giampapa's theory is not spelled out in any detail. Nor does Giampapa cite any case that holds that such a violation enables the franchisee to terminate the License Agreement rather than to an award of damages or injunctive relief as provided for in the Franchise Practices Act. Giampapa therefore has failed to meet his burden on this issue.

### 3. *Unreasonable Standards of Performance*

Giampapa argues that Carvel's purported requirement that he be in "good standing" and execute a release of his claims before receiving permission to expand imposed an "unreasonable standard[] of performance" on him. It is well established that a franchisor is prohibited from acting in a manner that is "arbitrary and capricious or in bad faith." *Westfield Centre Service v. Cities Service Co.*, 158 N.J.Super. 455 (Ch. Div. 1978), *aff'd*, 172 N.J.Super. 196 (App. Div. 1980), *aff'd*, 86 N.J. 453 (1981). However, there are very few cases explaining what constitutes an "unreasonable" standard of performance.

One case indicates that the franchisor imposes an unreasonable standard of performance when it sets conditions making it difficult or impossible for the franchisee to comply with his obligations. In *Gelardi Corp. v. Miller Brewing Co.*, 502 F.Supp. 637 (D.N.J. 1980), a beer company apparently "targeted" the plaintiff distributor for replacement by another distributor. The company subsequently entered into a distributorship agreement with the plaintiff's direct competitor in the same area (a violation of the exclusive area given to plaintiff). The company then gave the plaintiff's competitor more favorable credit terms and better delivery services. These obvious actions by the franchisor led to a bitter price war between the plaintiff and his competitor.

Finally, the plaintiff was forced to sign a noncompete agreement with his competitor agreeing not to serve in that area. The company then terminated the plaintiff's distributorship agreement, based on the plaintiff's breach of contract in not serving the stipulated area. The court denied the company's motion for summary judgment, finding that

it appears that Miller's conduct towards Gelardi made Gelardi's business life sufficiently miserable that Gelardi was forced to quit its distribution of Miller products in its primary area of responsibility. While any given action of Miller may not have violated this statutory prohibition the cumulative effect amounted to imposing an unreasonable standard of performance insofar as Miller expected Gelardi to perform at all under the adverse conditions that Miller had created.

Id at 653

It is simply not the case that Giampapa had no choice other than terminating the License Agreement in response to Carvel's actions. This case is quite different from *Gelardi*, where the franchisee was expected to perform his franchise agreement under not only adverse but destructive conditions imposed by the franchisor. The only adverse condition that Giampapa suffered was his inability to expand to another store. This did not cause a detriment to his original store, or to his rights under the original License Agreement. He was still capable of performing his obligations under the License Agreement. Carvel's actions certainly did not alter the standards that Giampapa was required to meet in order to keep his franchise and do not rise to the level of "unreasonable standards of performance."

### 4. Ancillary or Collateral Agreements

N.J.S.A. 56:10-7(f) prohibits a franchisor from including a term or condition in an ancillary or collateral agreement that would indirectly or directly violate the Franchise Practices Act. Given the underlying policy of the Franchise Practices Act to protect franchisees from unfair dealings, this section of the Franchise Practices Act was likely intended to prevent a franchisor from doing indirectly what it could not do directly. In other words, what is illegal in a franchise agreement is also illegal in an ancillary agreement.

Giampapa states, accurately, that the Franchise Practices Act encourages franchisees to seek redress through the courts, by providing a cause of action in Superior Court and allowing the recovery of attorney's fees. N.J.S.A. 56:10-10. Giampapa claims that Carvel's demand for a release is an ancillary agreement contravening this public policy by undermining his access to the courts. Carvel counters that the state has an equally strong public policy in favor of private settlement of disputes without involving the courts.[4]

It is true that franchisees in general have far less bargaining power than franchisors, and are thus potentially subject to economic coercion in their contracts. *See Kubis & Perszyk, Assocs., Inc. v. Sun Microsystems, Inc.*, 146 N.J. 176 (1996). In this case, Giampapa essentially argues that the "ancillary agreement" sought by Carvel forced him to choose between expanding his business and maintaining his lawsuit in Connecticut. This appears to be a permissible choice under the Franchise Practices Act, however, at least according to legislative history cited by the Carvel, which indicates that the statute was not intended to prohibit releases as part of the settlement of disputes. During the debates on the bill, the Governor noted:

Section 8(a) [now codified in N.J.S.A. 56:10-7(a)] which prohibits a franchisor from requiring a franchisee to assent to a release, assignment, novation, waiver or estoppel and thus relieve any person from liability imposed by the Act, has an unintended result. *It would effectively prohibit the parties from settling disputes by way of new agreements or releases for consideration. It is my understanding that the intent is to prohibit the compelling of such releases on waivers of liability at the time the franchise is entered into.*

(Defendant's Supp. Brief at 5 ( *quoting* Governor's comments, dated December 2, 1971, to Assembly Bill No. 2063 (emphasis added)).) In response to this comment by the Governor, N.J.S.A. 56:10-7(a) of the Franchise Practices Act was changed to make clear that it only prohibited waivers or releases of liability *at the time of entering into* the franchise agreement. More significantly, these comments in the legislative history assume that the Franchise Practices Act allows releases *during the term* of the franchise agreement for the purpose of settlement of disputes between the franchisor and franchisee. Although the Franchise Practices Act protects the rights of franchisees to bring an action in state court, it does not follow that any conduct that affects a lawsuit is a violation of the statute. Under Giampapa's theory, *any* release of liability executed by a franchisee would be illegal. The evidence indicates that a release such as the one in this case is not an illegal restriction on a franchisee's right to litigate.

Finally, even if Giampapa was truly subjected to unreasonable standards of performance or any other prohibited practice, his remedy was a suit for damages or an injunction under the Franchise Practices Act. It was not to terminate the License Agreement. It is quite apparent to this court that Giampapa decided to terminate the License Agreement because it was not financially advantageous to him and because of Carvel's supermarket program. He testified that he was paying approximately $15.00 to $16.00 a gallon for mix that was available from other dairies for $5.00 a gallon and that the significant reason that he terminated the License Agreement was that he was not generating enough revenue. The alternative explanations he gave to justify the termination of the License Agreement simply do not hold up. For example, he testified that there were quality control issues that went to the heart of the License Agreement. These quality control issues, however, were with fellow franchisees and not with Giampapa. There were never any complaints to Giampapa from customers nor were there any complaints from Giampapa to Carvel about the quality of the product. Carvel periodically tested Giampapa's ice cream at the store and found no defects. In fact, Giampapa testified that his own tests on the ice cream were always fine and that he was not concerned about bad product.

It is also apparent to the Court that another factor, other than quality control, motivating Giampapa to terminate the License Agreement was Carvel's supermarket program. Giampapa acknowledged that he first wanted to terminate his relationship with Carvel at the point when they started the supermarket program in the franchisors' backyards in 1994. In Giampapa's case, Carvel was servicing a supermarket in Paterson within two blocks of his store and another within a two mile radius of the store.

Giampapa also testified to other grievances that he felt justified his termination of the License Agreement, such as Carvel insisting that he keep open a lobby and submit to other inspections to insure compliance. The Court, however, after observing the demeanor of the witnesses for Carvel, finds that Carvel did not engage in some kind of retaliatory action because of Giampapa's involvement in the Supermarket Lawsuit but dealt with him in an even handed way. Giampapa may not have liked Carvel's response to his request, but Carvel acted well within its rights under the License Agreement. The Court credits the testimony of James Stubblefield that Giampapa was never targeted with respect to quality control or singled out and tested because of Giampapa's involvement in the Supermarket Lawsuit.

Giampapa also complained that Carvel denied him the opportunity to engage in co-branding, that is, selling products other than Carvel's at the store. But Gregory DeMadis, Vice President of Retail Operations and Business Development, credibly testified that Carvel never offered co-branding to all its franchisees. The most that Giampapa was denied was the opportunity to participate as a test site.

Nor did Giampapa ever advise DeMadis prior to August 31, 1996, that he was contemplating terminating the franchise due to a bad mix problem, an onerous royalty structure, or unfair treatment due to his participation in the Supermarket Lawsuit.

Because Giampapa unilaterally terminated the agreement, Carvel is permitted to raise his noncompliance with the franchise as a statutory defense to liability:

It shall be a defense for a franchisor, to any action brought under this act by a franchisee, if it be shown that said franchisee has failed to substantially comply with requirements imposed by the franchise and other agreements ancillary or collateral thereto.

N.J.S.A. 56:10-9. Not only did Giampapa fail to comply with the franchise requirements by closing his store, he also violated the Franchise Practices Act by failing to provide fifteen days' written notice before termination. N.J.S.A. 56:10-5. Carvel is therefore not liable for any violations of the Franchise Practices Act.

### E. *Validity of Restrictive Covenant*

Carvel, in its counterclaim, seeks enforcement of the restrictive covenant in the License Agreement barring Giampapa from operating an ice cream store within two miles of his former Carvel store for three years after termination. (Giampapa is currently operating an independent ice cream store in the exact location of his former Carvel store.) Giampapa argues that the restrictive covenant in the License Agreement is unreasonable and therefore unenforceable under New Jersey law.

Restrictive covenants in New Jersey are generally enforceable to the extent that they are "reasonable under the circumstances." *Solari Indus. v. Malady*, 55 N.J. 571 (1970). The party seeking to enforce the covenant has the burden of proving its reasonableness. *Ingersoll-Rand v. Ciavatta*, 110 N.J. 609 (1988). A restrictive covenant's terms will be modified ("blue-penciled") to make its terms reasonable under the circumstances if necessary. *See e.g., Raven v. A. Klein & Co.*, 195 N.J. Super. 209 (App. Div. 1984).

To determine whether a restrictive covenant is "reasonable," the court must consider whether the covenant 1) protects a legitimate interest; 2) imposes an undue hardship on the party subject to it; and 3) injures the public interest. *Solari*, 55 N.J. at 576. One court has noted that covenants ancillary to the sale of a business are given more latitude than a restrictive employment covenant, because parties entering into a sale of business contract presumably have more bargaining power than an employee. *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993) (Irenas, J.). How far this "latitude" extends is not clearly set forth, but there is nothing in the case law that mandates the application of a different substantive test of "reasonableness" depending on which type of covenant is involved.

In *Jiffy Lube*, Judge Irenas held that a restrictive covenant in a franchise agreement is analogous to a sale of business, and is therefore "to be examined under the more liberal standards applicable to a sale of business." *Id.* Nevertheless, he applied the three *Solari* factors to find that the covenant was reasonable. This Court will therefore evaluate the reasonableness of this covenant applying the *Solari* factors as well.

### 1. *Legitimate Business Interest*

Giampapa argues that Carvel does not have a legitimate interest in enforcing the covenant. Giampapa states that

the only legitimate interests which have been recognized by the Courts of the State of New Jersey to support the enforcement of restrictive covenants are the protection of trade secrets and confidential business information and the protection of customer relationships.

(Plaintiff's Supp. Brief at 11.) Trade secrets and customer relationships have been recognized as legitimate protectable interests, particularly in employment contracts. In this case, Carvel provided Giampapa with access to its equipment, its product mix, and its vendors, in other words, to all the items he needed to operate an ice cream store. This knowledge certainly has value to Carvel and to potential competitors. Without a restrictive covenant, any franchisee could (as Giampapa did) develop a relationship with Carvel's suppliers, and then use those relationships after the termination of the contract. The Court therefore finds that this information constitutes a protectable interest.

Additionally, in franchise agreements, courts have found that customer goodwill developed by the seller or franchisor is also a protectable interest. Courts have recognized that the customer goodwill associated with the franchisor is an important benefit of the franchise relationship. *See Liberty Sales Assoc., Inc. v. Dow Corning Corp.*, 816 F.Supp. 1004, 1010 (D.N.J. 1993). As Judge Irenas stated in *Jiffy Lube*, "a franchise agreement, in part, [is] a conveyance of the franchisor's good will to the franchisee for the length of the franchise." *Jiffy Lube*, 834 F. Supp. at 691. Carvel's customer goodwill, therefore, is a legitimate interest that benefitted Giampapa during the franchise and that can be protected after the agreement is terminated.

Giampapa further argues that Carvel's new business initiative through its supermarket program somehow evidences that Carvel no longer had a business interest in its conventional franchisee program. This argument is simply a non sequitur. That a company is endeavoring to increase sales through supermarket sales does not mean it has no continuing interest in sales through its franchisees. The evidence that Carvel was attempting to increase sales through its franchisees (for example, by co-branding or kiosks) hardly supports a conclusion that Carvel had no business interest to protect.

Giampapa further argues that Carvel's failure to enforce the covenant against other franchisees in New Jersey illustrates that there is no legitimate interest in the covenant, and estops Carvel from enforcing it in his case. However, Carvel's actions (or lack thereof) in other cases do not amount to a waiver or estoppel of its contract rights in *this* action. One district court considering this issue found that an employer's failure to enforce a restrictive covenant against similarly situated employees did not estop the employer from enforcing the covenant. In *Minnesota Mining & Manufacturing Co. v. Kirkevold*, 87 F.R.D. 324 (D. Minn. 1980), the court found that the

plaintiff's situation was distinguishable from that of the other employees, and that other considerations were relevant in the employer's decision not to enforce the covenant against those employees. Similarly, in this case, the other franchisees were in a different position from Giampapa. Greg DeMadis of Carvel testified that the other franchisees were nearing the end of their agreements, and that it was simply not cost-effective to enforce those covenants. The Court found this testimony credible. Carvel made a business decision not to enforce the restrictions in other cases. Giampapa, on the other hand, had nearly two years of royalty and advertising payments remaining when he terminated the License Agreement.

The court in *Kirkevold* concluded:

All things considered, the failure of [defendant] to attempt to enforce similar covenants against other former employees is not overly probative of any intent to relinquish its contractual rights or to knowingly mislead [plaintiffs] so as to estop [defendant] from enforcing the covenant in question. For the Court to hold otherwise would effectively place employers in the precarious position of being compelled to enforce all such restrictive covenants with respect to all its former employees, which might encourage attempts to restrain trade, and which might undermine labor relations.

*Id.* at 336. A similar rationale would apply to the franchise context. Giampapa's argument would require a franchisor to enforce every restrictive covenant, without regard to cost-effectiveness or individual circumstances. This is impractical and unfair, not only to Carvel, but to other franchisees. Whether a restrictive covenant may be enforced depends on its reasonableness *under the circumstances*. See *Solari*, 55 N.J. at 576. Carvel may enforce or may not enforce other covenants, but the primary inquiry is whether enforcement of the covenant in *this* case is reasonable.

### 2. Undue Hardship

Giampapa claims that the covenant is unduly restrictive, because Carvel can open another store anywhere within his trading area. Like so many of Giampapa's arguments, this argument is not clearly articulated in his brief. Giampapa's arguments that Carvel believes "there is no geographical trading area for any particular Carvel store" or that Carvel is not subject to a similar restrictive covenant are ultimately irrelevant to the central question: whether the covenant imposes an undue hardship on Giampapa. "Undue hardship" has been interpreted to mean that the restrictions imposed are disproportionate, compared to what is necessary to protect the legitimate interest of the party enforcing the covenant. See *Coskey's T.V. and Radio Sales v. Foti*, 253 N.J. Super. 626 (App. Div. 1992). In this case, Giampapa is not severely restricted from opening another ice cream store. The covenant restricts Giampapa from opening a competing business within two miles of the store for three years after termination. To comply with the covenant, Giampapa needs only to find a location more than two miles away from his current store.

Instead, Giampapa simply converted the Carvel store (literally overnight) into his own independent ice cream store. Carvel has a legitimate interest in protecting the goodwill developed at this store location. Carvel also has a legitimate interest in protecting its "know-how" and ice cream manufacturing processes from appropriation. There was no evidence that it would be particularly difficult to find a location more than two miles away, or that there is no market for ice cream stores outside of Paterson. In fact, as Giampapa testified, his current location has problems with crime and vandalism; a location several miles away might actually avoid these problems.

Courts have found restrictions of longer than three years reasonable, *see, e.g., Rubel & Jensen v. Rubel*, 85 N.J. Super. 27 (App. Div. 1964) (five years), and have found restrictions of greater than three miles reasonable, *see, e.g., Jiffy Lube*, 834 F. Supp. at 692 (five miles). The Court finds the time and geographic restrictions in the covenant are reasonable under the circumstances.

### 3. Public Interest

Giampapa claims that the enforcement of the covenant harms the public interest by undermining franchisees' efforts to litigate disputes. Giampapa obliquely refers to a similar argument under the Franchise Practices Act, *see* Section D, above. It is really a claim that the franchisees' right to litigate is being harmed. Nevertheless, even if the Court reads this argument to state that franchisees will potentially be harmed, this type of harm to the "public" is not the focus of restrictive covenant law.

New Jersey courts have generally invoked harm to the public interest to preclude enforcement of a restrictive covenant only where the covenant could interfere with or place limitations on a special professional relationship, for example, the doctor-patient relationship or the attorney-client relationship. *Karlin v. Weinberg*, 77 N.J. 408 (1978) (noncompetition clause in doctor's employment agreement could limit patient choice); *Jacob v. Norris McLaughlin & Marcus*, 128 N.J. 10, 20 (1992) ("[L]awyer restrictions are injurious to the public interest. A client is always entitled to be represented by counsel of his own choosing." In these cases, the courts were concerned that prohibiting a doctor or lawyer from practicing in a certain area would prevent patients or clients in that area from having freedom of choice in the highly personal area of health care or legal representation.

The restrictive covenant in this case is not quite of this import. Conceivably, it could limit the public's choices among ice cream shops around in the area of the Giampapa's former Carvel store. This is a limitation, but a very minor one. The Court does not see a special "personal" ice cream consumer-ice cream store relationship that would be undermined. Although the Court does not wish to minimize the importance of ice cream, the "public interest" in free and unfettered choice of ice cream is not of sufficient weight to preclude enforcement of this covenant. The Court finds the restrictive covenant reasonable and enforceable as written.[5] The Court will therefore enjoin Giampapa from violating the covenant for two years from the date of entry of judgment.

### F. *Carvel's Right to Damages*

Carvel also asserted a counterclaim for royalties and advertising fees. As explained above, Giampapa has not established that he was entitled to terminate the contract due to Carvel's material breach. Giampapa's closing of his Carvel store therefore amounted to a breach of his obligations under the License Agreement.

Giampapa was obligated to make annual royalty and advertising payments to Carvel through July 31, 1998. (License Agreement, ¶7.) Giampapa wrongfully terminated the License Agreement on September 1, 1996. The Carvel established that these fees were as follows:

```
Sept. 1, 1996-March 1, 1997

     Royalty Fee:     .................................   $ 7,400.00

     Advertising Fee: .................................   $13,300.00


March 1, 1997-March 1, 1998

     Royalty Fee:     .................................   $15,200.00

     Advertising Fee: .................................   $13,300.00


March 1, 1998-July 31, 1998

     Royalty Fee:     .................................   $ 6,458.33

     Advertising Fee: .................................   $ 5,666.66
```

```
TOTAL: ....................................................    $54,474.99
```

Therefore, Giampapa is liable for $54,474.99 in royalty fees and advertising payments.

Carvel also argues that it is entitled to liquidated damages of $15,000 pursuant to the License Agreement. The enforceability of a liquidated damages provision depends on whether the set amount is a reasonable forecast of just compensation for the harm caused by the breach and whether the harm is difficult to estimate accurately. *Wasserman's, Inc. v. Middletown*, 137 N.J. 238, 250 (1994). New Jersey courts have recognized that liquidated damage clauses are presumptively reasonable and that the party challenging the clause bears the burden of proving its unreasonableness. *Id.* at 252.

The terms of the liquidated damages provision do not apply to the facts of this case. The provision states that liquidated damages arise if *Carvel* terminates or cancels Giampapa's right to operate his store through his breach. Here, Giampapa terminated the contract himself. *Cf. Ramada Franchise Systems, Inc. v. Bhagat*, 1993 WL 408001, at **3-4 (4th Cir., Oct. 14, 1993) (provision entitled franchisor to liquidated damages only when it terminated the franchise agreement, and not when the agreement was terminated under other circumstances). This is not a situation where Giampapa kept his store open but did not meet his obligations in other ways, and Carvel was forced to terminate his franchise.

Even if the liquidated damages provision was triggered, it was to serve as an alternative remedy to receiving consequential damages. Enforcing both the liquidated damages provision and awarding regular damages is a double recovery. *See Farnsworth on Contracts*, §12.18 at 897 (1982 ed.) ("[I]f the [liquidated damages] provision is sustained ... both parties are bound by it, and it displaces the conventional damage remedy for breach."). [6] The Court finds that Carvel is not entitled to liquidated damages.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Carvel is *not liable* for breach of the License Agreement or for breach of the covenant of good faith and fair dealing. The Court also concludes that Carvel *did not violate* the Franchise Practices Act.

The Court concludes that Giampapa *is liable* for breach of the License Agreement and consequently for damages in the amount of $54,474.99. Giampapa is further *enjoined* from violating the restrictive covenant in the License Agreement for a period of two years from the date of entry of the judgment.

The parties shall agree as to form on a proposed Final Judgment consistent with this opinion. This proposed Final Judgment shall be submitted to the Court no later than fifteen (15) days from the date of this opinion.

If the parties are unable to agree to a proposed Final Judgment, Carvel shall, within twenty (20) days from the date of this opinion, submit to this Court and serve on opposing counsel a proposed Final Judgment, in writing, that is consistent with this opinion.

Giampapa shall have five (5) days from receipt of Carvel's proposed Final Judgment in which to file his written objections to its form and his own written proposed Final Judgment that is consistent with this opinion. These shall be served on opposing counsel and filed with the Court. If Giampapa wishes to file objections, he *must* file an alternative proposed Final Judgment in writing with the Court.

Carvel shall have three (3) days from receipt of Giampapa's alternative proposed Final Judgment in which to file written objections to its form.

*All objections must be submitted in writing to the Court, and must contain legal and factual support for the objections and for the party's own proposed Final Judgment.*

[*] Carvel withdrew its trademark claims before trial.

[4] Carvel objected to the introduction of Giampapa's expert report on the basis that the mix itself had not been preserved, making it impossible for Carvel's expert to test the mix. The Court, however, found Giampapa's explanation as to why the mix was not preserved to be credible. Giampapa was not planning this suit when the mix was tested, and did not deliberately destroy the evidence so as to preclude the introduction of the report or to alter the terms of the franchise agreement. See, e.g., Westfield Centre, supra.

[5] Furthermore, as Carvel points out, three New York courts have found this same covenant reasonable.

[6] The Court is skeptical whether this liquidated damages provision is even enforceable. Liquidated damages provisions are more likely to be reasonable where the parties had comparable bargaining power. Id. at 253. Although Carvel claims in its brief that the liquidated damages term was "bargained for," the Court finds this scenario implausible. Furthermore, Giampapa is already subject to an enforceable restrictive covenant, which serves to protect Carvel's customer goodwill. The liquidated damages provision thus seems superfluous and even punitive. "The subject cancellation clause is unreasonable if it does more than compensate [the non-breaching party] for their approximate actual damages caused by the breach." Id. at 254.

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company