US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶10,434, P.P. & K., Inc. v. Judith K. McCumber, et al. (Dated May 3, 1994)

© 2006 CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

P.P. & K., Inc. v. Judith K. McCumber, et al.

U.S. District Court, Northern District of Illinois, Eastern Division, No. 94 C 938. Dated May 3, 1994.

Preliminary Injunction Enforcing Noncompetition Agreement Against Terminated Franchisee Recommended

### Illinois Franchise Disclosure Act

**Contract Law --Implied Contract --Option to Renew --Failure to Renew --Contract of Indefinite Duration --Failure to Affirmatively Terminate. --**

Despite a convenience store franchisee's failure to exercise its option to renew its franchise agreement, an implied agreement existed between the franchisee and its franchisor that could be terminated only by an affirmative action by either party. Under Illinois law, once an option to renew has lapsed, a contract of indefinite duration is formed that can be terminated at will by either party.

**Relationship/Termination --Cause for Termination --Refusal to Sign Written Agreement --Material Breach. --**

A convenience store franchisee's refusal to sign a written franchise agreement was a material breach of an implied agreement between the franchisee and its franchisor that justified termination. The breach was material because the franchisor had treated the breach as serious, offering the franchisee the opportunity to sign the agreement several times, and because the franchisee's refusal to sign was willful, not negligent or the result of unavoidable circumstances.

**Preliminary Relief --Trademark Infringement --Enforcement of Noncompetition Agreement -- Likelihood of Success on Merits --Reasonableness of Noncompetition Agreement. --**

A convenience store franchisor was likely to succeed on the merits of its claims against a terminated franchisee for trademark infringement and breach of a noncompetition agreement. The franchisor had justifiably terminated the franchise agreement, thus giving rise to the specific rights and obligations under the termination provision of the contract. Under this provision, the franchisee could no longer remain on the premises or operate a competing store in the immediate location. Contentions that the noncompetition agreement did not apply because the franchisor did not terminate the franchise agreement prior to its expiration were rejected, since an implied agreement existed at the time notice of termination was given. A decision on the reasonableness of the noncompetition agreement was unnecessary because the franchisee's lease had terminated and no evidence indicated that the franchisee intended to conduct its business at any other location.

**Preliminary Relief --Trademark Infringement --Enforcement of Noncompetition Agreement -- Irreparable Injury --Adequacy of Money Damages. --**

A convenience store franchisor asserting claims for trademark infringement and breach of a noncompetition agreement against a terminated franchisee would be irreparably harmed if a preliminary injunction prohibiting the franchisee's continued operation of its franchise were not entered. If the injunction were not entered, the franchisor would not be able to relicense a franchise in the area, would have its standard franchise agreement undermined, and would lose customers and sales as a result of the franchisee's continued operation. These injuries could not be adequately remedied by money damages.

**Preliminary Relief --Trademark Infringement --Enforcement of Noncompetition Agreement --Balance of Harms --Likelihood of Success on Merits. --**

Even though a terminated convenience store franchisee would suffer greater harm from the issuance of an injunction prohibiting the continued operation of its franchise than its franchisor would suffer if the injunction were not granted, the balance of harms favored granting the injunction when measured against the franchisor's overwhelming likelihood of success on the merits of its claims for trademark infringement and breach of a noncompetition agreement. Such a determination was bolstered by the franchisee's refusal to continue the relationship despite ample opportunity to do so.

To: The Hon. George W. Lindberg, U.S.D.J.

### Report and Recommendation

### [In full text]

LEFKOW, Exec. Magis. J.: This is a civil action under the Lanham Act, 15 U.S.C. §§1051 *et seq.*, for trademark infringement and unfair competition. The complaint also asserts Illinois claims for specific performance of a franchise agreement, violations of the Illinois Deceptive Trade Practices Act, the Illinois Consumer Fraud and Deceptive Trade Practices Act, and for common law unfair competition. Plaintiff, P.P. & K., Inc. ("PP&K"), has moved for a preliminary injunction against defendant, Judith K. McCumber, individually and doing business as Convenient Food Mart #581 in Lincoln, Illinois; and Cather Grocery, Inc., an Illinois corporation, doing business as Convenient Food Mart #581, enjoining defendants from further use of the Convenient Food Mart, Inc. ("CFM") trademarks and service marks, to enforce the non-compete provisions of a franchise agreement between the parties, to transfer assets to PP&K, and to grant possession of the subject premises to PP&K.

The jurisdiction of this court rests on 15 U.S.C. §1121, as well as 28 U.S.C. §§1331 and 1338(a). Defendants do not contest plaintiff's allegation that venue is proper in this district under 28 U.S.C. §1391(b) and (c).

On February 24, 1994, Your Honor entered a temporary restraining order enjoining defendants from displaying the CFM trademark and service marks and from holding themselves out in any manner as being affiliated with the CFM system. The temporary restraining order was issued on March 1, 1994 and expired on March 11, 1994, although the parties continue in compliance with it. Your Honor denied, however, PP&K's request for enforcement of the non-compete provisions of the franchise agreement and for possession of the premises. The motion for preliminary injunction was referred to me for a Report and Recommendation. An evidentiary hearing was held before me on March 11, 1994 concerning the motion.

### *Findings of Fact*

Based on the testimony of the witnesses, the exhibits admitted into evidence and the stipulations of the parties, the following proposed Findings of Fact are entered:

1. Plaintiff, PP&K, is an Illinois corporation with its principal place of business in Arlington Heights, Illinois. PP&K is in the business of franchising and operating franchises associated with the CFM franchise chain.

2. Defendant Judith K. McCumber is an individual doing business as Convenient Food Mart Store #581, which is located at 1302 Fifth Street, Lincoln, Illinois ("the store").

3. Defendant Cather Grocery, Inc., is an Illinois corporation doing business as Convenient Food Mart Store #581.

4. PP&K owns and operates CFM convenience stores in 38 counties in Illinois, including Logan County, where defendants' store is located. PP&K is the exclusive franchisor of CFM's in those 38 counties in Illinois.

5. John Patrick Purcell has owned PP&K since March 13, 1993. As pertinent here, Purcell succeeded to all the rights and obligations of its predecessor, CFM of Illinois.

6. Defendants entered into a "Franchise Agreement" with CFM of Illinois on June 23, 1986 which granted defendants the right to operate a CFM franchise in Lincoln, Illinois.

7. The "Grant of Franchise" clause, Para. 1 C of the Franchise Agreement provided, " . Termination or expiration of this Agreement shall constitute a termination or end of the franchise."

8. The Franchise Agreement, by its terms, expired on April 30, 1992.

9. The Franchise Agreement, Section 14, provided for renewal of the franchise whereby defendants were to give written notice of their intention to renew 18 months in advance of the expiration of the initial term. CFM of Illinois was to give one year advance notice of election not to renew the franchise. The Agreement contained no automatic renewal provision for the circumstance where no notice was given by either party.

10. For renewal of the franchise, the Franchise Agreement required execution of the franchisor's current standard franchise agreement. Para. 14 B. It provided that failure by the franchisee to sign a renewal agreement "within ninety (90) days after delivery thereof to FRANCHISEE shall be deemed an election by FRANCHISEE not to renew the Franchise."

11. The Franchise Agreement, Section 15, provided that the franchisee could terminate the agreement, "... with or without cause, by giving COMPANY at least sixty (60) days written notice of his intentions to do so. In the event of termination by FRANCHISEE, the provisions of Section 16 of this Agreement shall apply."

12. Under Section 15, the franchisor was permitted to terminate the agreement for "good cause" which was defined as "any material violation of the terms of this Agreement" and it was specifically agreed that any one of 13 specifically enumerated factors constituted good cause (none of which is at issue here).

13. Section 16 of the Franchise Agreement was titled "Rights and Obligations of Company and Franchisee Upon Termination or Expiration of the Franchise." Section 16 provided that after termination or expiration of the franchise, defendants would pay amounts due to the franchisor, would not in any manner identify themselves with the former "Convenient Food Mart" name, and would immediately cease to use the "Know-How" [2] disclosed to them under the Agreement.

14. Section 16 also contained a covenant not to compete, prefaced with the language, "If prior to expiration the Franchise is terminated by COMPANY in accordance with this Agreement or by FRANCHISEE...." The covenant forbade the franchisee for two years from operating a retail food store in competition with CFM within a two and one-half mile radius of the store. It also gave the Franchisor the option to purchase the store assets, including good will, upon termination.

15. The Enforcement Section of the Franchise Agreement, Section 7, provided that neither party shall

... be deemed to have waived or impaired any right, power or option reserved by this Agreement including without limitation, the right to demand exact compliance with every term, condition and covenant herein ... by virtue of ... any failure, refusal, or neglect of COMPANY or FRANCHISEE to exercise any right under this Agreement or to insist upon exact compliance by the other with its obligations hereunder....

16. On the same date that the parties entered into the Franchise Agreement, defendants executed a sublease ("the Lease") from CFM of Illinois for the store premises.

17. Paragraph 3 of the Lease provided that the premises were to be used exclusively as a CFM store.

18. Paragraph 22 of the Lease provided,

[I]f for any reason the franchise of the LESSEE to operate a "Convenient Food Mart" on the demised premises

shall be terminated by the Licensor, the same shall constitute a default hereunder and this lease shall also be considered terminated and of no further effect as of the date of termination of the franchise.

19. The Franchise Agreement and the Lease originally expired at the same time. On November 22, 1991, however, the parties extended the term of the Lease from May 30, 1992 to May 30, 1997. The terms material to this litigation remained the same as in the original Lease.

20. In September, 1992, CFM of Illinois sent defendants a renewal franchise agreement and Uniform Offering Circular. McCumber signed and returned the offering circular but did not sign the renewal agreement. McCumber never heard from anyone at CFM of Illinois regarding her failure to sign the renewal documents.

21. Upon purchasing the Illinois region, PP&K notified the franchisees in that region, including defendants, of the sale to PP&K. Defendants then began to pay monthly franchise fees and rent to PP&K.

22. After PP&K took over the region, its local representative, Tim Garber, continued to visit defendants' store. PP&K continued to pay for advertising for the store and also provided defendants with accounting services.

23. The first time that Purcell met with McCumber was around May 4, 1993. At that meeting, which took place at the store, McCumber did not mention that her Franchise Agreement had expired at the end of April, 1992.

24. On October 29, 1993, McCumber sent PP&K a letter notifying it that her Franchise Agreement had expired, and stating her belief that she therefore had "no further obligation" to PP&K. The letter set out a number of complaints about PP&K's performance of its obligations under the Franchise Agreement and demanding "cure" within 30 days. Failing that, McCumber threatened to cease payments to PP&K and to "de-identify" the store.

25. After receiving this letter, Purcell called McCumber to discuss the issues raised in the letter. Purcell also reviewed the Franchise Agreement in his file and confirmed that it had not been signed.

26. On or about November 5, 1993, PP&K sent McCumber PP&K's current Uniform Offering Circular and renewal franchise agreement requesting that the agreement and other documents be signed and returned within ten days.

27. McCumber refused to sign the renewal agreement. She testified that she did not sign the agreement because its terms were more onerous than the terms of her prior, expired agreement and because she was required to sign a general release prohibiting her from bringing any claims against either PP&K or its predecessor for their breaches of the expired franchise agreement. [4]

28. After another telephone conversation during which McCumber claims, and Purcell denies, that Purcell referred to her as "bitch," McCumber remained unpersuaded. Thereafter on February 14, 1994, PP&K sent a letter to McCumber purporting to "terminate" the Franchise Agreement immediately and invoking from the expired Franchise Agreement its rights upon termination.

29. From the inception of the Franchise Agreement and continuing through December, 1993, defendants paid franchise fees pursuant to the terms of the Franchise Agreement to CFM of Illinois and then to PP&K.

30. Throughout this period, defendants held themselves out to the public as a CFM store, considered themselves to be a CFM franchisee, and acted in all respects consistent with that status. After receiving PP&K's notice to terminate, defendants continued to use the name, trademark, service marks and logos until the entry of the temporary restraining order in this case.

31. Over the years, the store has developed significant good will and good reputation in the minds of the consuming public.

32. Since entry of the temporary restraining order, defendants have continued to operate the store but without using the CFM name and trademark, service marks and logos.

33. When PP&K purchased the Franchise Agreement in March, 1993, it expected the continued collection of future royalty payments based on five percent of the gross sales of the business which amounted to between $2,500 and $3,000 per month from defendants. Defendants have consistently paid approximately $3,000 per month to PP&K.

34. If no franchise agreement runs on the premises until 1997, PP&K would lose approximately $30,000 per year.

35. McCumber's sole source of income is the store. She does not have enough money to build a new store in the Lincoln area, nor does she have the ability to lease a previously built facility in the Lincoln area.

36. If this case had not been filed, McCumber would have continued to pay invoices as sent by PP&K and would have continued to operate the store.

## Analysis

To show a right to preliminary injunctive relief, plaintiff bears the burden to show the following:

(1)

    that it has no adequate remedy at law;

(2)

    that unless the statute under which it is suing excuses a showing of irreparable harm, it will suffer irreparable harm if the injunction is not entered; and

(3)

    that it has some likelihood of success on the merits.

*Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 385-87 (7th Cir. 1984).

**1. Likelihood of Success on the Merits.**

Relying on common law doctrines,[5] plaintiff argues that its contract with defendants did not expire on April 30, 1992, because the parties by their conduct entered into a new contract on the same terms as the original Franchise Agreement. (Later, PP&K argues the Agreement was merely extended month-to-month). Because McCumber refused to sign the renewal franchise agreement tendered to her in November, 1993, PP&K argues, it was entitled under the provisions of an implied-in-fact contract to terminate the franchise, take possession of the premises, purchase the assets of the store and enforce the non-compete provisions. Alternatively, again relying on common law doctrines, PP&K argues that defendants are equitably estopped from claiming that the Franchise Agreement expired in April, 1992; essentially, they should not be permitted to conduct themselves as a franchisee, accepting PP&K's services and the benefit of CFM's trademarks and good will, and then assert that there is no agreement in order to operate a competing store on the premises.

Defendants concede that they have no right to use PP&K's trademarks. They maintain, however, that they are entitled to remain on the premises until the Lease expires and operate an independent convenience store in competition with CFM. Defendants reason that the Franchise Agreement expired in April, 1992 and that the Section 16 closure provisions of that Agreement define the rights of the parties. Under those provisions, they contend, expiration and termination have separate consequences. To reach this conclusion, they read the language of Paragraph 1C of the Franchise Agreement, "Termination or expiration of the Agreement constitutes a termination or an end of the franchise" as meaning that "termination of the Agreement constitutes a termination of the franchise and that expiration of the Agreement constitutes an end of the franchise." Defendants' Proposed Findings of Fact and Conclusions of Law at 11. Thus, for example, because the covenant not to compete says it applies if the franchise is terminated *prior* to its expiration, and because PP&K's "termination" occurred *after* the

expiration, defendants believe they were not "terminated", rather the contract merely ended. Similarly, because the Lease provides for forfeiture if the franchisee's rights to operate a CFM are "terminated," defendants argue that because the Agreement expired, PP&K was simply too late when it purported to "terminate" the Agreement. Acknowledging the restriction in the Lease to use of the premises as a CFM store, defendants simply suggest that this provision is impossible to perform in light of the expiration of the Franchise Agreement, although damages might be available. Defendants concede, however, that they are not entitled to continue to operate a CFM store indefinitely, rather "in order to end the relationship between the parties, all PP&K had to do was notify Defendants that they had no franchise agreement. This notification, however, would not and could not operate as a 'termination' under the agreement, since as that term is defined a variety of legal consequences follow from 'termination.'" Id. at 13.

Alternatively, even if the contract was renewed by the conduct of the parties, defendants reason, their refusal to sign PP&K's proposed contract was not "good cause" for termination under the renewed Agreement, rather PP&K must simply allow the franchise to "end" or "expire."

Defendants have cited no cases or statutes in support of their positions.

The issue for decision is whether PP&K is likely to prevail on its claim to enforce the non-compete provisions of the Franchise Agreement, as well as to purchase the assets and take possession of the premises, where defendants have refused to sign the franchise agreement tendered by PP&K in November 1993.

Plaintiff is correct that the inaction of the parties concerning renewal and their subsequent behavior consistent with the existence of a Franchise Agreement gave rise to an implied-in-fact contract. Defendants concede as much when they state that the relationship after April, 1992, was defined by the conduct of the parties, not the Franchise Agreement. Although the parties have not characterized it as such, the provision of the Franchise Agreement for renewal was an option. An option contains an offer to do something which does not become a contract until accepted, and an agreement to leave the offer open for a specified time or for a reasonable time. 12 I.L.P. Contracts §2, citing, *Hermes v. William F. Meyer Co.*, 65 Ill App 3d 745, 382 N.E.2d 841 (1978); see also cases cited at 12 I.L.P. Contracts §2 n.24. The Franchise Agreement gave defendants an option to renew the contract upon written notice and required that they sign a renewal agreement within 90 days after receiving it. The franchisor was required to give one year advance notice if it chose not to renew. Where as here CFM of Illinois had not given notice of nonrenewal, defendants had the right to exercise their option and bind CFM of Illinois.

In general, failure to comply with the terms of an option requiring specific acts for its exercise prevents its effective exercise and, as a result, there arises no executory contract between the parties. *In re Estate of Girga*, 15 Ill. App. 3d 916, 921, 305 N.E.2d 565, 568 (1973), aff'd, 60 Ill 2d 27, 322 N.E.2d 798 (1975). In *O'Brien v. Board of Education*, 70 Ill. App. 3d 604, 607, 388 N.E.2d 1104, 1106 (5th Dist. 1979), the Illinois case I have found closest to the facts presented in this case, the court held that the failure of the offeree to expressly exercise the option, coupled with evidence that the parties did not view the option as having been exercised even though they continued to perform under the original agreement, effected an executory contract terminable at will. There, plaintiff entered into a three-year written contract with a school board to prepare the board's payroll. The contract provided two one-year options. After the three-year term expired plaintiff continued to prepare the payroll for a number of months during the succeeding year. Learning that the board planned to prepare its payroll in-house, plaintiff wrote inquiring about how long his services would be required, stating, "During the last number of years our firm has operated under a verbal contract, which is automatically renewable on an indefinite continuing basis ...." After being informed that his services would not be required after a particular date, plaintiff responded, "Since termination by District 189 has been established by your letter ...." In court, however, plaintiff argued that he had exercised his option by continuing to perform under the agreement. The court rejected this argument citing 17A C.J.S. Contracts §449 (1963):

Except in the case of an automatic renewal, ... the fact that the parties by their acts and declarations indicate an intention to treat a written contract as continuing after the time prescribed in it for its termination will not have the effect of continuing such contract, although it may show a subsequent oral agreement on the same terms.

The court's conclusion was "bolstered" by the evidence that the plaintiff himself considered the relationship capable of termination prior to the end of the option period. *O'Brien*, 70 Ill. App. 3d at 608, 388 N.E.2d at 1107. Because the option had lapsed the court ruled that the parties were operating under a contract with no specific duration, stating, "Executory contracts of indefinite duration are terminable at the will of either party." *id.*, and awarding plaintiff's payment only through the date given in the notice of termination.

There is some Illinois authority in the employment context, cited by plaintiff, for the principle that where an employee continues working under an expired contract, a presumption arises that the contract was renewed on the same terms. E.g., *Consolidated Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224 (7th Cir. 1990); *Foster v. Springfield Clinic*, 88 Ill. App. 3d 459, 410 N.E.2d 604 (1980). But PP&K does not argue that the parties' agreement was renewed for another five-year-and-10-month-period but merely was extended until PP&K gave notice of termination. Rather than these employment cases, O'Brien gives better guidance in this case. Similar to O'Brien, McCumber had the power 18 months in advance of April 30, 1992, to exercise the option. She failed to do so then or at any time, however, and indicated to PP&K by the October 1993 letter and in conversations with Purcell that she considered the contract expired. Under O'Brien, a contract terminable at will should be implied. Of course, this pertains merely to duration and not to whether PP&K proceeded correctly under the implied contract terms and Illinois law. See Illinois Franchise Disclosure Act ("IFDA"), 815 ILCS §§705/1 et seq.

As indicated above, the original Agreement may well define the terms of the new implied-in-fact agreement. Indeed, both parties rely on the Franchise Agreement to define procedures, rights and liabilities with respect to ending the relationship. Since they agree, it surely follows that, other than the duration of the contract, which is defined by Illinois law, the language of the Franchise Agreement controls.

An election not to renew under Section 14 implies an intention to let the agreement expire. McCumber in electing not to sign the proffered franchise agreement elected not to renew the franchise, i.e., to let it expire. But since the contract at this point was one without specific duration, it would not expire until one party or the other took action to end it. PP&K took action, following the contractual (and in compliance with statutory) procedures for termination based on "good cause," breach of a material term of the contract. In response, defendants argue that their refusal to sign the written agreement was not a material breach of the agreement which would give rise to cause for termination. [9] Therefore, PP&K's hands are simply tied until the Lease expires. So it must be decided whether the refusal to sign was a material breach.

Materiality of breach is ordinarily a question of fact. Calamari & Perillo, *Contracts*, 408 (1979), citing, *Coxe v. Mid-America Ranch & Recreation Corp.*, 40 Wis. 2d 591, 162 N.W.2d 581 (1968). Calamari & Perillo explain,

There is no simple test to ascertain whether a breach is material. Among the facts to be considered are: 1) to what extent, if any, the contract has been performed at the time of the breach.... 2) A willful breach is more likely to be regarded as material than as [*sic*] a breach caused by negligence or by extraneous circumstances. 3) A quantitatively serious breach is more likely to be considered material. In addition, the consequences of the determination must be taken into account. The degree of hardship on the breaching party is an important consideration particularly when considered in conjunction with the extent to which the aggrieved party has or will receive the substantial benefit of the promised performance and the adequacy with which he may be compensated for partial breach by damages.

The starting point in ascertaining the materiality of McCumber's refusal to sign the written agreement is the instrument itself which, as stated in Section 7, authorizes the parties to demand exact compliance with every term. It is not necessary to decide whether this would operate to let either party declare a term to be material, however, because based on the factors cited above, the clause is material to this contract. As soon as Purcell discovered that he had no written agreement with defendants, he tendered one. This indicates, regarding 1) above, that he did not continue to perform as if the matter were unimportant. Factor 2) weighs in plaintiff's favor in that Purcell on numerous occasions gave McCumber the opportunity to sign the agreement. McCumber's refusal to sign was therefore willful, not negligent or the result of unavoidable circumstances. Regarding factor 3), PP&K treated the matter as a serious breach. Purcell testified that he has written agreements with all of his franchisees. Indeed, one would expect a relationship of this complexity to be in writing so as to avoid misunderstandings and disputes. Purcell testified that he is concerned that if one franchisee is permitted to operate outside a written agreement, others would want the same privilege, which would eventually undermine his entire business. Nothing in defendants' submissions suggests that the breach of this term was minor or insignificant. For these reasons, I conclude that McCumber's decision not to sign a written agreement was a material breach of the agreement between the parties.

Once it is ascertained that the breach was material, it follows that PP&K had a right to terminate and that the rights and obligations under Section 17 come into force. It is submitted that this construction of the language of the agreement gives effect to the intention of the parties, whereas defendants' construction does not fairly treat

the language of the contract as a whole, does not give effect to the obvious intent of the parties and leads to the absurd result that defendants can remain on the premises and operate a competing store in spite of the explicit clauses in the contract to the contrary."

In regard to the covenant not to compete, defendants have argued that the covenant does not apply because plaintiff did not terminate prior to expiration. Because I have concluded that a contract existed at the time notice of termination was given, this argument has no force, i.e., it was terminated before expiration. Defendants have not asserted that the covenant is unreasonable in scope or duration. See *Booth v. Greber*, 48 Ill. App. 3d 213, 363 N.E.2d 6 (1977) (upheld electrolysist's interest in her established clientele to be protectable through a covenant against competition for two years within a 25-mile radius of plaintiff's business); *Field Surgical Associates, Ltd. v. Shadab*, 59 Ill. App. 3d 991, 376 N.E.2d 660 (1978) (denial of injunction reversed where covenant restricted physician from practicing medicine within five miles of former partners). It is unnecessary to decide here, however, whether the covenant is reasonable because it is clear that defendants are not entitled to do business on the premises conveyed by the Lease. There is no allegation or evidence that defendants intend to conduct their business at any other location.

In summary, the clear intent of the parties to this contract was that defendants could operate a CFM franchise on the premises and when that agreement came to an end, either by non-renewal or by termination for good cause, the provisions of Section 16 of the Franchise Agreement would govern the closure of the relationship. Plaintiff is likely to succeed on the merits of its claims. Defendants' arguments lack any authority under Illinois law and the force of logic.

### 2. Lack of Adequate Remedy at Law, Irreparable Harm

Plaintiff has established that it has no adequate remedy at law and will be irreparably harmed if the injunction is not entered. Under *Roland Machinery*, a plaintiff must show that an award of damages at the end of trial will be "seriously deficient as a remedy for the harm suffered." *Roland Machinery*, 749 F.2d at 386, citing, *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970), and 11 Wright & Miller, *Federal Practice and Procedure*, §2944, at 396. A damages remedy may be inadequate if it comes too late to save the plaintiff's business or if the nature of the plaintiff's loss may make damages very difficult to calculate. *Roland Machinery*, 749 F.2d at 386. PP&K argues that if an injunction is not entered it will not be able to relicense a Lincoln, Illinois location while permitting defendants to remain and reap the benefits from their former affiliation with CFM. It believes it will also be irreparably harmed in its relationships with its other franchisees because its standard Franchise Agreement will be undermined. In unfair competition actions, damage to the party whose mark is allegedly infringed is presumed to be irreparable. E.g., *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982), quoted with approval in, *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988); *Kinsey Distilling Sales Co. v. Foremost Liquor Stores, Inc.*, 15 Ill. 2d 182, 194, 154 N.E.2d 290, 296 (1958). Likewise, when a landlord has a right to possession of premises, the law requires the defendant to surrender possession. 735 ILCS §§5/9-101 et seq. Breach of a covenant not to compete results in irreparable harm and is appropriately enjoined. See, e.g., *Central Water Works Supply, Inc. v. Fisher*, 240 Ill. App. 3d 952, 959, 608 N.E.2d 618, 623 (1993) (The loss of customers and sales resulting from breach of covenant not to compete and the threat of continuation of such loss to a legitimate business interest is sufficient to show irreparable injury). These are matters which cannot be fully redressed by assessment of damages. Defendants argue that plaintiff has an adequate remedy at law which can be remedied merely by damages in the amount of the monthly fees. As above, defendants cite no authority for their position and it is inconsistent with the law of Illinois.

### 3. Balance of Harms.

Before an injunction may issue, the court must weigh the irreparable harm the plaintiffs will suffer if the preliminary injunction is denied against any irreparable harm that the defendants can show they will suffer if the injunction is granted; evaluate the likelihood of success in light of the balance of harms (the more likely the plaintiff is to win, the less heavily the balance of harms weigh in their favor; the less likely they are to win, the more it need weigh in their favor); and where appropriate, consider the public interest. *Roland Machinery*, 749 F.2d at 387-88.

Defendant McCumber will likely suffer greater harm if the injunction is issued than PP&K will suffer if it is denied. McCumber has testified that this store is her livelihood and that she cannot afford to start another business at another location. If a preliminary injunction is entered by which defendants are dispossessed, plaintiff

will receive the great portion of the relief to which it would be ultimately entitled if it wins on the merits. In the event that defendants should ultimately win on the merits, their business would by that time be dissolved. Plaintiff, while suffering irreparable harm which should not be discounted, does not face drastic economic injury such as insolvency. On the other hand, Roland Machinery requires the court to measure the balance of harms in light of likelihood of success on the merits. Here, PP&K has an overwhelming likelihood of success on the merits. In addition, PP&K has given defendants more than ample opportunity to continue in the franchise relationship but defendants have, for reasons that are not entirely apparent, adamantly refused."" Under these circumstances an injunction which would prohibit defendants from using the premises for the purpose of competition with plaintiff is an appropriate exercise of the injunctive powers of the court.

**4. The Public Interest.**

Although the public interest normally lies in upholding the rights of the parties, I find no particular public interest at stake in this case.

### Conclusion and Recommendation

For the reasons stated above, it is concluded that plaintiff is likely to succeed on the merits; and that although defendants may suffer greater immediate harm if an injunction is entered than will plaintiff if an injunction is denied, the balance of harms in light of likely success on the merits weighs substantially in favor of plaintiff. Therefore, it is recommended that the plaintiff's motion for preliminary injunction be granted and that the court enter a preliminary injunction requiring defendants

(a) to cease using any names, marks, signs, forms, advertising, telephone listings, operating manuals, supplies, products, merchandise, and all other materials of any kind which are associated with CFM;

(b) to refrain from representing themselves in any manner as being associated with CFM or in any manner likely to cause confusion that defendants are associated with CFM;

(c) to cease operating the store in competition with CFM;

(d) to turn over possession of the premises to plaintiff; and

(e) to cooperate with plaintiff in regard to transfer of assets as provided in the Franchise Agreement.

Although I recommend that a preliminary injunction is proper under the circumstances presented, the court may also wish to consider ordering that the CFM store be restored to its pre-litigation condition, that defendants continue to operate the store *pendente lite*, and that the parties arrange to place in escrow the profits from the store until this case can be resolved. Because PP&K has been satisfied with McCumber's performance in the store, this may be an acceptable compromise for PP&K if its rights are preserved. Whatever Your Honor may decide, however, it is important to eliminate the existing situation where defendants are operating a competing store in violation of the Franchise Agreement and the Lease.

Written objection to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable George W. Lindberg within ten days after service of this Report and Recommendation. See Fed. R. Civ. P. 72(b). Failure to object will waive any such issue on appeal.

[1] Although it would appear that defendants do not have significant contacts with the Northern District of Illinois, see §1391(c), the Franchise Agreement at issue waived defendants' objections to venue.

[2] The terms of the Franchise Agreement, Paragraph 1C, provided,

"Licensor and Company own proprietary Know-How comprising knowledge of the design and operation of a 'Convenient Food Mart' store ('the Know-How'). Company will disclose the Know-How to FRANCHISEE ... on the condition that FRANCHISEE agrees that he will not use the Know-How in any other business or capacity and will maintain the confidentiality of such Know-How during and after the term of the franchise."

the same provisions as the old: and ordinarily the existence of such a contract is determined by the 'objective' test, that is, whether a reasonable person would think the parties intended to make such a new binding agreement. Consequently, where, after the expiration of a contract fixing the reciprocal rights and obligations of the parties, they continue to do business together, the conduct of the parties may at times permit, or even require, a finding that they impliedly agree that their rights and obligations in connection with such business should continue to be measured as provided in the old contract; but even in such case, the reciprocal obligations arise from the new implied contract and, unless an intent to make such a new contract is expressed or may be fairly inferred from the conduct of the parties, the obligations of the parties are as a matter of law not measured by the terms of the contract which has expired."

[7] Professor Corbin states:

"Parties who have made an express contract to be in effect for one year (or any other stated time) frequently proceed with performance after expiration of the year without making any new express agreement, of extension or otherwise. From such continued action a court may infer that the parties have agreed in fact to renew the one-year contract for another similar period."

1 Corbin, *Contracts* §18, at 43 (1963).

[8] Section 7 of the Franchise Agreement permitted plaintiff to demand compliance with any term even though it had waived it in the past.

[9] IFDA, 815 ILCS 705/19(b), defines "good cause" as including " ... the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days."

[10] The primary purpose of contract construction is to give effect to the intention of the parties. E.g., *Boatmen's National Bank of St. Louis v. Smith*, 835 F.2d 1200, 1203 (7th Cir. 1987), citing *Schek v. Chicago Transit Authority*, 42 Ill. 2d 362, 364, 247 N.E.2d 886, 888 (1969); *Freeland v. Edwards*, 11 Ill. 2d 395, 142 N.E.d 701 (1957). As a rule contracts should receive a reasonable construction, not one that would lead to absurd results. *Llewellyn v. Board of Education*, 324 Ill. 254, 154 N.E. 889 (1926); *Borys v. Josada Builders, Inc.*, 110 Ill. App. 3d, 441 N.E.2d 1263 (1982). A strict construction of unambiguous language which reaches a different result from that intended by the parties should not be adopted. *Schek*, 42 Ill.2d at 364, 247 N.E. 2d at 888; *Richards v. Liquid Controls Corp.*, 26 Ill. App. 3d 111, 325 N.E.2d 775 (1975).

[11] The offered franchise agreement is an adhesion contract which gives McCumber only a "take it or leave it" bargaining position. Although less than satisfactory to her, she makes no argument that the contract is unconscionable.

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company