CCH Internet Research NetWork

STATE-DECISION, BUSINESS FRANCHISE GUIDE ¶10,222, International Bartending Institute, Inc. v. Patricia N. Baird. (Dated March 31, 1993)

© 2006 CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

International Bartending Institute, Inc. v. Patricia N. Baird.

Florida Circuit Court, Thirteenth Judicial Circuit, Hillsborough County, Case No. 92-9204, Dated March 31, 1993

Franchisor Could Enforce Noncompetition Agreement Against Breakaway Franchisee

**Noncompetition Agreements --Enforcement Against Breakaway Franchisee --Exception to General Statutory Prohibition --Franchisor's Continuation of Business in Territory --Interference with Business.**

A bartending school franchisor could enforce a post-term noncompetition clause against a breakaway franchisee under an exception to the Florida general statutory prohibition on noncompetition agreements. The statute specifically permits a trademark and business format licensor to enforce a post-term noncompetition agreement against its licensee as long as the agreement is reasonably limited in time and area and the licensor continues to carry on a similar business in the area. A contention that the franchisor did not continue to carry on a similar business because it neither operated nor franchised another school in the area was rejected on a finding that the breakaway franchisee's continued operation under a confusingly similar name precluded the franchisor from carrying on business. A literal application of the statute, permitting the breakaway franchisee to avoid enforcement of the clause, would lead to an absurd result. The breakaway franchisee's argument was akin to that of the child who shoots his parents dead and then seeks mercy from the court as an orphan.

[Letter Decision in full text]

GALLAGHER, Cir. J.: I have just now completed a thorough review of this case to include the two files, the numerous exhibits contained in a box, the memos, my trial notes and the trial transcripts. I even read all the instruction material relative to mixing the drinks but probably could not pass the final examination. My thoroughness even went as far as the reading of Mr. Kaufmann's hyped bio and all the articles contained therein.

Its not often that we have the privilege and pleasure of seeing and hearing a New York franchise expert in action. The articles were instructive and well written. Especially ironic are the following remarks in Vol. 22 #4 of the Continental Franchise Review, page 2 (Feb. 28, 1992) "*With distressed franchises you should not resort to legal intimidation,* Mr. Kaufmann warned. "Do not use us in a distress situation to attack. Do not use us to file immediate termination suits for late payment or non payment of royalties" he said. "You don't solve economic problems with a sledge hammer. *Even if you win in Court, you lose.*" Mr. Kaufmann said. Your company spends thousand of dollars on legal fees and preoccupies itself with a short term goal of winning a lawsuit rather than pursuing the long term goal of strengthening the system. And the whole system loses because of the ill will generated by the action.

What probably caused this lawsuit was the fact as hinted on page 4 of Plaintiff's closing argument "other franchisees have indicated to Mr. and Mrs. Haren that they are watching this case closely to see whether they should join Mrs. Baird in failing to make royalty payments to IBI and continuing their operations independent of IBI." As it developed during the trial, other franchisees pulled out with success to where they had used the same names but what the factual circumstances were in the half dozen or so separatists was never delved into. Maybe they all left the "family" on friendly terms for all we know. There is however some legitimacy to Mr. Campbell's argument that IBI allowed its mark to be weakened in those instances therein.

So the Harens feared an uprising somewhat like the break up of the Soviet Union but Mrs. Baird it appears wasn't in revolt as much as in economic stress so that Mr. Kaufmann's advice not to use a sledge hammer

probably was wise. However apparently Mr. Haren ran out of patience. Mrs. Baird apparently didn't even send in the enrollment forms and figures which was tantamount to telling the Harens to go to hades.

The plaintiffs brief says that Mrs. Baird cut and ran because of advice of attorney however she admitted that she ran into economic difficulties due to IRS problems which she lays on the Harens because of her being forced into an independent contractor status.

Mrs. Baird had a long standing relationship with the Harens and it appears that the nasty stuff about the FTC came after the law suit was filed and was not the cause of the nonpayments as is implied. So yes, the IBI contract was breached by Mrs. Baird and yes the non compete covenant was breached. The royalties payments dried up without any legal justification with respect to the basic contract.

Basically there was no allegation by Mrs. Baird that the Harens breached the IBI contract. There is however evidence that Mrs. Baird did not live up the contract terms. The overall defense to the termination action was to charge fraud in the inducement, fraud *ab initio* and other allegations of misrepresentations in that the FTC disclosure statements were never provided in 1981 or if same were provided Mrs. Baird would never have tied in with the Harens if full disclosure was given. Mr. Campbell paraded a lot of other franchisees into court that were similarly duped. It appears that the Harens were not playing by the FTC rules until Mr Kaufmann came on board and steered them on the straight path.

Mrs. Baird talked about a recent FTC probe which she intimated created doubts in her mind as to the Harens' operation and justified her termination of her franchise. As pointed out by the plaintiff this investigation did not and does not justify any type of contract breach. I can say that the 1981 nondisclosure allegations are too little and too late but what the latest investigation develops may become legally significant in the future if pursued via the FTC.

The fraud argument would be persuasive if it weren't for the strong argument that the damages aren't there. Mrs. Baird was the highest producer in the whole family of stores grossing over 2 million in her franchise tenure so if there was fraud in 1981 its continuing existence did not prejudice Mrs. Baird one iota. I will concede that the Harens probably were not 100% forthright in their initial relationship with Mrs. Baird. Certainly the Charles Rush incident might be an example of their business ethics. I along with Mr. Campbell am disturbed that full disclosure wasn't forthcoming voluntarily and had to be discovered by the defendants.

Before learning of the stepson caper, I had put very little or next to no credibility in the whole testimony of Mr. Rush. It disturbs me that a routine telephone spiel like this can be the subject of a copyright. At any rate, I'm not giving the testimony any credence and for appeal purposes and on my own motion the entire testimony is stricken or will be stricken on the record. The telephone presentation is not protected. I would certainly hate to think that plaintiffs attorneys were a party to the duplicitous testimony. If this was the main and essential testimony to prove a preliminary injunction I would buy the clean hands doctrine but unfortunately for Mrs. Baird plaintiffs case does not rise and fall on the sweet heart testimony of Mr. Rush. At any rate it was bush league all the way. I also agree with Mr. Campbell that Mr. Haren did a lot of back pedaling on the "exact same disclosure" form testimony but again this was not so egregious as to call for the unclean hands doctrine applicability. Enough said about the ethics or lack of ethics of the plaintiff.

We went around and around about the Lanham Act. Was it part and parcel of the case or wasn't it? The amendment to the complaint puts it in issue so we will talk about it. I am not finding as a fact that Mrs. Baird and/or Kanel Inc., violated each and every litany of things that the plaintiffs proposed order enumerate. Certainly the telephone spiel is out. The main thing that I think the plaintiff proved was the use of the advertising in the yellow pages that says learn bartending in big bold letters and then it gives the numbers and it says International Bartending since 1977. This was later changed to International Bartending School. Mr. Campbell argues that use of the names International and Bartending aren't actionable and I have to disagree. I think there is a confusion generated by the similar names so I will especially so find on this issue --see *E. Remy Martin & Co. v. Shaw-Ross International Imports, Inc.*, 756 F. 2d 1525 (11th Cir. 1985). As to the other copyrights trademarked, etc., there was no adequate proof of violations.

There was no proof that Mrs. Baird is using any of the trade marks, bar books, brochures of IBI, etc. I'm not going to open the hearing up to give Mr. Campbell opportunity to bring in witnesses to show Mrs. Baird is squeaky clean as to IBI techniques.

I'll concede for Mr. Campbell's sake that Mrs. Baird did make changes to the IBI format, especially to the telephone spiel, that she has redesigned all brochures to take out the IBI marks and that her sales people aren't mentioning IBI or using any trade secrets of IBI as mentioned previously. I'm only zeroing in on the telephone ad for Lanham purposes.

Finally, Mr. Campbell's bellwether argument is what is termed by plaintiffs as The "Continues to Carry on Like Business Thesis." Mr. Campbell says Mr. Kaufmann puts the cart before the horse because Mrs. Baird and Kartel Inc., are not illegal until IBI is actually operating a like business in Hillsborough and or Pinellas County. Mr. Kaufmann says it was only due to Mrs. Baird's unlawful violation of the post termination provision of the license agreement which has prevented IBI from carrying on a like business.

I think Mr. Kaufmann's position is more logical --Mr. Campbell's argument is akin to the kid that shot his parents dead and complained about being an orphan. I think it is the old "but 'for'" tort principal that is applicable. I agree that the ultimate result of Mr. Campbell's argument would defeat the Florida Legislature's intention in enacting Fla Stat 542. 22(2)(b).

Mr. Kaufmann says that Mr. Campbell's interpretation would do away with franchising if a franchisor couldn't protect the territory when being the victim of the violations of the franchise agreement they have to run out and set up another franchise so they can say they have another business going.

Essentially, I feel that all the six elements of a preliminary injunction have been met, irreparable harm being the main element.

In summary, I will find Mrs. Baird learned all she knew about the business as an IBI license, that she breached her covenant not to compete, that the Lanham Act has been considered. Because I realize the extent of the power the court has in the use of a preliminary injunction, I am generally reluctant to grant preliminary injunctions unless the case is clear. I feel that IBI has satisfied its burden of proof.

I agree with Mr. Campbell that a hearing needs to be conducted as to a bond, I also agree with Mr. Campbell that the bond decided will need to be substantial as opposed to minimal. The injunctive order will not be signed until the bond is in place. Despite the acerbic nature of the hearings I do appreciate the attempts at civility and I do find that the briefs and/or memorandums were first class caliber and very helpful. Mr. Campbell made a real horse race out of this case by putting the plaintiffs on the defensive most of the case. He sure had the Harens squirming and scowling. I think Mr. Kaufmann will concede that Mr. Campbell can hold his own with New York lawyers. A lot of legal ability and talent were displayed on both sides.

© 2006. CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company