CCH Internet Research NetWork

**US-DIST-CT, BUSINESS FRANCHISE GUIDE ¶11,345, ATL International, Inc. v. Mohammad Baradar. (Dated November 12, 1997)**

© 2006 CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company

### ATL International, Inc. v. Mohammad Baradar.

U.S. District Court, District of Maryland. Civil No. JFM-97-3642. Dated November 12, 1997.

#### Relationship/Termination --Noncompetition Agreements --Preliminary Relief --Enforcement of Agreement --Reasonableness of Terms --Irreparable Harm to Franchisor. --

An automotive repair franchisor was entitled to a preliminary injunction enforcing a franchise agreement's post-termination covenant not to compete against the franchisee. The covenant's geographic and time limitations --ten miles and two years --were reasonable. In addition, the franchisor would suffer irreparable harm if the franchisee were permitted to continue operating in violation of the covenant. Allowing a "breakaway" franchisee to continue operating in violation of a covenant not to compete very well could send a signal to other disgruntled franchisees that they could also break away, thereby unraveling the entire franchise system. No monetary remedy could adequately compensate the franchisor for such harm. While the franchisee undoubtedly would suffer harm if an injunction were issued, any such harm was the direct result of its executing an agreement containing a noncompetition covenant.

**Back references: ¶845.60, ¶845.70.**

### PROCEEDINGS

### [In full text]

THE COURT: Who do I have on the line?

MR. HILLMAN: Your Honor, this is Allan Hillman and Grover Outland, General Counsel for ATL International.

Your Honor, I have the honor of presenting to Your Honor Thomas B. Howell, the President of ATL.

Your Honor, also on the line is chief counsel for Mr. Baradar, J. Michael Dady, in Minnesota, his colleague, Mr. Jeffrey Haff, and Mr. Baradar himself is also on the line from Oregon.

THE COURT: All right. If I could please ask you all to identify yourselves each time you speak since I do have a court reporter here.

We are here in the case of ATL International versus Baradar, Civil Action Number JFM-97-3642, on ATL's motion for a preliminary injunction.

The last legal memorandum was submitted by ATL. I did get these transcripts that Mr. Baradar submitted, but I would think the most efficient way to proceed would be to hear from Mr. Baradar to respond to the reply memorandum that ATL has filed.

Who would like to speak for Mr. Baradar?

MR. DADY: I would, Your Honor. This is Michael Dady with the firm of Dady & Garner in Minneapolis today.

THE COURT: All right. Go ahead.

MR. DADY: With respect to the issue of injunctive relief. Your Honor, the concept is basically this: it seems to me. The wrecking ball is about to knock over the historic building. In other words, is there some type of irreparable harm that is going to incur here if the Court does not grant the relief requested?

The courts in your jurisdiction look at that as the preeminent criteria, as does the United States Supreme Court in the case of Sampson versus Murray. They say that you've got to look at that first, and the irreparable harm must both be both substantial and irreparable.

In this case there is an adequate remedy at law. Sometimes in Maryland they talk about that as being a separate factor. It does seem to me that one is the mirror image of the other, that is, in determining whether there is an irreparable injury or not, you look at would money damages be adequate?

In this case the franchisor is claiming they are entitled to keep my client out of the business of providing oil changes and lube jobs and related services for two years. If in fact they are right --we have several reasons why we contend they are wrong --the damages are very simple.

Determine the two years worth of revenue, multiply that times seven percent, and subtract from that any mitigation efforts that the franchisor reasonably undertook or should have undertaken, and that is the damage. So there is a very clear money damages remedy here. There is no irreparable harm.

With respect to the law on this point, the segue into the law, of course, is the fact that in that regard, I noticed that the principal case, Judge, that they rely on is the case of Jiffy Lube versus Weiss Brothers, interesting because it is in the same industry. That case happens to be out of New Jersey.

In that case, however, injunctive relief was granted because, and properly so, I might add, in that case the franchisee continued to use the trademark and had been caught, in the words of the Court, with his hand in the till.

The Court said we are going to enforce in this case, where you have such unclean hands, a franchisee who admittedly has been caught with his hands in the till, we are going to enforce the covenant, but we are going to reduce it. We are not going to make this at ten miles. We are going to make this three miles. We are not going to make it two or three years. We are going to make it ten months.

But even in that case, where the franchisee is using the mark, and is caught with his hands in the till, we are going to impose a one million dollar bond because if we, the Court, are wrong here, the damages to this operator will be very substantial.

In this case, Judge, by contrast, we did not end the relationship and continue to use the mark; rather the franchisor ended the relationship. That is an important distinction. They terminated our client.

Our client has good claims against the franchisor for violations of the applicable state Franchise Acts in both Oregon and Maryland for fraud in the inducement.

In that regard, by the way, we noticed with respect to the fraud in the inducement claim that the franchisor is assuming that Maryland law applies. We don't know why because in the franchise agreement it says Maryland law applies with respect to the contract.

With respect to the fraud claim, of course, involving an Oregon plaintiff, it does seem to us that Oregon law would apply. In the case of Campbell --this is not in our brief. Judge, because it just came up in their reply -- Campbell versus Southland Corporation, 127 Oregon Appellate Court 93, at 871 P.2d 487, a 1994 decision of the Court of Appeals, the Court said what most judges of the country recognize, and that is this, that the law long ago abandoned the position that a written contract must be held sacred, regardless of the fraud of one of the parties in procuring it. It is for the jury to decide whether a party is entitled to rely on a verbal representation to conflict with the written agreement.

The precise holding in this case was the question of fraud in the inducement is one for the jury, not to be disclaimed ineffectively with the writing.

Case 7:07-cv-06404-CLB   Document 6-20   Filed 07/19/2007   Page 3 of 21

There are many, many cases from other jurisdictions that hold to the same effect. I don't see there is any point in stream citing them, but they are out.

So we have different fact situations than the Jiffy Lube case. We have no irreparable harm, and we then rely principally on four cases on the fact scenario.

The case out of your jurisdiction, Your Honor, it is a Maryland case. It is Budget Rent-A-Car versus Raab. I think the franchisor does a very fair job of framing the issue with respect to looking at whether a covenant post-term should be enforced, and that is to determine whether the law of a particular jurisdiction is going to look at it like the sale of a business or they are going to look at it like an employment contract.

Where they miss the mark, however, is they suggest that we agree with them that Maryland jurisdiction would look at a franchise post-term non-compete like the sale of a business. We dispute that, and I think our brief was intended to be very clear on that.

Raab says you look at a franchise relationship. In Budget Rent-A-Car it was a rent-a-car license, a clearly sophisticated business as a franchise that changes oil and lubes a car.

They say in Maryland the test in a franchise post-term covenant is like that of an employment relationship. In applying that test, not surprisingly in the Raab case they said we are not going to shut this guy down under the circumstance. The injunction is denied.

The second case we rely on besides the Raab case is out of Ohio, and that is the Physicians Weight Loss versus Creighton case. What that case says that is important for Your Honor's determination of this issue we believe is that you need existing competition within the state in order to determine whether a covenant should be enforced. If there is no existing competition within the state, we are not going to speculate about what might happen in the future. Since there is no competition at that time, we are going to deny the covenant in the writing as a matter of law.

The facts are the same here. We can dispute how far away the next state's location is, but there is no dispute that there are no other franchise locations in the entire state.

THE COURT: Now, the state is not --

MR. DADY: By the way, Judge, you will notice in Mo's affidavit he offered his opinion. We apologize for this. He thought he was right. He offered his opinion that the closest location was in another state, was 35 miles away. That was his best estimate.

He had one of his employees drive the distance today over the commonly traveled route between Vancouver, Washington and Lake Oswego, Oregon. He is prepared to testify that the precise distance is 26.7 miles, not the 15 that is referenced in the papers of the franchisor in this case.

So we are sorry. We were off by about eight miles on that, but he drove it today when that became in dispute, or he had an employee do it, and it is 26.7 miles.

With respect to the third case, Judge, that we rely on, it is the Flem Metals case out of Oregon. That case says this. When you are looking at whether it is appropriate to grant injunctive relief in a post-term situation, you want to look at are there some real secrets? If you are looking at an employer/employee situation, are there some real trade secrets that need to be protected here against disclosure in the market place or some form of unfair competition?

The burden is upon the moving party to demonstrate some secret. We are not talking about designing or manufacturing a heart valve here. We are talking about lubricating the belts in automobiles.

The franchisor has not pointed to a single significant trade secret that it needs protection against in this situation, and that is because there are none. That is the only logical assumption or certainly their capable

counsel would have pointed them out

So that is the Rem Metals case out of Oregon. It is cited in our brief

The fourth case that we rely on, Judge, we mentioned. That is Clampdel versus Southland, and that is the case out of Oregon which says in Oregon, when you are looking at a fraud in the inducement in a contract with an integration clause, we are going to look at all the facts, not just the document drafted by the franchisor in determining whether there has been a fraud here

So with respect to irreparable harm, we submit there is none to the franchisor because they have an adequate remedy at law

On the other hand, with respect to the irreparable harm to the franchisee, it is the case that if he is told, in this premises where he has got two and a half years left to go on the lease, he is out of business, he is going to be pushed in all likelihood, as his affidavit points out, certainly out of business and into bankruptcy

There is a whole laundry list of cases that say putting a franchisee out of business constitutes irreparable harm. Indeed, the case that the franchisors rely on, Judge, the Jiffy Lube case points out, I think they called it a death penalty.

They said in that case, because he was using the trademarks of the franchisor, wanting that fact, even though he ended the relationship and he was caught with his hand in the till, the death penalty is in order there.

It isn't in order, we submit, Judge, on the facts present in this case, which is the segue into the second point that we have here, the Court properly considers under Maryland law in deciding whether it is going to grant injunctive relief, and that is balancing the hardship. We submit that the hardship to the franchisee in this case is so much greater than the hardship to the franchisor that you can't weight them on the same scale.

The franchisee is talking about a single isolated franchise out there left to develop his own market all by himself in Oregon, and there is going to be no type of irreparable harm to the franchisor if the injunction is not granted; whereas the common definition of irreparable harm, that is you are out of business, would occur in all likelihood to this franchisee if the injunction is granted. So that second factor is well tipped decidedly in favor of denying the injunction here.

With respect to success on the merits, this case is in its earliest stages, Judge. It is just a few days or several days old. We don't even have an answer in yet, but we have laid out in our responsive papers a blueprint of a claim for a violation of the Oregon Franchise Disclosure Statute.

It is elementary. When franchises are sold, they have to be done consistent with the disclosure statute in place. In this case we are selling in Oregon. You have to comply with the Oregon statute. That means no earnings are claimed, unless you make them in a specified way.

We submitted an affidavit saying that they were puffing both the earnings potential of this business and the success ratio. That is a violation of the Oregon statute. It is also a violation of the Maryland statute.

When you are looking, as you are here, at equitable relief, one of the things you look at is is the contract, pursuant to which the covenant might be enforced, is that contract void or voidable because of a statutory violation or because of a prior material breach? If so, you don't need to look any further. There is nothing to be enforced.

In this case, that leads to the next point on the merits, Judge, and that is prior material breach of commitment by the franchisor. Mo's affidavit talks about the commitment that he received to be provided with substantial site selection assistance. He was furnished with none.

He talks about the commitment that he received for ongoing assistance in advertising, for example. He got none. In fact, what he got is reversed help. They ran up some ad bills and didn't pay them. He is left defending a claim in small claims court.

So there is a prior material breach here that would excuse an otherwise existing obligation to perform on a post-term covenant not to compete.

With respect to the fourth factor, Your Honor, public policy, it is not a huge factor generally, but where you have an out-of-business situation, the case law says it is in order to take a look at public policy, because we favor employment. We favor giving people an opportunity to pursue the trade that they have learned, and Mr. has learned this trade, oil change, lube job. It is what he knows, and selling ancillary products.

For the franchisor to attack him in the scurrilous way they have and suggest he admits underreporting revenue is a falsehood of the greatest order.

There is a $286,000 dispute here that is comprised of two things, 110,000 to 120,000 of customer discounts. In other words, he didn't get the money. They want seven percent on that.

Secondly, he was told in training, and it is even admitted in the affidavit of the franchisor in their submission, that they say that on ancillary products you do not owe a fee. The balance of that relates to ancillary sales of other products in which no fee is owed.

So there is nothing at all admitted with respect to any underreporting or any amount new, except for the fact that when he didn't get any services, starting in about February of '97, he, in exercising self-help, he ceased continuing to send in royalty checks for getting nothing in return, let alone a promise of service.

When you look at all four of those factors, Your Honor, we submit that all four of them support denying the injunction in this case. Let's develop the facts and go forward and have the trial on the merits.

If it should turn out that the franchisor's dreams as reflected in their papers are realized, they have an adequate remedy at law because my guy will be in business and will be making money. He can pay a money judgment equal to seven percent he would have earned in the next two years, less any appropriate mitigation offset if by any chance the Court were to ignore the facts and the law as we presented them and grant the injunction.

The last thing I would say is we think you should look at the Jiffy Lube case where in that case, unlike this one, the franchisee is caught with his hand in the till. Unlike this case, he continues to operate with the trademarks and the Court says I am going to give you a three mile radius. I am going to give it to you for ten months because that is more than enough time to put another franchisee in there, and I am going to require the franchisor to post a one million dollar bond.

We think that is the worst thing that should happen in this case. For the reasons that we discussed, Your Honor, we don't think any injunctive relief should be granted. Thank you.

THE COURT: In terms of the relative harms to the party, you did not address one of their points that they suffer incalculable harm simply because the message sent to other franchisees that, you know, if you want to, just leave us, set up a business on your own, that is destructive to the very concept of the franchise.

MR. DADY: Thanks, Judge, because I want to talk about anything you want to talk about. I appreciate the opportunity to address that point.

In law school they used to call that the parade of horribles. They said when you don't have anything to argue on the facts and the law with respect to the particular situation at issue, talk about the parade of horribles, all the bad things that can happen.

What we say is the way the franchisor keeps people in the system is delivering on the commitments that it made, showing franchisees, like it said it would to my client, that there is actual value attached to this mark for staying in this system.

This is one isolated situation. Keep in mind, Judge, my client did not leave this system. This is something that they keep overlooking in their moving papers. He was terminated.

We wanted to sit down with them and negotiate a commitment from them to either honor their commitment or if not, let's cut the cord in an equitable way.

This cases arises out of the franchisor's termination of an do-it-yourself franchisee out there in Oregon and the fact that in this case the Court says to the franchisor go ahead, if you think you have a ten million dollar or a hundred million dollar damages claim against Mo, go make it.

That should be a deterrent if they are looking for one. But in any event, it seems to me the job of the plaintiff's lawyers, the defense lawyers in this case, and the job of this Court is to decide this case. In this case we are talking about one isolated franchisee in Oregon, and the harm that they talk about is speculative in the extreme.

The fact that an injunction is denied and the Court says go ahead and prove up your multimillion dollar damages if you can should give anybody out there that cares about what happens to Mo in Oregon pause about doing anything that some judge or jury might consider to be a violation of the franchisor's legal rights.

So our thought in a nutshell is the best way for any franchisor to keep his franchisee in the system is to deliver on its commitments and show them that there is value attached for staying in the system.

Secondly, we are not asking for any decision on the merits today, Judge. All we are saying is that where, as here, there is an adequate remedy at law, injunctive relief is not appropriate. It is not appropriate for the additional reasons as well.

THE COURT: All right. Mr. Outland, Mr. Hillman, who is going to be speak?

MR. HILLMAN: Your Honor, this is Allan Hillman. I would like to speak first and then provide Mr. Outland with an opportunity, if it please the Court?

THE COURT: All right.

MR. HILLMAN: Let me address Mr. Dady's point concerning the parade of horribles.

The Court in Jiffy Lube noted that --apparently the Court believed it wasn't such a parade of horribles --that specifically one of the reasons to grant the injunctive relief was that other franchisees would get the message that they could violate the agreement with impunity. These are the Court's words again. Such a result could be devastating to the franchisor. That is page 17 of our reply.

Your Honor, taking Mr. Dady's points one at a time, in the Budget case, and I appreciate Mr. Dady's characterization that we addressed it reasonably fully, and I give Mr. Outland credit for that, I think one point to be made about Budget is that it was decided in 1972, 25 years ago. It was decided at a time when there was virtually no franchising at all.

The interesting point is that apart from every other distinction between Budget and this case and all the subsequent franchise cases we cited, is that the Court didn't even ask whether there could be an analogy to sale of business cases. It treated it as if it was purely an employment case. The subject never came up.

Twenty years later Mr. Garner, who is my friend and Mr. Dady's partner, wrote a treatise in which he stated, as we quoted to Your Honor, that the appropriate analogy was the sale of business case. The reason for that is that the courts in 20 years have come around to that way of thinking.

Your Honor, I submit that the Maryland Court of Appeals presented with a franchise case in this day and age would conclude the same, but we do not have to rely on that because in this particular case there is no question that under any theory this covenant is enforceable.

Your Honor, let me note one other thing now on this subject. ATL does not merely do light maintenance. It doesn't just do oil changes, tune-ups. It is not a Jiffy Lube. It is not a Sparks Tune-Up, although in the Sparks

case, which we cited, the covenant was fully enforced for a ten mile radius.

ATL is a multifaceted organization which does heavy maintenance, including engine repairs. We haven't gotten into the subject of the radius. Your Honor, but under these circumstances, ten miles is entirely appropriate.

Five miles may have been appropriate in the Jiffy Lube situation. But in a situation where somebody gets major maintenance for $3500, like an engine repair, people will go a long distance to do that.

Your Honor, ATL used to have a longer radius in its original contracts. ATL did studies. ATL determined that ten miles was sufficient in its more recent contracts, and Mr. Baradar is a beneficiary of that.

The reason is that ATL is not interested in frustrating competition. It believes, and its legal department believes, that it ought to have a covenant not to compete to the extent necessary to protect itself, and no more.

Your Honor, with respect to the two years, Mr. Howell's affidavit goes into that at great lengths and I won't recapitulate it unless Your Honor wants to hear it, but it takes a very long time in the normal situation, particularly in view of the kind of heavy maintenance that ATL centers do, to get a center, to get through the zoning problems that don't exist necessarily with other light maintenance kinds of organizations, to find franchisees, to obtain the necessary permits, the processes set forth there.

Does it take two years all the time? No, Your Honor. Sometimes it takes longer; sometimes it takes less time, but the point is that we can't have a contract which says for every different franchisee or every different locality it will be one year for this person, five years for this, and so forth. You have to have something consistent which seems reasonable to your needs and the franch see's protection also.

That is why the ten miles is in there because sometimes it might be that seven or eight miles would be appropriate and sometimes --

In a situation where Mr. Baradar is, where it is not a major metropolitan area, ten miles is, quite frankly, probably too little. A person who has a major job to do is going to go ten miles, is going to go 15 miles. Your Honor, ten miles is a reasonable compromise from Mr. Baradar's standpoint certainly.

Mr. Dady said that Mr. Baradar, we are trying to stop him from doing business. Well, we are not trying to stop him from doing business. We don't have one of those non-competes saying you can't compete for two years, you can't compete with our centers.

A lot of franchisors have that sort of thing. They have provisions that say you can't compete with any of the franchisor's centers for two years.

Well, we don't do that at all. This is a modest covenant. It says you can't compete within ten miles of your own center, period. That is the only restriction.

As to Mr. Baradar being trained by us to do the job, I note that in their papers they say that Mr. Baradar didn't get any training at all. Now, Your Honor, it is convenient to argue that he got trained and, therefore, he has got to keep doing this.

Well, Mr. Baradar has got a wonderful background. I wish I had it. He was a financial consultant. He was the branch manager and sales manager of two companies, none at all in the automotive industry. He has a wealth of experience. He is not in any --he doesn't have the slightest problem in going out and getting another job.

Compare him to the poor guy who was the branch manager for the tree company in the Ruhl case in Maryland, where he was enjoined in a similar fashion, and he didn't know a thing but trees; but the Court of Appeals said well, it is a reasonable covenant, we've got to protect the employer. Here we've got a franchisor.

With respect to --let me tick off their cases. I've discussed the Budget case. Mr. Outland will be thrilled to discuss it at great lengths, but it is discussed at pages 18 to 22 of our original memo.

The key here is that protectable interest is the franchise itself. Case after case still hold it. More than that, if you just put that aside, we have substantial and spurred business good will, customer good will.

As Mr. Howell's affidavit makes clear, the repeat business in this kind of business is substantial. Half the customers or more come back. They don't come back next week, but they come back. That is undisputed.

Your Honor, with respect to the 26 miles versus 35 versus 15, covenants not to compete are not analyzed, as Your Honor knows, under the nearest road. They are analyzed by taking a map and doing a radius. That is the only way you could possibly do it. That was 15 miles.

My suggestion, Your Honor, is that Mr. Baradar simply pulled the wool over his counsel's eyes when he said 35. He certainly knew it wasn't anything like 35.

With respect to trade secrets, we demonstrated --first of all, trade secrets are one of the several protectable interests that support the covenant. You do not need to prove the existence of trade secrets.

We have protectable interests proven in the area of the franchise itself, as the McDonald's case says, as the Jiffy Lube case says, and every case we've cited says, and we've shown substantial customer good will.

I believe, frankly, we have shown that there is plenty of confidential information provided to the franchisee. The manual itself, if one actually looks at it instead of quoting six lines from it, demonstrates that; but Your Honor doesn't have to find or even reach the issue of trade secrets in order to grant this covenant.

With respect to irreparable harm, as I said, the courts have said over and over again that irreparable harm is not just the message sent to the other franchisees that they can break the system. That has happened, Your Honor, many times when these covenants have not been enforced.

But irreparable harm is the franchise system itself, is the loss of good will. There is no way to calculate that. There is no way to run a franchise system without some sort of protection like this.

I would defy, frankly, Mr. Dady to find a franchisor in the United States of any significance and any success who does not have a franchise agreement with a non-compete. I would tell you, Your Honor, from doing this work for over 20 years, that most of them are more far-reaching than ATLs.

Mr. Dady makes the point that in Jiffy Lube the fellow was continuing to use the trademark after termination, and that is why the Court struck him down.

Well, there were two issues in that case, Your Honor. One is unlawful termination and the franchisee challenged it. The other was whether the covenant not to compete would be enforced. I think Mr. Dady is mixing them up innocently.

The Court said yes, it could be irreparable harm if the franchisee is terminated, but went ahead and terminated it. The Court said yes, he was caught with his hands in the till, and that was the ground, not for the issue of the non-compete, Your Honor, but for the termination.

Now Mr. Baradar, Mr. Outland can speak to this, has proffered an explanation for the 286,000 shortfall, and we've submitted an affidavit that specifically states we will accept all of that merely for the sake of argument. There is still about $190,000 left that is unaccounted for, and there is no explanation given for it.

Although Your Honor doesn't have to reach that issue and resolve it here, it is pretty clear that there is plenty of reason to terminate this man. If you want to talk about unclean hands, he is the gentleman with unclean hands.

I think in terms of the law that applies here, the law that applies here is clearly going to be Maryland law. Not only because of the choice of law clause, but as Your Honor knows, under tort law it is the place where the injury is suffered.

So even if you ignore that, under Maryland law and the law of most jurisdictions, the law of the place that suffers, being Maryland, since this is where ATL's would be the law applied to, you know, to the tort.

Frankly, beyond that, if Mr. Barazan claims fraud on him, it is Mary, and law not only because of the fact that the agreement states it, but also because he was in Maryland when he was supposedly defrauded.

The next point, Your Honor, is with respect to the covenant, and I don't dwell too much on this, Your Honor, but Judge Harvey did recognize, albeit in dictum, that ATL's post-term covenant would be in enforceable.

Your Honor, with respect to the Physicians Weight Loss Center and the issue of competition, we discussed that case at page 21 of our brief, our reply brief.

The Court said there that the problem we have is that the franchisor has abandoned his interest in preserving his good will. That is a quote we cited on page 21 of our brief. The Court found that the number of centers had gone from 35 to 2. The franchisor didn't have anybody competing, but also had no plans to have anybody competing. It simply did not have a system anymore.

In another case that was cited by them, which they don't refer to, the O V case, the Court said that one of the problems here is that the deterrent value of the restrictive covenant is lost without other franchisees.

Here, there are hundreds of other franchisees. There is another franchisee in the same phone book as Mr. Baradar. There is another franchisee who has employees, frankly, that Mr. Baradar was unhappy about when the fellow came and tried to take Mr. Baradar's employees. That is how close they are.

There are people going back and forth between these two places, and we've got nine people interested in franchises in that area. I guess we have eight now because Mr. Baracar told them, as we sworn in our statements, that we are a bunch of liars, but we've still got eight others.

In the International Bartending Institute case, Your Honor, which we quote, Judge Gallagher in Florida said the other franchisees have indicated that they are watching this case closely to see if they should join Ms. Baird --that is the franchisee --in failing to make her payments and then continuing operations independent of defendant.

That is exactly the case here, Your Honor. That is what is happening here. They paraded a lot of franchisees in that case in front of the judge yelling fraud. The judge said that's not the issue.

Your Honor, Mr. Dady has paraded a lot of franchisees here, although they scoured the company and just dredged up eight guys, and they all yell fraud, but, Your Honor, that's another issue.

As Judge Niemeyer recognized and Judge Harvey recognized in Payne, that's not presented here, but they are waiting to see what is going to happen. There will be another 50 people if this non-compete isn't enforced who are going to come in and yell fraud.

We stand on the Maryland law concerning fraud in the inducement, which is the general proposition. I think Judge Niemeyer's decision in the Quality case says it as well as it can possibly be said.

There is also an incredible staleness to these claims and the ATL statute of limitations of one year is clearly violated. There is no question that these people cannot bring these claims here or in arbitration, where they have asserted them. We will deal with that in the arbitration. Your Honor, but clearly they are barred.

Your Honor, the next point is with respect to public policy, again, he has manifold opportunities to go elsewhere.

I would like to take a look at my notes, Your Honor, to see if there is anything else I would like to add before Mr. Outland speaks. If the Court will bear with me for one second, please?

THE COURT: Certainly.

MR. HILLMAN: Your Honor, I would like to close with two points. First of all, as to the bond, I am prepared to address the amount of bond. I don't want to get ahead of myself, Your Honor.

I certainly don't want to assume that we are going to reach that issue, but if the Court would like to hear that now, we have substantial argument on the bond issue.

THE COURT: I was going to ask you, so go ahead.

MR. HILLMAN: All right, I will respond to that.

Your Honor, I would cite to Your Honor several cases. First of all, with regard to Jiffy Lube, Mr. Dady is absolutely correct that the bond was set at one million dollars. The judge in that case noted that the franchisee paid $500,000 for the franchise. Mr. Baradar paid $25,000. I am going to ask Mr. Outland to do the math on that, but I believe that that is 1/20th.

On that basis, if it is 1/20th cash down, and that is what they are talking about in Jiffy Lube, we are talking about a $50,000 bond. This is consistent, Your Honor, with several cases decided on non-compete bonds recently.

I cite Your Honor Curtis versus Youngblade, 878 F.Supp. 1224, where a United States District Court in Iowa, a salesman had a $250,000 a year job and the Court said well, we are going to place a bond pretty close to that, so the bond was 200,000.

Here Mr. Baradar says that he is making between 13 and $20,000. Now under the analysis of the Curtis case, he should have 4/5ths of that as the bond. We will call it 20. Four-fifths of that would be 16,000.

Your Honor, in the Equipment & Systems versus the Zevetchin case, 864 F.Supp. 253, Massachusetts, a federal court there, several former employees had left the company and they stole all the trade secrets and competed. The company was facing ruin and the Court said the non-compete is enforced, $50,000 bond. It was only one person doing this.

Another decision in the O'Rourke case at 920 F Supp. 1405, also a federal court case in Iowa --I guess they have a lot of crazy people in Iowa. Mr. Dady lives out there. He can tell me about that.

But the employee violated the covenant, took the trade secrets, set up a whole new business, was driving the other company into the ground, $100,000 bond, and he was making a lot more money when he had been an employee.

So, Your Honor, we suggested in our brief, Mr. Howell actually has stated in his affidavit and we put in our brief, that he had sold the center for $300,000 when he was making a hundred thousand dollars off it when he had been a franchisee, and he is very experienced in this area. Using that as a guideline, the amount of the bond would be no more than 60,000.

We are certainly prepared to put up whatever bond Your Honor believes is appropriate, but we think the neighborhood of between 20 and 60 is certainly appropriate under all the authorities and under Mr. Baradar's statement that he is just not doing real well, so how much can this business be worth?

The last statement is, Your Honor, in the Jiffy Lube case the Court said one can view a franchise agreement in part as a conveyance of the franchisor's good will to the franchisee for the length of the franchise. When the franchise terminates, the good will is metaphysically reconveyed to the franchisor. A restrictive covenant reasonably crafted is necessary to protect the good will after that reconveyance.

Jiffy Lube not only has a valid interest in protecting its good will that has been developed by having its franchisees do business, but it also has an interest in being able to place a new franchisee at or near the same location where this good will has been created.

A reasonably crafted restrictive covenant is a legally acceptable means of protecting those interests.

Finally, to the extent that the defendant suffers significant and perhaps irreparable damage in the granting of the preliminary injunction, this is a predictable consequence of their willful breach of contract and misconduct. As such, it is not the type of harm from which we seek to protect a defendant.

While the Court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interest, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled.

Your Honor, the post-term covenants are the only protection that ATL or any other franchisor has to effect that protection. I would like Mr. Outland to make a few remarks, if it pleases the Court.

THE COURT: All right.

MR. HILLMAN: Thank you, Your Honor.

MR. OUTLAND: If it please the Court, Your Honor, this is Grover Outland speaking. I note that Mr. Baradar's declaration is not accompanied by any contemporaneous writings at the time supporting his averments. With the ten affidavits we have just supplied, there are numerous exhibit, as many as eight exhibits of contemporaneous attachments or contemporaneous writings attached as one.

Specifically responding to something Mr. Dady said, that there was no site assistance, the Waters affidavit avers that he traveled to Oregon twice to assist Mr. Baradar. Several sites were identified. The Tualatin site was agreeable to everyone. That site actually went to lease.

I worked on the lease on that site, providing assistance from ATL headquarters in assisting Mr. Baradar and his other counsel in Oregon. My own affidavit attests to the substantial assistance that I gave Mr. Baradar and his attorney on the Lake Oswego site that is the subject of this litigation.

In fact, due to recent developments which are covered I believe in Exhibit 4 to my affidavit, the sublessor, Mr. Baradar's sublessor has abandoned the premises at that property, and he would have no legal rights whatsoever in the property if I had not insisted on the master landlord's consent letter. This sets up by way of attornment and non-disturbance certain rights that he has in terms of now being able to move forward and possibly continuing to occupy the premises.

Mr. Howell's affidavit very clearly lays out protectable interests. He speaks to nine different innovations, new programs and services that have been added over the years, a principal one of which, ATL MotorMax, the engine replacement line, Mr. Baradar enthusiastically embraced in September of 1996.

This is the type of heavy use, heavier service where customers will travel more than that ten miles where they have had a positive experience. Mr. Baradar in his declaration states that he gave quality service and he knows that these customers are coming back.

Susan Waters' affidavit and Mr. Howell's affidavit also speak to the fact that with respect to advertising assistance that Mr. Dady just complained about, that as a matter of fact, Mr. Baradar stopped making advertising contributions in September, 1995, after only two months of operation.

Furthermore, on his initial advertising fee, which is $6,000, he only paid $1,000. So I think we have to look at which party breached with respect to its obligations, and that party is clearly Mr. Baradar.

Finally, Your Honor, in conclusion, in wrapping up the arguments, the insightful arguments that Mr. Hillman has made on the law, I would like to return to Mr. Dady's analogy.

He is right. There is an historic building here. There is a wrecking ball. ATL International and its system is the historic building and Mr. Baradar, if he continues to operate in violation of the post-term covenant not to compete,

that will be the wrecking ball.

Thank you. Your Honor.

THE COURT: All right. Anybody on the plantiff's side want to say anything? On the defendant's side. Mr. Baradar's side? Hello. Hello.

MR. DADY: Michael Dady here. Judge.

THE COURT: Mr. Dady, anything you want to say in response?

MR. DADY: Yeah, very briefly. Thank you.

First of all, I would like to take challenges from Mr. Hillman and others, and the most obvious example, let me start by saying that franchisor attorneys race in contest with each other who can put the most in there with respect to shortening statutes of limitations, disclaiming applicable statutes and everything else in terms of their drafting competition.

Nevertheless, since the question was are there franchise systems out there that do not have in the formal agreement they draft non-competes, the answer is yes, there are lots of them. The most obvious is the automotive franchise. It is extremely --I am not aware of any. I have just been in that industry this week. That is why it immediately comes to mind.

But post-term non-competes are commonly not enforced and there are industries where they do not exist at all, even in the writing drafted by the franchisor. Automotive franchises would be the most obvious example.

With respect to Mr. Outland's point, you bet they helped us to draft the lease when they were signing us up with the franchise and what my client is talking about, Judge, in his affidavit, is a violation under the Franchise Statute.

So the commitment that they made to provide us with their expertise claimed at the time at selecting a site that would generate dramatic revenue and once we signed up, they left us high and dry to find a site. So Mr. Baradar did that, and the record is very clear on that.

THE COURT: How much is your client making out of this business?

MR. DADY: What's that?

THE COURT: How much is your client making out of this business?

MR. DADY: The amount that he was making as a franchisee, Mr. Hillman, when he said he has been able to eke out like 20 grand, whereas when he signed up, he was told he would make 90 or a hundred grand, that is his best information.

The situation now is, after he has had an opportunity for several days to operate private, is if it is the case that the business that he generated, and our affidavits say that it is. Judge, he generated the business out there, he generated the good will, nothing that ATL did, he reasonably believes that his business will remain the same, if not improve without ATL.

If you take his, and he is generating 400,000 plus a year in revenues, if you take seven percent of 400,000, that is about 30 grand. Add that to the 20, that is 50 grand. It is common --

You know, the New York Stock Exchange right now, the earning multiple is 20. That isn't the case with small businesses, but taking cash flow at a multiple of six to eight is common in selling small businesses.

So if you take six times the cash flow of 50 grand, that is the $300,000 that Mr. Baradar estimates is the value of his business. It appears to me, based on my review of the information, that that is low. If indeed he could

continue to operate as an independent and build on his own good will, the value of that business will be significantly higher than $300,000.

By the way, with respect to the value of the business, I think Mr. Human misspoke when he said my client was able to purchase this business for $25,000. The e was an up-front fee I believe Judge, of $25,000, but my client had to buy equipment, hire employees and so forth, so he had 150 to $200,000 invested in that business extremely fast. So the business is something different than what you pay for your initial franchise fee. It was dramatically higher.

With respect to the Jiffy Lube case, the New Jersey case that the franchisor relies on, Your Honor, the quote that you were given is at page 693. What that says is this:

Defendants, that is the franchisee, have been caught with their hands in the till --indeed, they've admitted to putting their hands there. Were plaintiffs not allowed to terminate an errant franchisee, franchisees would get the message that they could defraud with impunity.

In other words, in that situation the franchisee was stealing from the franchisor, admitted to it. The franchisor continued to use the mark.

In granting the injunctive relief, the Court said at page 692, most importantly for this case, on the topic of irreparable harm, the trademark infringement amounts to irreparable injury as a matter of law.

It is undisputed in this case. There is no such trademark infringement. All of the signs have been taken down, the marks have not been used, the telephone number is not being used.

Finally, in that case the Court said while admitting the dramatic damage that would occur to the franchisee in that Jiffy Lube case, "Equitable relief against forfeiture should not be granted to a party whose own knowing fraudulent conduct is itself the cause of the forfeiture."

That is not the case here. There has been no fraud here on the part of the franchisee. The fraud was in the misrepresentations, the violations of the Franchise Act that this franchisor made in signing up this franchise.

When you look at all the factors, it is clear to say that there are dramatic difference of opinion on what the facts will ultimately show. Under this situation, Judge, the most equitable thing to do in balancing those four factors, it seems to us, is to deny the injunction. If indeed the franchisor can prove its claims, it has an adequate remedy at law.

Thank you very much.

MR. HILLMAN: Your Honor, may I have two minutes?

THE COURT: Yes.

MR. HILLMAN: This is Allan Hillman, Your Honor.

MR. DADY has made much of the fact that Mr. Baradar has been an honorable guy and took down all the signs and so forth, Your Honor, there is a problem here.

Mr. Baradar not only was totally dishonorable but the only reason those signs came down, that the trademark was ceased being used is because we filed the lawsuit and got a TRO. We went --

THE COURT: You did not get a TRO.

MR. HILLMAN: Excuse me. I beg your pardon. We got an agreement to every part of the TRO from Mr. Garner, all right? No TRO was entered, but he agreed to every provision in the TRO, except the restrictive covenant. I will be glad to get Mr. Garner on the phone if you would like from New Jersey and he will, I am sure, state that.

That is why, Your Honor, we are only debating the non-compete because the evidence showed that after the termination, for ten days approximately, until we had to file suit, Mr. Baradar continued to use the ATL mark, answer the phone, so forth and so on, all the things that were violated.

We went in for a TRO. Mr. Garner very honorably said, Your Honor, we agree to everything in this TRO except we do not agree to the non-compete, the post-term non-compete. That is why, we are here, Your Honor.

I am not saying that a TRO was actually entered. I do not mean to say that. I am saying, however, that the only reason that Mr. Baradar took down everything was because we filed suit. Then his counsel, acting very responsibly, I might say, agreed to those terms.

The next thing is that Mr. Baradar, the Court doesn't have to resolve the issue of whether Mr. Baradar had his hand in the till or not, although, we believe it is pretty clear that he did.

He didn't pay tons of royalty fees and advertising fees from a most the inception of his contract, as Mr. Outland pointed out, which was an independent basis for the termination and a substantial violation. He certainly had his hands in the till in that respect because he had our money and still does.

Obviously we don't agree that he was told he would make $90,000 or ten million or whatever. That is a dispute the Court needs to resolve.

The last two points I would make, Your Honor, are small businesses, and Mr. Howell will speak to that if Your Honor wishes because he is very experienced in this, don't go for six to eight times earnings. They go for about two times earning.

Mr. Baradar claims he is making 50,000 now. We don't have any evidence of that, Your Honor, but we still believe that even that would only be a hundred thousand dollar bond. We certainly don't believe that that would be --that would be acceptable, but certainly anything more would be rather unusual.

Finally, Your Honor, although you don't have to resolve all the disputes the parties have now, Judge Harvey made clear to this Court in two cases, the Phillips case, which I had the pleasure of being plaintiff's counsel 21 years ago, and the Cable TV case, that merely because the Court has heard the motion on affidavits, it is not foreclosed from evaluating the sworn statements in light of the overall record, and it is well-established that the Court may make findings of disputed facts on a record such as this one, that one being a record on affidavits, exhibits and memoranda.

So we believe Your Honor has the full discretion to enter this injunction, and we believe that it is a very reasonable injunction. It is the norm, if not less than the norm in this industry, the automotive aftercare industry, and we ask Your Honor to enter it.

Mr. Outland has one comment.

MR. OUTLAND: Your Honor, Grover Outland.

We don't want to concede that the trademark infringement issue at this point has been totally resolved. There is this telephone number --4551 are the last four numbers --that has been advertised under the ATL mark. It is in the current phone book for the Portland, Vancouver areas that runs all the way through the fall of 1998, advertised as All Tune and Lube. Furthermore, this phone number is also in our offering circular.

So his attempt to try to retain that phone number and trade on the good will is also a violation of the Lanham Act.

MR. HILLMAN: Your Honor, the preliminary injunction that we submitted, the proposed order would cover that issue, as well as the other.

Thank you very much for your time. Your Honor.

THE COURT: One thing I am still not clear on - in terms of the net revenues from the business, does that include from the ancillary activities for which I don't know whether you call them royalties or whatever, the seven percent is not paid, does it include the U-haul business and everything else?

MR. DADY: Mo, maybe you can answer that for the Judge. It does include the tires and batteries and so forth. I am not sure if that 400,000 plus number would include any revenues generated from your U-haul business. Does it, Mo?

MR. BARADAR: Yes it does. It includes that.

THE COURT: That is Mr. Baradar?

Hello? Are people still there?

MR. DADY: Yes.

MR. HILLMAN: Yes, Your Honor.

THE COURT: The $20,000 is the total net revenue?

MR. DADY: We are confusing our terms here, Judge. The revenue of the business is between 400 and 450,000 annualized.

THE COURT: Right.

MR. DADY: You asked earlier about what he was making.

THE COURT: Yeah, that is what I mean.

MR. DADY: Mr. Hillman said that that number was in the $20,000 range --

THE COURT: Right.

MR. DADY: --when he was operating as an ATL franchisee. We've acknowledged that as being in the ball park.

THE COURT: Okay.

MR. DADY: That $20,000 net --

THE COURT: Net profit.

MR. DADY: --annual number to this individual.

THE COURT: And that includes all the ancillary activities.

MR. DADY: That is my understanding. I'm not sure if you could hear Mo very well, Judge, but that is what he said.

THE COURT: That is what I thought he said.

All right. Well, I am prepared to rule.

Under Fourth Circuit law it is clear the factors that I am to apply: first, the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; two, the likelihood of harm to the defendant if the requested relief is granted; three, the likelihood that the plaintiff will succeed on the merits; and four, the public interest.

I note that this is not the conventional language of adequate remedy at law, although clearly, if one clearly had a clear monetary remedy, that would factor into the first factor that I do consider.

I am going to grant the injunction. I have no doubt that the plaintiff would suffer irreparable harm if I were to deny the preliminary injunction. As cases say, it is the franchise system itself that is at issue.

I do not take it as a parade of horribles argument at all. I think it is very realistic to expect that if a franchisee simply were to stop paying fees or stop other things that were due and then, after having operated under the franchise name for several years, were simply to then say okay, I'm breaking away. I'll stop using the various things that I've received as a franchisee and will go out on my own, that that would be a clear signal that other franchisees could do the same.

Clearly, there is before me a record that there are at least some unhappy franchisees, indeed represented by plaintiff's counsel in this case. So it is not simply a question of what is going on out there in the undefined world. There is a world that is somewhat defined by the record, and I have little doubt that my failure to grant the injunction here might unravel the franchise system.

I might say Mr. Howell's affidavit I found very well done. This is not simply a big nameless franchisor against somebody who is, granted, a small businessman. This is a small businessman who built up his business who stands to lose it if the franchise unravels. So I have little doubt that the plaintiff would suffer irreparable harm if the preliminary injunction is denied.

The idea that the monetary remedy against Mr. Baradar would be sufficient, frankly, is laughable. That is not what the harm is, and I do not accept that argument at all.

Of course, Mr. Baradar is going to suffer harm because I am granting the injunction. He is not going to be able to do this kind of business within ten miles of where he is now doing it for two years, but that is exactly what he contracted for. I am very sorry, but you enter into a contract, if the contract is reasonable, you are going to have to live with its terms.

Here, there is little doubt in my mind that the ten miles is reasonable and that the two years is reasonable. Whether or not it should be a couple more miles here, a couple more miles there, one could argue in a specific context; but on this record at least, there is no basis for me to infer that either the duration or the distance is unreasonable and indeed, I affirmatively find that they are reasonable on this record.

All of this obviously is on a record that has been developed early; it will be further developed as the litigation proceeds, but I've got to make the decision on the front end.

The likelihood that the plaintiff will succeed on the merits, that is something that clearly there are going to be factual disputes down the line. There are going to be legal issues. There are going to be choice of law issues.

There are going to be issues concerning the effect of --whether you call them integration clauses or disclaimer clauses or whatever, there are going to be issues there and there are going to be allegations made by the defendant that he was misled; whether it be in violation of common law fraud rules or franchise statutes. I am perfectly aware that those are going to be real issues in this case.

However, on the issue on which the plaintiff will bear the burden, which is essentially the reasonableness of the covenant, I have little doubt on this record that the plaintiff will prevail.

On the other issues, of course, it is the defendant who is going to bear the burden of proof. I cannot say from this record that it is likely that he is going to prevail on those.

I think that there are going to be severe serious legal obstacles, and there are some things in the record here

which I am not going to get into credibility, but there are issues -- let me just say I can't, there is no reason for me to take everything the defendant says at face value.

They are issues which are not directly related to the fraud in the in judgement but, for example, the nature of how good the business was when he took it over, where he is now, which, you know, which obviously on this record, I am not. I have reasons to question credibility.

I am not saying that he is not telling the truth, but I am saying that since he has got the burden, there are reasons for me to realize that credibility ultimately will be an issue.

In that regard I also take into account the question of the length of time, the alleged staleness of the claims now being asserted.

I am not saying that Mr. Baradar is not telling the truth. I have no idea. All I am saying is that it is important to recognize that his credibility will be important, that he bears the burden of proof, and on this record there obviously are going to be disputes about credibility.

The public interest I don't really think is an independent factor in this case. Of course, it is unfortunate that Mr. Baradar will not be able to stay in this line of business at that location or within ten miles of it, but there are other things that he can do. He can go in this business outside that geographic area. He can go into another business.

But in any event, the fact of the matter is that the covenant is a reasonable one, and I think that is the controlling public interest factor.

So that's my ruling. The question is how much bond to set? I will set a bond of $60,000.

Whichever way one looks at it, either by a multiple of --it wouldn't be a multiple. It would be the reverse of a multiple --of the Jiffy Lube case, assuming that it was a $500,000 franchise fee there, working backwards one could get to something, whatever it was, the 30,000 figure that Mr. Hilman mentioned, some figure, 50,000 I think.

Here, what I am really using is a, trying to value Mr. Baradar's business. If he has been operating historically at $20,000 profit basically, taking three times that is based upon what Mr. Howell said in his affidavit about what he could sell the business for, maybe that's high to apply that multiple here, maybe it is low, but it is reasonable. So it is going to be a $60,000 bond.

Are there any specific --I don't have, of all the things I reviewed, and I have reviewed all of your papers, which I commend both sides for, they were very well done, as well as I commend both sides for the quality of the oral arguments, I do not have the preliminary injunction itself in front of me.

MR. HILLMAN: Your Honor, Allan Hillman. I will have it hand-delivered to Your Honor immediately. We had given it to Judge Young subsequent to the TRO hearing. I think he said he was going to send it along with the file.

THE COURT: It may be in the court file or it may be here somewhere. My law clerk is going to go look for it.

The reason I am raising the issue, is there anything in there specifically --obviously the concept or the idea of the preliminary injunction is objectionable to Mr. Baradar and his counsel in any event. Is there any specific language that is problematic?

MR. HILLMAN: Your Honor, Allan Hillman.

Before Mr. Dady has an opportunity to respond, I just say one thing, which is that the preliminary injunction order is precisely the same, except that it accommodates the fact that it is a preliminary, exactly the same as a TRO, the terms of which were agreed to by Mr. Dady's partner before Judge Young, excepting --as Your Honor knows, he did not agree to the non-compete.

MR. DADY: Judge, speaking to the order issue, we believe --

THE COURT: Is this Mr. Dady?

MR. DADY: This is Mr. Dady.

THE COURT: Yes.

MR. DADY: The proposed temporary restraining order is moot except as to the discussion here today with respect to staying in business at that location. So we believe that the order should be limited to saying he is enjoined from operating at that location.

With respect to the telephone number, he bought that telephone number when he bought this business. It was an independent Lake Oswego Auto Repair that he bought, and that number was the number of that business. So we think he should be able to use that number for whatever other purpose he wants to use it.

I think we do have a dispute, as Mr. Outland has identified, with respect to that telephone number. It is not something that was given to him by ATL or that was acquired after he became an ATL franchisee. He acquired that number before he became an ATL franchisee.

So we think he should be able to keep that number and the Court's order should be limited to saying that he may not operate an ATL franchise or anything similar to it at that location.

THE COURT: Mr. Hillman, we can get into the telephone number, but as a matter of --I was going to say as a matter of the Lanham Act, but that is essentially where I don't want to go, I guess.

But as a matter of practical sense, if the telephone number is being used in some line of work other than this, is there any real harm?

MR. HILLMAN: Your Honor, Mr. Outland will address this.

MR. OUTLAND: Your Honor, but for the fact that it has been advertised in the telephone book running through 1998 under our service mark, and but for the fact also, Your Honor, that it is in our registered offering circular, I certainly could understand what Mr. Dady is trying to assert there.

I mean there is a very real danger that if Mr. Baradar operates anything under this number, the prospective franchisees calling in will receive the same kind of information that I understand caused one of them to bolt from any further consideration of the franchise.

The business there was defunct, based on the best information that we have. There did exist a phone number there. I can attest to that because of my affidavit.

I have said that I used to call that phone number, but it certainly was not a business that, you know, that had any kind of viability to it. There were just empty shop bays. I believe that to the extent Mr. Baradar purchased anything, it was simply a few items of equipment.

People will call. People will keep calling that number. In terms of Mr. Howell's affidavit, in excess of 50 percent of customers return. Existing customers familiar with the ATL mark and that center will keep calling that number.

THE COURT: Okay.

MR. HILLMAN: If he opens up more than ten miles away, Your Honor, and he keeps this phone number, then the same problem kind of problems exists with respect to trademark infringement.

THE COURT: Well, I think, as a practical matter, I don't think that prospective customers or prospective new franchisees but particularly old customers, prospective customers, it makes any sense to having them call a

Case 7:07-cv-06404-CLB    Document 6-20    Filed 07/19/2007    Page 19 of 21

CCH Internet Research NetWork                                                    Page 19 of 21

telephone number of a franch see who has just had a covenant not to compete entered against him  so I am
going to also enjoin Mr. Barabar from using that telephone number

On the other issues  they have become moot  have they not  so there is no reason to enter the injunction?

MR. HILLMAN: Well Your Honor  I am a little bit concerned here  Mr. Garner made clear that they agreed to
the terms of the TRO and made clear that that was no longer at issue

You know  we filed all our papers originally discussing the whole issue of the identification. There are a number
of things that are required for an ex-franchisee to do in terms of  identifying  in terms of protecting the information
of the franchisor and so forth. They were all agreed to

There is nothing in this order  and if Your Honor has the TRO in front of Your Honor  as I say  it is the same
order.

MR. OUTLAND: Your Honor, this is Grover Outland for just a second.

Specifically under that franchise agreement, he is supposed to assign all telephone numbers used in the
business. This number has been extensively advertised under the ATL mark, regardless of its origin.

So we should go ahead and receive an assignment. He should be ordered to assign that over to us.

MR. HILLMAN: They are not objecting to this, so we need this order entered. The last thing we need is there to
be a dispute later about there not being an order entered on the trademark and all of sudden franchisees around
the country hearing that there was some sort of preliminary injunction issued, but the Court only issued the order
on the non-compete and didn't issue anything else.

Your Honor, this case is the case that is going to be known around the country as the ATL case. We need the
preliminary injunction order, that they have not even objected to the form, except for the non-compete, we need
that entered.

If they object to any of those terms, they should say so now. We should have been arguing that before.

THE COURT: Okay.

MR. HILLMAN: I shouldn't have been led --

THE COURT: Okay. Wait, wait, wait.

MR. HILLMAN: I didn't think it was an issue before this Court.

THE COURT: Wait a minute.

MR. DADY: My name is Michael Dady, not Michael Garner. I think my position has been very clear, and it is
also Michael Garner's position as spelled out in the introduction in defendant's memorandum of law in opposition
to the motion.

In the very first paragraph he said we wish to make clear that we've complied with the requirements of the
franchise agreement to remove signs and so forth, such that the motion is now moot. The defendant opposes only
the portion of the motion that seeks to enforce the covenant not to compete.

That is Michael Garner's position and that's Michael Dady's position. The injunction should relate only to the
open issue, which is the issue related to his ability to operate the auto care facility at that specific location.

THE COURT: Okay.

MR. HILLMAN: Your Honor --

THE COURT: Mr. Hillman.

MR. HILLMAN: --I respectfully disagree with that.

THE COURT: Mr. Hillman, what I want you to do is to draft an order which essentially may be doing my work a little bit, but I don't have the order.

Just redo it to say that in light of Mr. Baradar's agreement, voluntary agreement that his counsel have now represented has been accomplished, that whatever it is that he has done is done. Those issues are now moot. So it is, therefore, not necessary for the Court to enjoin him to do this, this, and this.

Then have the injunction run only to what is remaining, which I gather from what you are telling me, I don't have it in front of me, is enforcement of the covenant not to compete and the telephone number.

What I am suggesting is if you are concerned about the form of the order, draft the order in such a way that it states in the order why it is that I am not granting the preliminary injunction as to the other things as to which there has been an agreement, and that should protect your interest; should it not?

MR. HILLMAN: Thank you, Your Honor.

MR. DADY: Judge, in that regard, I suggest to Mr. Hillman and the Court, he could just lift the language right out of the first paragraph of our brief.

THE COURT: That is what I am suggesting. Just take the language out of their brief. Everything that was agreed to, just put that in, what the injunction is not addressing, and then put in what it is. Send that over to Mr. Dady. Fax it out for approval by form.

Can you get it to me tomorrow sometime?

MR. HILLMAN: Absolutely, Your Honor. I will get it to you in the morning.

THE COURT: If you can --

MR. HILLMAN: Can the bond be posted by 5 p.m. tomorrow, Your Honor?

THE COURT: Five o'clock tomorrow. Okay?

MR. DADY: Judge, can I just intrude for one more minute here with respect to the issue of the bond?

THE COURT: Yes, Mr. Dady.

MR. DADY: I understand the Court to say that the reason you were setting the bond that low is because you had assumed that in the Jiffy Lube case, that the franchisee in that case paid a million dollars for the franchise and here we paid $25,000 and indeed, that was Mr. Hillman's argument.

Not to circle around the barn a second time, but just to quote from that case at page 693, Judge, the reason the Court in that case set a million dollar bond is because it says, "This amount is determined on the basis of the $500,000 paid by the defendants to purchase this franchise and on the basis of the considerable losses which will be incurred by the shutting down of this business."

I am sure Mr. Hillman and Mr. Outland will concede Jiffy Lube does not charge its franchisee the $500,000 fee to get in the business. Rather the Court looks at what is the total investment in the business, plus what's the

losses in setting that million dollar bond.

In this case the total investment was approximately $150,000, and I don't think there is any dispute about that.

But I just want to clear up that factual basis. I don't know that it makes any difference to the Court in the amount of the bond, but I just thought to be clear on our position. It appears it wasn't as clear as I intended to be, so forgive me.

THE COURT: I appreciate that, Mr. Dady. In fact, I shouldn't have referred to it at all because I really, my real basis for coming up with $60,000 was the $20,000 profit figure, historic profit figure with a multiple of three, which seems to me to be reasonable for the value of the business.

So I did refer to it. I referred to the million. I should have referred to 500,000, but I don't know what Jiffy Lube -- I don't want to get into a debate about that. I should never have referred to it.

My method of analysis really was taking a look at what has been represented to me by Mr. Baradar himself as to what his annual profit has been and put a multiple of three on it. Okay?

Thank you very much.

MR. HILLMAN: Thank you, Your Honor.

THE COURT: Thank you again for the quality of your arguments.

(The proceedings concluded.)

© 2006, CCH INCORPORATED. All Rights Reserved. A WoltersKluwer Company